UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AL HIRSCHFELD FOUNDATION,<br><br>         Plaintiff,<br><br>   - against -<br><br>THE MARGO FEIDEN GALLERY LTD. and<br>MARGO FEIDEN,"<br><br>         Defendants. | Case No. 16-CV-4135 (PAE) |

### DEFENDANTS' LOCAL RULE 56.1(B)(3) RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, defendants Margo Feiden ("Feiden") and the Margo Feiden Galleries (the "Gallery") (together, the "Feiden Defendants") respectfully submit this response to the Statement of Undisputed Material Facts of Plaintiff the Al Hirschfeld Foundation ("Plaintiff"), with additional undisputed material facts requiring denial of Plaintiff's motion for summary judgment:

### Response to Plaintiff's 56.1 Statement

1.    Pursuant to the terms of his Last Will and Testament, celebrated artist Al Hirschfeld left all of his drawings and works of art that were owned by him at the time of his death, to the extent not bequeathed to certain individuals, to AHF. Declaration of Brittany L. Kaplan dated April 26, 2017 ("Kaplan Decl."), Ex. 1; Declaration of Lynn Surry, sworn to April 26, 2017 ("Surry Decl.") at ¶¶ 2-3.

     **Response**: Disputed because Plaintiff only produced an excerpt of the Last Will and Testament of Al Hirschfeld despite demand for production by the Gallery, and the excerpt submitted here does not support the assertion.  It states that Al Hirschfeld left Plaintiff the sum of one hundred thousand dollars and all of his "right, title, and interest in and to the Engel Company, a New York General Partnership."

2.    Hirschfeld also transferred to AHF all right, title, and interest in and to any and all copyrights in such works. Kaplan Decl., Ex. 1.

**Response**: Disputed as Plaintiff did not produce the Last Will and Testament of Al Hirschfeld despite demand for production by the Gallery, and as noted above, the excerpt provided as an exhibit to the declaration of Brittney Kaplan, Esq. does not support the asserted fact.

3.    In September of 2000, Hirschfeld entered into a settlement agreement with defendants Margo Feiden ("Feiden") and The Margo Feiden Galleries Ltd. ("MFG," with Feiden, "Defendants") to resolve a lawsuit filed by Hirschfeld against Defendants earlier that year. Id., Ex. 2 (the "Settlement Agreement"); Surry Decl., ¶ 4.

**Response**:  Undisputed.

4.    Hirschfeld and later, AHF, continued to work with Defendants following execution of the Settlement Agreement. However, by June of 2016, the relationship had become untenable as a result of Defendants' unlawful conduct, exacerbated by Feiden's erratic, adversarial, and unpredictable behavior, both of which conflict with their obligations under the Settlement Agreement and have injured AHF. Declaration of David Leopold, sworn to April 26, 2017 ("Leopold Decl.") at ¶¶ 2-3; Surry Decl., ¶¶ 5-6.

**Response**:  Undisputed only insofar as Hirschfeld and Plaintiff continued to work with Defendants following execution of the Settlement Agreement.  Otherwise disputed, as argumentative, conclusory, and not factual concerning "unlawful conduct," "erratic, adversarial, and unpredictable behavior," "conflict with their obligations under the Settlement Agreement," and "have injured AHF."  Further disputed as to timing since the relationship had begun to sour years before.  Rao Decl. Exs..

5.    The Settlement Agreement provides that AHF may terminate it for cause if Defendants materially breach any provisions of, inter alia, paragraphs 5 or 6 and do not cure within 30 days following notice of termination for cause. Kaplan Decl., Ex. 2 at p. 25, ¶ 11(b)(i).  AHF may also terminate for cause if Defendants materially breach any provisions of 7, 9, or 15.

**Response**: Disputed.  Paragraph 11 of the Settlement Agreement allows termination for material breach, upon 90 day advance written notice of termination specifying

the cause, which cause remains uncured for a 30 day period thereafter, for any termination due to material breach of paragraphs 5, 6, 7, 9, or 15. Kaplan Decl., Ex. 2 at p. 25, ¶ 11(b)(i).

6.      Determining that Defendants had breached multiple provisions of paragraphs 5 and 6 of the Settlement Agreement, AHF served a notice of termination on Defendants dated June 6, 2016. Kaplan Decl., Ex. 3.

**Response**: Disputed as argumentative regarding "determining" that any alleged breaches had occurred or justified termination. Undisputed as to the fact that Plaintiff served a document styled as a notice of termination on Feiden personally and later on Feiden's prior counsel Chris Cardillo, Esq.

7.      Defendants received notice on June 7, 2016. Kaplan Decl., Ex. 4 at ¶¶ 1-2 and Ex. 5 at ¶¶ 1-2; Dkt. 68, ¶ 4.

**Response**: Undisputed as to service on Feiden, but disputed as to service on the Gallery's counsel, which occurred several days later.

8.      Pursuant to paragraph 6(a) of the Settlement Agreement, the relationship between AHF and Defendants must be construed in accordance with the New York Arts and Cultural Affairs Law. Kaplan Decl., Ex. 2 at p. 14, ¶ 6(a).

**Response**: Disputed as to provisions of the Settlement Agreement that provide otherwise. E.g., Kaplan Decl., Ex. 2 ¶ 6(c).

9.      Under paragraph 6(h)(i) of the Agreement, AHF retains "sole proprietorship" of copyright rights in all of Hirschfeld's works. Kaplan Decl., Ex. 2 at p. 16, ¶ 6(h)(i).

**Response**: Disputed because Settlement Agreement modifies this proprietorship by assigning or granting certain rights to the Feiden Defendants. Kaplan Decl., Ex. 2 at p. 16, ¶ 6(h)(i), stating that the "sole proprietorship" is "subject to Feiden's right . . . ."

10.     The Settlement Agreement permits Defendants to reproduce Hirschfeld's artwork solely in connection with (a) limited editions approved by AHF, and (b) Defendants' promotion, advertising and marketing in furtherance of Defendants' rights under the Settlement Agreement. *Id.*

**Response**: Disputed as to "solely in connection with," as paragraph 6(h)(i) of the Settlement Agreement does not use the word "solely" and other provisions allow for reproduction. See, Kaplan Decl., Ex. 2 at p. 3, ¶ 2.a.ii (giving Defendants exclusive rights over the licensing "of all reproductions"); p. 5 2.d.i and ii (concerning Defendant's rights to "license reproductions" on "commodities or goods for commercial sale." Further disputed as to "approved by AHF" as the Settlement Agreement does not limit the reproduction rights to limited editions. Undisputed only insofar as the Settlement Agreement permits the stated types of reproductions, among others.

11. While the Settlement Agreement authorizes Defendants to produce a certain number of limited-edition prints of Hirschfeld's works each year, the prints (and their pricing) must be approved by AHF in writing. Kaplan Decl., Ex. 2 at pp. 8-9, ¶ 3(c)

**Response**: Disputed, as the cited provision conditions these approval rights by standards of reasonableness and good faith and includes exceptions for promotional and gift prints. Kaplan Decl., Ex. 2 at pp. 8-9, ¶ 3(c).

12. Limited edition prints, if approved, are to be limited to between 100 and 500 copies. *Id*.

**Response**: Disputed as to the scope of approval, and Plaintiff's mischaracterization of the number of permitted prints and the number restriction. The language in the Settlement Agreement is that "[a]s long as the number of prints . . . is within the range of one hundred and five hundred and fifty (550) prints, the exact number of prints within each such series shall be within Feiden's sole and absolute discretion." *Id.*

13. It is important that new editions of prints not compete with current editions of prints, as reflected in the Settlement Agreement in at least two places: Paragraph 3(d), which prohibits AHF from authorizing any new person or entity to restrike new editions of AHF authorized limited edition prints; and Paragraph 15(a)(vi), which consists of a representation and warranty that no party to the Settlement Agreement has authorized or will authorize any person or entity to restrike new editions of prints which were previously

authorized by AHF for limited edition prints. Id., Ex. 2, at pp. 9-10, ¶ 3(d) and p. 32, ¶ 15(a)(vi).

**Response**: Undisputed as to the cited language, but disputed as to Plaintiff's conclusory interpretation of these provisions as discussing "competing." Kaplan Decl. Ex. 2, at pp. 9-10, ¶ 3(d) and p. 32, ¶ 15(a)(vi).

14.     Each party to the Settlement Agreement acknowledged the materiality of the representation and warranty set forth in Paragraph 15(a)(vi). Id., Ex. 2, at p. 32, ¶ 15(b). Defendants admitted, however, that they have only reviewed select portions of the Settlement Agreement over the past several years. Id., Ex. 6 at 148:12-149:5.

**Response**:     Undisputed as to the language in Paragraph 15(a)(vi) of the Settlement Agreement. Disputed as to the characterization of Feiden's testimony, which does not appear in the referenced Exhibit 6 and is not material.

15.     Defendants acknowledge that, given their visual similarities, "giclee" reproductions compete with limited editions. Kaplan Decl., Ex. 6 at 59:19-60:30, 60:20-24, 70:25-71:12; 633:8-24; Ex. 7 at 145:6 – 146:2; Ex. 8 at 169:20-170:4; and Ex. 9.

**Response**:     Disputed, as none of the cited references discuss competition between giclee editions and limited editions as a general matter, or even at all. For example, Ex. 7 at 145:6 – 146:2 cites a general deposition discussion about photostatic and giclee reproductions, noting that ultimately both result in a reproduced image on paper. In one particular case, concerning the Annie Hall giclee, Feiden acknowledged that the owner of the limited edition might feel competition, and in that instance she and the Gallery ceased selling the giclee.

16.     Indeed, in selling giclee reproductions to Time Life, Feiden agreed to characterize the giclees as "lithographs." Kaplan Decl., Ex. 4 at ¶ 97; Ex. 5 at ¶ 97; Ex. 8 at 154:16-156:19; 158:4-6; Ex. 10; and Ex. 11.

**Response**: Undisputed

17. The giclees were ultimately advertised on Time Life's website as "lithographs." Kaplan Decl., Ex. 12. Feiden did not discuss this language with AHF, but did apparently discuss the language with her attorney. Kaplan Decl., Ex. 13.

**Response**: Disputed as to discussing the language with her attorney as to materiality and relevance and because the cited privilege log does not evidence whether she specifically discussed characterization as "lithograph" with an attorney.

18. Defendants also offered images of Carol Burnett for a giclee project for Time Life; the deal included allowing Time Life to use Al Hirschfeld artwork in order to advertise Time Life's sales. Kaplan Decl., Ex. 8 at 191:24-195:21.

**Response**: Undisputed as to the Carol Burnett images. Disputed as to the characterization "use Al Hirschfeld artwork" generally and "to advertise Time Life's sales," neither of which are evidenced by the cited testimony.

19. At deposition, Feiden initially claimed that the heavily redacted correspondence pertaining to the Time Life deal had to do only with "a small nonprofit organization that was honoring Carol Burnett." Id., Ex. 8 at 190:6-191:23, Ex. 14, and Ex. 15.

**Response**: Disputed as to the characterization of "claimed" and as to materiality and relevance. In the referenced testimony, Feiden stated she was not sure and did not know whether the correspondence pertained to the Time Life transaction or a different Carol Burnett transaction which occurred around the same time.

20. In addition to the Time Life giclees, Defendants have offered for sale giclee "posthumous editions" of at least six Hirschfeld works, including "Washington Square," "West Side Story," "The Golf Ball," "Laurel & Hardy, 'Long & Wide,'" "Artist and His Muse," and "Zabar's." Kaplan Decl., Ex. 4 at ¶ 122, Ex. 5 at ¶ 122, and Exs. 16-18; Leopold Decl. ¶ 4.

**Response**: Undisputed.

21. There is no record that these editions were authorized during Hirschfeld's lifetime. Leopold Decl. ¶ 5.

**Response**:  Disputed.  Plaintiff would be in possession of such records as they relate to Hirschfeld's authorizations.  Since Plaintiff has refused to produce those records there are now issues of disputed fact regarding what HIrschfeld authorized for editions

22.  AHF was not paid in connection with any of the six "posthumous editions," except for "The Golf Ball," with payments beginning in August 2005. Leopold Decl. ¶ 6.

**Response**: Undisputed, insofar as AHF did not exist during the time period when payments were made on certain editions, or where payment was made directly to Louise Hirschfeld.

23.  Nor did Defendants provide the contractually required artist proofs for any of the "posthumous editions," not even for "The Golf Ball." Leopold Decl. ¶ 7. Kaplan Decl., Ex. 2 at 4(a)(v).

**Response**:  Disputed insofar as there are conditions precedent to the provision of proofs which were not met.

24.  Unlike limited edition lithographs, "posthumous editions" offered for sale and sold by Defendants are print-on-demand; advertised as an "edition" but in fact are unlimited in number; and offered in a variety of sizes. Kaplan Decl., Ex.6 at 433:19-23, Ex. 7 at 119:13 – 23, Ex. 8 at 234:17-236:14; 237:7-12; 239:20-241:8, and Exs. 19-24.

**Response**:  Disputed as to unlimited in number, and the Feiden Defendants note that none of the cited materials evidence this fact and in fact they contradict it.  *See* e.g., Kaplan Decl., Ex. 8 at (p. 25 of the document) 238:9-239:13 (noting that Defendants paid for the posthumous editions up to a certain number and would not print more than that number).

25.  Defendants make giclees available in large, potentially unlimited amounts. *Id.*, Ex. 8 at 314:18-316:13. Defendants even make available giclees of works of which limited editions already exist. Id. at 111:17-25.

**Response**:  Disputed as to unlimited amounts, and further disputed as to giclees of works for which limited editions already exist.  Id. at 111:17-25.  In fact Defendants dispute that the giclees made were of works of which limited editions exist, since the giclees differ in their sizing, quality of paper, and have other material differences to the limited edition.

26.     Even where Defendants occasionally say that posthumous editions are limited and that they have allegedly paid AHF (or Hirschfeld) in connection with editions, they cannot in the present day confirm how big the edition is – or even will be – relying instead on "go[ing] back two decades and feel[ing] the zeitgeist of the moment." Kaplan Decl., Ex. 8 at 446:5-13.

**Response**:  Disputed as mischaracterizing deposition testimony. *See* Kaplan

Decl., Ex. 8 (p. 25 of the document) 238:9 -239:13.

27.     In some cases, Defendants do not know whether a print is a posthumous edition or a "non-edition" giclee, and cannot confirm whether it is numbered or whether AHF (or Hirschfeld) was paid for it. Kaplan Decl., Ex. 8 at 278:12-13, 297:22-298:19, Ex. 25, and Ex. 26.

**Response**:  Disputed as none of the cited materials support the factual assertion

and to Defendants knowledge nothing in the record supports this assertion.

28.     On MFG's website, Defendants state that posthumous editions are Estate Stamped and Embossed with the Seal of The Margo Feiden Galleries Ltd." Kaplan Decl., Ex. 4 at ¶ 173 and Ex. 5 at ¶ 173.

**Response**:  Disputed as to the present website, but undisputed that the website at

one point stated this.

29.     AHF learned in conjunction with this case that Defendants have been selling giclees since at least 2003. Kaplan Decl., Ex. 7 at 143:22 – 25, Ex. 9 at 231:6 – 234:14, and Ex.

**Response**: Disputed as to "in conjunction with this case" and "since 2003."  Al

Hirschfeld was aware of Defendants' giclee sales during his lifetime, prior to 2003 and hand

signed giclee limited edition prints for sale.  Two years before this litigation, the Foundation's

internal counsel raised issues concerning Defendants' printing of giclees for sale.  Rao Decl.

Ex. 6

30.     Except where confronted by AHF, Defendants characterize photostats as being different from lithographs or giclees. Id., Ex. 8 at 158:4-14 and Ex. 28.

**Response**:  Disputed as argumentative and as unintelligible as to "confronted by

AHF."  In some contexts it is reasonable to distinguish between photostats and giclees while in

others it is not. Kaplan Decl. Ex. 8. As Feiden testified by example, the word "lithograph" originally meant a print made from a stone cutting but eventually, common usage included metal plate reproduction or even giclee reproduction under the term "lithograph." Kaplan Decl., Ex. 8.

31.  The pricing of giclees ($900) is different than the pricing of photostats ($150-300, depending on size). Id., Ex. 28; Leopold Decl. ¶ 11.

**Response**:  Undisputed.

32.  The Settlement Agreement permits Defendants to create "photostats," provided that such photostats accord to past practices in price and number. Kaplan Decl., Ex. 2 at ¶ 4(iv).

**Response**: Disputed as misconstruing the terms of the Settlement Agreement, which allows Defendants to "reproduce Works," whether photostatically or otherwise. Kaplan Decl., Ex. 2 at ¶ 6(h). The requirement to be consistent with past practices has nothing to do with permission to reproduce works, but rather is a condition precedent for the exclusive representation in selling photostatic reproductions at the stated split of net sales price. Kaplan Decl., Ex. 2 at ¶ 4(iv).

33.  The price and amount of so-called "photostats" that Defendants have sold is not consistent with past practices in price and number. During Hirschfeld's lifetime, photostats were created when a prospective customer wanted to purchase a limited edition that had been fully sold. In those instances, a photostat of the image was printed on plain paper and signed by Hirschfeld. Given the low-quality of the photostat, purchasers could not have mistaken it for a limited edition lithograph. Leopold Decl. ¶¶ 9-10.

**Response**:  Disputed insofar as the "past practices" as to price and number of giclees extend back almost two decades and have been consistent. Kaplan Decl. Ex. 8. Further disputed as argumentative as to "so-called." Further disputed as photostats were created in several instances, including for archival or record keeping purpose. Kaplan Decl., Ex.  Disputed

as impossible to confirm whether any purchaser or purchasers ever mistook a photostat for a limited edition lithograph.

34.     At the deposition of MFG, Feiden inexplicably could not remember the pricing for photostats. Kaplan Decl., Ex. 6 at 265:8-20.

**Response**:  Disputed as argumentative, non material and irrelevant as to "inexplicably."  Feiden testified that the price of a photostat would vary depending on whether it was signed or unsigned, but that she could not recall decades later the exact price.  She further testified that the prices would appear on monthly statements provided to Hirschfeld. Kaplan Decl., Ex. 6 at 265:8-20.

35.     Defendants paid AHF $300 for the sale of each giclee reproduction, reporting its manufacturing cost at $300 per giclee. Id., Ex. 28. This effectively required AHF to shoulder reproduction costs, even though the Agreement indicates that Defendants shall bear all such costs. Kaplan Decl., Ex. 2 at p. 13, ¶ 5(e).

**Response**: Undisputed as to the payment of $300.  Disputed as to Plaintiff's interpretation of the Settlement Agreement.  Paragraph 4(iv) provides that the "net sales price" is to be considered in calculating payment for Photostatic Reproductions.  By analogy, this has applied to giclees and the price has been fixed because of the large variation in net sales price due to several factors affecting manufacturing price.  Kaplan Decl., Ex. 8.

36.      On at least one occasion, Defendants procured giclees at a cost of $85 each. *Id.*, Ex. 30.

**Response**:  Disputed.  As Feiden testified, the cited document these giclees were created for a different client having nothing to do with Hirschfeld, and are not representative of any pricing relating to giclee reproductions of Hirschfelds.  Kaplan Decl. Ex. 8.

37.     Defendants sold the Bob Hope and Carol Burnett "lithographs" to Time Life in units of 105 each, at a price of $45 each, with no tax charged. Id., Ex. 31.

**Response**:  Undisputed.

38.    In fact, the average cost to Defendants to manufacture a giclee is approximately $150. Id., Ex. 32.

**Response**: Disputed.  The cost to Defendants of manufacturing a giclee is highly variable, depending on factors such as the paper used and the number of prints struck before finalizing the giclee.  Kaplan Decl. Ex. 8.

39.    Defendants let Time Life dictate the retail sales price for the giclees that Defendants made for Time Life. Kaplan Decl., Ex. 6 at 272:23-273:8.

**Response**: Disputed, as the cited material evidences that Defendants negotiated a price with Time Life.

40.    Defendants have misreported sales of giclees, characterizing them as "Photostats" on MFG's monthly statement submitted to AHF and, in one instance, as "premiums" in connection with a PBS distribution agreement. Kaplan Decl., Ex. 5 at 139:6 – 141:10; Kaplan Decl., Ex. 33; Kaplan Decl., Ex. 8 at 247:11-248:13; Ex. 34.

**Response**:  Disputed as to the argumentative statement of "misreport[ing]." Defendants have used the same format for monthly statements for decades.  As the Foundation has been aware since its inception that Defendants make and sell giclee reproductions, Defendants did not believe this to be misreporting.  Even Defendants internal records show giclees listed as "photostats."  Kaplan Decl. Ex. 64.

41.    Not realizing what the "PBS premiums" referred to, AHF approved MFG's decision to split the revenue evenly with AHF on the "PBS premiums." Kaplan Decl., Ex.35.

**Response**:  Disputed as to whether Plaintiff realized what the premiums referred to or why Plaintiff agreed.  The cited correspondence shows that Plaintiff's counsel agreed to the revenue split.

42.    Indeed, during Feiden's deposition on behalf of MFG, she herself could not remember that the premiums referred to print reproductions, suggesting instead that the premiums were mugs to give away to donors. Id., Ex.6 at 83:10 – 15 and Ex. 8 at 247:18-248:4.

**Response**: Disputed as to relevance and materiality. Further disputed insofar as Feiden stated that the monthly statement would provide the information and without being presented with the monthly statement (from roughly four years ago) she could only guess as to the meaning of premiums here. Kaplan Decl., Ex.6 at 83:10 – 15.

43.     Once AHF understood that Defendants were selling unauthorized reproductions, AHF explicitly instructed Defendants not to make or sell them. Kaplan Decl., Ex. 36.

**Response**: Disputed as to Plaintiff's knowledge that Defendants had for over a decade been using giclee rather than photostatic reproduction methods. Feiden Decl. 34 – 38.

44.     After AHF informed Defendants that they were not permitted to make giclees, Defendants retaliated by ceasing reporting of infringing copies of Hirschfeld works. Id., Ex. 8 at 305:15-306:16.

**Response:** Disputed as argumentative with respect to "retaliated." Further disputed as the cited testimony bears no relation to the asserted fact. The testimony describes questioning by Plaintiff's counsel as to whether Feiden is actively policing Plaintiff's copyright and trademark rights on behalf of Plaintiff. Feiden testified that she understood the Foundation to be policing this, in part because of their aggressive actions toward her. Ex. 8 at 305:15-306:16. Further disputed as Defendants are not aware of anything in the record supporting this asserted fact. Further disputed as to relevance or materiality.

45.     With respect to the Time Life transaction specifically, even though they were giclees, and publicly described as "lithographs," Defendants put them on their November 30 monthly statement under "pending, other," not "photostats." Id., Ex. 37.

**Response**: Disputed as argumentative. Feiden treated the promotional Time Life transaction like the prior PBS transaction, and therefore categorized it as other. Kaplan Decl. Ex. 35.

46.    After seeing this on the "pending, other" list when the November 30 statement arrived in early December, AHF president Lynn Surry repeatedly informed Defendants that they were not authorized to proceed. Id., Ex. 38.

**Response**:  Disputed as mischaracterizing the record.  Plaintiff first addressed the issue on February 28, nearly three months after receiving the monthly statement.  By that time the transaction was completed.  Kaplan Decl. Exs. 38 and 39.

47.    By the time Defendants responded weeks later, AHF learned that Defendants had proceeded anyway. Kaplan Decl., Ex. 39.

**Response**:  Disputed as argumentative and mischaracterizing the record. Plaintiff waited three months to inform Defendants of any objection to the Time Life transaction.  At that time the transaction was completed.

48.    The Time Life deal had been introduced in October and completed by mid-November; the print was available for purchase by December 4, 2015. Kaplan Decl., Exs. 40-42.

**Response**:  Disputed as to "introduced" and to the characterization. There were discussions regarding a deal in October which concluded around November 19.  Orders were anticipated beginning December 5.  Kaplan Decl., Exs .40-42.

49.    The first time that the Time Life deal appeared as a pending transaction on any statement was on the November 30, 2015 statement, received by AHF a week later. Leopold Decl. ¶ 14.

**Response**:  Undisputed.

50.    Defendants' giclee reproductions are priced significantly lower than limited edition lithographs. For instance, the "Bob Hope" Time life print is nearly identical to an existing limited edition print published in 1988; while the former currently retails for $6,500, the latter is priced at $199.99. Leopold Decl., ¶ 12, Kaplan Decl., Ex. 8 at 198:19-200:5 and Ex. 43.

**Response**:  Disputed as to identical, as the size and paper quality were substantially different, among other differences, and therefore this was not a "restrike[ing]" of a

previously authorized limited edition. Kaplan Decl. Ex. 2 ¶ 15(a)(vi).  Undisputed as to the retail price since Defendants offer this edition for sale at $6,500.

51.     Paragraph 15 of the Settlement Agreement expressly prohibits the creation of new editions of prints which were previously authorized for limited-edition prints. Kaplan Decl., Ex. 2 at ¶ 15(a)(vi).

**Response**:  Disputed as to relevance and materiality since Defendants did not create a new edition of the 1988 Bob Hope work.  Undisputed as to the language of 15(vi), except that the language concerns authorizing the "restrik[ing]" in a new edition of a "previously authorized" limited edition.

52.     Defendants have also created a number of giclee reproductions offered for sale through various websites, including Defendants' website and eBay. Kaplan Decl., Ex. 44.

**Response**: Undisputed.

53.     Defendants have, for instance, offered for sale reproductions of the Hirschfeld drawing titled "Annie Hall," characterizing it as a giclee. Kaplan Decl., Ex. 4 at ¶¶ 113, 115, 116 and Ex. 5 at ¶¶ 113, 115, 116.

**Response**: Disputed as argumentative as to "characterizing," because the referenced Annie Hall Print is a giclee.

54.     "Annie Hall" already exists as a limited edition etching, first published in 1983. Leopold Decl., ¶ 8.

**Response**: Disputed as the giclee offered was not the same size as the limited edition and is distinguishable.  Kaplan Decl., Ex. 8 (page 12 of document) 165:21-23.

55.     Defendants were aware that both AHF and another dealer in Hirschfeld works found the manufacture of "Annie Hall" as a giclee to be problematic. Ex. 8 at 162:24-166:8, 170:5-10; Kaplan Decl., Ex. 9.

**Response**:  Defendants removed the giclee from their offering promptly after being contacted by Alex Goodstadt of the Goodstadt Gallery regarding this image.  Kaplan Decl., Ex. 8 (p. 11 of document) 164:5-24.

56.     Despite AHF's objection to selling giclees and AHF's reasonable request that Defendants do not do so given Defendants' copyright interests (see Kaplan Decl., Ex. 2 at p. 14, ¶ 5(i)), and despite understanding the point of view expressed by AHF and the other dealer, Defendants insisted on continuing to sell giclees and proceeded to continue to sell them. Ex. 8 at 170:11-14; 206:21-207:23.

**Response**: Disputed insofar as Defendents took down from their website the Annie Hall giclee upon request of Alex Goodstadt of the Goodstadt Gallery.  Further disputed due to Plaintiff's characterization of the demand to cease selling giclees as "reasonable" since giclees are the standard reproduction technology for art reproduction and the Settlement Agreement grants Defendants the right to reproduce Works.  Kaplan Decl., Ex. 2 ¶ 6(h)(i).

57.     On their monthly statements, Defendants reported the sale of the "Annie Hall" giclees as "photostats." Kaplan Decl., Ex. 45.

**Response:** Undisputed.

58.     The works referenced as "Bob Hope" and "Annie Hall" are duly registered with the U.S. Copyright Office. Kaplan Decl., Exs. 46-47.

59.     Even after this Court enjoined Defendants from continuing to sell giclees, Defendants continued to do so, changing the description of a "100 Years of Hope" giclee on MFG's website to "limited edition" and swapping out "posthumous edition" for "posthumous giclee." Kaplan Decl., Ex. 48 (instructing "Under Drawings, the words Available as a Giclee should be changed to read Available as a posthumous Limited-Edition"), Ex. 8 at 263:18-265:17.

**Response:**  Disputed as Defendants actually removed the "100 Years of Hope."

60.     Neither AHF nor Hirschfeld ever approved a limited edition print of "100 Years of Hope" (Leopold Decl., ¶ 15) and Defendants have never paid AHF (or Hirschfeld) for a "100 Years of Hope" limited edition. Id. at ¶ 16.

**Response:**   Disputed as to the characterization of these reproductions as "limited edition" as they are not limited edtions.  Further disputed as the Settlement Agreement

provides authorization. Kaplan Decl. Ex. 2, ¶ 6.h.i. Further disputed because Defendants did

pay Plaintiff. Kaplan Decl. Ex. 35.

61. When notified at deposition in February that the Zabar's giclee was still up, Feiden stated that she would take it down. Kaplan Decl., Ex. 8 at 447:8-448:12 and Ex. 49.

**Response:** Undisputed.

62. Defendants continued to offer giclees for sale as recently as several weeks ago, offering for sale a "Zabar's" giclee through MFG's website. Id., Ex. 50.

**Response:** Disputed. Defendants refused to sell this work when inquiry was

made by a person apparently solicited by Plaintiff, and stated that they are not offering this

work for sale. Feiden further clarified that despite significant efforts to take it down the print

appeared in one category on the website. Kaplan Decl., Ex. 69.

63. In the course of this litigation, AHF has discovered that Defendants offered limited editions that had never been approved pursuant to Paragraph 3(c) of the Settlement Agreement, and Feiden has been unable to explain away why approval was not required. Id., Ex. 8 at 303:3-304:13, Ex. 51, and Ex. 52.

**Response:** Disputed as to the characterization of prints that are not limited

editions as "limited editions."

64. Some of these editions and other copies made by Feiden's giclee printer do not appear on statements to AHF. Ex. 8 at 342:6-347:6, Leopold Decl. ¶ 16.

**Response:** The stated fact is not capable of a response because it does not

identify what editions do not appear on statements or what copies do not appear on statements.

Statements would report transactions which result in payments to Plaintiff. Archival copying,

for example would not be reported on statements. Similarly giclee prints of non-Hirschfeld

works would not be reported on statements.

65. The Settlement Agreement permits Defendants to use Hirschfeld's name, likeness, and biographical material in connection with Defendants' promotion, advertising, and

marketing efforts in furtherance of their rights under the Settlement Agreement. Kaplan Decl., Ex.2, p. 14, ¶ 6(h)(i).

**Response:** Undisputed

66.     Defendants have exceeded the scope of this license, offering for sale giclee reproductions accompanied by a purported "Certificate of Authenticity" bearing a Hirschfeld "Estate Stamp" or "Al Hirschfeld's Embossed Seal." Kaplan Decl., Ex. 4 at ¶¶ 123, 129, 174 and Ex. 5 at ¶¶ 123, 129, 174; Ex. 53.

**Response**:  Disputed as a legal conclusion as to "exceeded the scope of this license" and argumentative as to "purported."  Otherwise undisputed.

67.     Defendants have also issued Certificates of Authenticity that Defendants have represented bear the "raised seals of the Al Hirschfeld Estate and the Margo Feiden Galleries Ltd." Kaplan Decl., Ex. 4 at ¶ 178 and Ex. 5 at ¶ 178.

**Response:**  Undisputed, except that Plaintiff mischaracterizes Estate Stamps which are commonly used amongst buyers and collectors of art, particularly from artists who have passed away.

68.     Neither a Hirschfeld "Estate Stamp," "Embossed Seal," or "raised seal" exist.  Leopold Decl., ¶ 17.

**Response:**  Disputed.   Estate Stamps are widely used in selling works of deceased artists.  Feiden Decl. ¶¶ 56-60.  Moreover, as these items exist insofar as they are used by the Gallery.

69.     Nor has AHF provided any official seal or stamp to Defendants. Kaplan Decl., Ex. 4 at ¶ 179, Ex. 5 at ¶ 179, and Ex. 8 at 89:11-90:12; 93:4-8, 101:17-102:10.

**Response:**  Undisputed, except as to the implication that Plaintiff somehow needs to provide a seal or stamp to the Gallery.

70.     Similarly, the "Certificates of Authenticity" issued by Defendants are not produced by AHF. Id., Ex. 4 at ¶ 130 and Ex. 5 at ¶ 130.

**Response:** Undisputed, except as to the implication that Plaintiff somehow needs to produce certificates of authenticity.

71. Feiden is unable to explain how "Certificates of Authenticity" are purportedly recognized "around the world." Id., Ex. 8 at 116:24-118:17.

**Response:** Disputed as blatantly mischaracterizing Feiden's testimony. Because the Gallery has customers worldwide its Certificates of Authenticity rae recognized. Id., Ex. 8 at 116:24-118:17

72. Defendants have also offered for a sale a "Hirschfeld Spectacular" poster giclee featuring numerous reproductions of Hirschfeld images. Kaplan Decl., Ex. 4 at ¶¶ 128, 132, Ex. 5 at ¶¶128, 132, Ex. 8 at 106:6-19, and Ex. 54.

**Response:** Undisputed

73. The poster, which was never authorized by AHF, was designed primarily to enrich Defendants on the back of AHF's copyrighted works at a retail price of $255, and to earn further money by using those images to advertise prints that MFG owned outright. Thirty of the thirty-three images shown are prints offered for sale by MFG, and out of the remaining three images, two are drawings that have already been sold, and the final image is one that MFG has been offering as an unauthorized giclee. Leopold Decl., ¶ 18.

**Response:** Disputed, insofar as the Settlement Agreement authorizes the poster. Kaplan Decl. Ex. 2 6(h)(i). Further disputed as argumentative as to "enrich Defendants on the back of AHF's copyrighted works." Disputed as to "unauthorized giclee." Undisputed as to the description of the thirty-three images.

74. On MFG's website, Defendants represent that purchasers of the "Hirschfeld Spectacular" Poster will receive a "Certificate of Authenticity." Kaplan Decl., Ex. 4 at ¶ 176 and Ex. 5 at ¶ 176.

**Response**: Undisputed.

75. Defendants' eBay listing for the "Hirschfeld Spectacular" poster, created a decade after Hirschfeld's death, stated that the poster was "hand-signed" by Hirschfeld. Kaplan Decl., Ex. 4 at ¶¶ 133-135 and Ex. 5 at ¶¶ 133-135.

**Response:** Undisputed, and Feiden has already testified that his was an error. Kaplan Decl. Ex. 8.

76.     Defendants' website listing for the "Hirschfeld Spectacular" poster stated that a portion of the proceeds from the sale of the poster would be donated to charity. Ex. 55.

**Response:** Undisputed

77.     Only 17 ó percent of the proceeds were to go to charity, none was to go to AHF, and in fact Defendants have not donated any proceeds from the sale of the poster to charity despite the fact that they have been offering it for sale for more than three years. Kaplan Decl., Ex. 4 at ¶ 137, Ex. 5 at ¶ 137, and Ex. 8 at 106:20-108:4; 113:5-13.

**Response:** Undisputed, except as to the implication that proceeds should have gone to Plaintiff or that more should have gone to charity. Further disputed as mischaracterizing Feiden's testimony. Ex. 8 at 106:20-108:4; 113:5-13.

78.     Defendants hold themselves out as the "world-wide exclusive representative for Al Hirschfeld Art." Kaplan Decl., Ex. 56.

**Response:** Undisputed.

79.     Defendants' "Certificates of Authenticity," for instance, state that MFG is "The Exclusive Representative of Al Hirschfeld's Art since 1969." Kaplan Decl., Ex. 4 at ¶ 177 and Ex. 5 at ¶ 177.

**Response:** Undisputed

80.     Despite Defendants statements concerning exclusivity, Defendants are aware that the Settlement Agreement contemplates other dealers, and that other galleries operating out of Connecticut and London work with AHF to offer Hirschfeld's artwork for sale. Kaplan Decl., Ex. 2 at p. 11, ¶ 4(b), Kaplan Decl., Ex. 6 at 76:3-9; 507:6-508:12; 513:9-23.

**Response:** Disputed, insofar as the Goodstadt Gallery in Connecticut contracted its rights from Feiden. Feiden Decl. ¶ 9 and Ex. 2. Further disputed insofar as the Chris Beetles Gallery in London has possession of Hirschfeld works due to Plaintiff's breach of the Settlement Agreement.

81.     Nonetheless, Defendants have warned the public to beware of other sellers of Hirschfeld drawings or prints. Kaplan Decl., Ex. 57, Ex. 8 at 52:2-56:10; 70:16-71:24, Ex. 48.

**Response:** Disputed, as Defendants have merely warned the public about a large number of fake Hirschfeld works in the market.

82.     Defendants also refer to themselves as "Al Hirschfeld," using the URL "alhirschfeld.com" and e-mail address "alhirschfeld.com." Id., Ex. 4 at ¶¶ 183-184, 221-226, Ex. 5 at ¶¶ 183-184, 221-226, and Ex. 58.

**Response:** Undisputed, except that Feiden stated one instance of reference as "Al Hirchfeld" was an error. Because Plaintiff does not provide any context it is impossible to know the context of this use.

83.     Defendants claim to operate "Al Hirschfeld's Official Website" and gallery. Kaplan Decl., Ex. 4 at ¶ 172 and Ex. 5 at ¶ 172.

**Response:** Disputed as to the word "claim."

84.     Defendants' basis for calling it Al Hirschfeld's Official Website is because it purportedly was a "99th birthday present." Kaplan Decl., Ex. 8 at 98:5-100:21.

**Response:** Disputed. Kaplan Decl., Ex. 8 at 98:5-100:21

85.     The Settlement Agreement expressly provides that there is no joint venture between the parties. Id., Ex. 2 at p. 15, ¶ 6(d).

**Response:** Undisputed.

86.     The Settlement Agreement provides that the relationship between AHF and Defendants shall be construed in accordance with the Arts Law, specifying that all AHF-owned artwork in Defendants' possession, custody, or control are on "consignment." Kaplan Decl., Ex. 2, p. 14, ¶ 6(a).

**Response:** Undisputed except as to those provisions of the Settlement Agreement that provide otherwise.

87.     The Settlement Agreement permits Defendants to possess a limited number of original Hirschfeld works that, in accordance with the Arts Law, are held on consignment. Id. at pp. 2-4, ¶ 2(a).

**Response:**  Undisputed, insofar as limited means "finite."  The precise number various based on various factors as outlined in the Settlement Agreement.

88.     Defendants should currently be in possession of 218 consigned original drawings (the "Original Works"). Leopold Decl., ¶ 19.

**Response:**  Disputed.  Defendants are entitled to the Consignment Number at a minimum, which is 250.  Kaplan Decl. Ex. 2. Section 2.

89.     Defendants are unsure of the precise number of consigned drawings in their possession, estimating that the number is certainly under 250, but more than 200, and perhaps around 225. Kaplan Decl., Ex. 8 at 441:13-19.

**Response:**  Disputed, Defendants merely disagree with Plaintiffs about the amount.  Plaintiff mischaracterizes the testimony of a deponent who was without access to records as somehow dispositive of Defendants knowledge.

90.     Feiden is not sure whether an omnibus list of consigned drawings was ever provided to Al Hirschfeld. Id. at 453:6-17.

**Response:**  Disputed.  Id. at 453:6-17.

91.     Defendants have stated that until they created one as required by the Court, they had created no omnibus list for the consigned works. Kaplan Decl., Ex. 6 at 408:17-409:8.

**Response:** Disputed as mischaracterizing testimony.

92.     The Settlement Agreement identifies 250 works as a ceiling, not a floor. Kaplan Decl., Ex. 2 at p. 2, ¶ 2(a)(i).

**Response:**  Disputed.   The Settlement Agreement does not use the terms "ceiling" and "floor" in this context and can be understood without injecting new terms.

93. The Settlement Agreement permits AHF to request that Defendants make available for pickup a consigned work. Kaplan Decl., Ex. 2 at p. 18, ¶ 6(h)(vii).

**Response:** Disputed insofar as Plaintiff's request is conditioned on reasonableness and good faith.

94. The Agreement also gives AHF broad latitude to determine and control exhibitions of Hirschfeld's work. Id. at pp. 16-17, ¶ 6(h)(ii).

**Response:** Undisputed**.**

95. When AHF requested that Defendants make available for pick up 28 consigned drawings, Defendants resisted, and instead consulted a lawyer. Kaplan Decl., Ex. 13 at pp. 8-11.

**Response:** Disputed as to characterization and faulty premise. Plaintiff requested ten works many of which had been sold as Plaintiff was aware. Defendants tried to accommodate and even offered to loan works to make up for the sold works. Plaintiff then asked for 28 works without explanation while also ignoring Defendants inquiries into Plaintiff's breach of the Settlement Agreement and casually revealing that Plaintiff is in fact pervasively breaching the Settlement Agreement. Rao Decl. Exs. 7-14.

96. When Defendants did finally respond to AHF's request, they used the opportunity to air vague and indignant grievances with AHF, rather than to address AHF's simple request for the return of consigned drawings. Kaplan Decl., Ex. 59.

**Response:** Disputed insofar as Plaintiff's pervasive breaches of the Settlement Agreement are here characterized as "vague," and as to general characterization of Defendants as indignant.

97. Defendants can provide drawings on a day's notice. Kaplan Decl., Ex. 8 at 402:5-7.

**Response:** Disputed as vague and lacking context and therefore incapable of confirmation.

98.     Defendants did not return the 28 original works until they were ordered to do so. Kaplan Decl., Ex. 4 at ¶ 103 and Ex. 5 at ¶ 103; Kaplan Decl., Ex. 8 at 430:24-431:18.

**Response:** Undisputed

99.     In February 2016, AHF asked Defendants to provide a list of the works in their inventory, but Defendants refused on the ground that AHF should have provided Defendants with a list of what AHF thought was in Defendants' possession. Kaplan Decl., Ex. 8 at 432:6-433:10.

**Response:** Disputed as to characterization of "refused" as Defendants suggested

that it would be easier to start with Plaintiff's list.

100.     Defendants did not explain to AHF their reasons for refusing to return the works. Id. at 436:20-437:23.

**Response:** Disputed as mischaracterizing testimony.

101.     Defendants subsequently took the view that "[u]ntil there is a greater demonstrated need for the drawings, I cannot see why I should give up drawings that have been consigned to me for sale." Id., Ex. 59.

**Response:** Undisputed, except that other context matters in interpreting this Statement,

e.g. that Plaintiff had refused to investigate allegations of its breach of the Agreement and

casually admitted to more breaches while demanding Defendants' strict performance.

102.     The Settlement Agreement gives AHF the right to possess all unsold Consigned Works and requires that the provision of information about exhibitions is to be reasonable and solely "for informational purposes," not as a condition of return. Id., Ex. 2 at p. 16, ¶ 6(h)(ii), p. 18, ¶ 6(g)(vii).

**Response:** Disputed as the Agreement has several mechanisms for ensuring the Gallery maintains at least the Consignment Number as inventory.  Kaplan Decl. Ex. 2, Sections 2, 4, and 7.

103.     The Settlement Agreement provides: "During the Term of the Settlement Agreement, Feiden shall . . . (b) maintain a gallery (the "Gallery") in the Borough of Manhattan substantially similar in quality to the gallery that Feiden currently maintains at 699 Madison Avenue, New York City, New York, devoted primarily to the Retail Sales of the Works…" Kaplan Decl., Ex. 2, p. 12, ¶ 5(b).

**Response:** Undisputed.

104. The Agreement defines "Works" as Hirschfeld's original drawings (i.e. not a reproduction of a drawing). Id. at p. 1.

**Response:** Undisputed

105. When the Agreement was signed in September of 2000, Defendants operated a gallery in a prominent, high-trafficked location on Madison Avenue, next door to other retail establishments. Kaplan Decl., Ex. 4 at ¶ 6 and Ex. 5 at ¶6; Ex. 6 at 178:25-179:9.

**Response:** Undisputed, except that Defendants also operated a gallery in a prominent high-trafficked location in a landmark townhouse in Greenwich Village at 15 E. 9th

St., just off of Fifth Avenue.

106. The street level bore a prominent awning identifying it as a gallery, and displayed Hirschfeld works for passersby to see. Kaplan Decl., Ex. 6 at 179:20-181:7; 202:23-203:7; Ex. 60.

**Response:** Disputed as to "prominent" and as to "displayed" since the street facing window was tiny. Feiden Decl. ¶ 14.

107. A doorman worked at the entrance, let customers in, and guided them to the elevator. Surry Decl., ¶ 8.

**Response:** Undisputed.

108. The gallery resided on three floors of the building (in which other businesses operated). Kaplan Decl., Ex. 4 at ¶ 8 and Ex. 5 at ¶ 8; Ex. 6 at 171:13-172:8.

**Response:** Undisputed.

109. The gallery contained only artwork related to Hirschfeld. Kaplan Decl., Ex. 4 at ¶ 13 and Ex. 5 at ¶ 13; Ex. 6 at 193:8 – 194:5.

**Response:** Disputed, as the Gallery also contained furniture and other items.

Feiden Decl. ¶ 24.

110. The gallery at 699 Madison was open seven days per week, while the claimed gallery on Ninth Street is opened only during weekdays. Kaplan Decl., Ex. 6 at 261:23-217:3 and Ex. 8 at 81:16-21.

**Response:** Disputed as to "claimed." Further disputed as there were times when the Madison Avenue Gallery was not open seven days a week and there have been periods of time where the Fifth Avenue Gallery was open every day of the week. See, e.g. this archive of the Gallery website with no restrictions as to hours. (https://web.archive.org/web/20090615164941/http://www.alhirschfeld.com:80/index2.html)

111. In 2000, Defendants simultaneously operated what they characterized as a second gallery location, from Feiden's Greenwich Village townhouse. Kaplan Decl., Ex. 6 at 194:20–195:10.

112. **Response:** Disputed as argumentative. In 2000 Defendants had two Gallery locations. Kaplan Decl., Ex. 6 at 194:20–195:10.

113. The Agreement makes no reference to this gallery location; instead, the Agreement uses as its standard the Madison Avenue location. Kaplan Decl., Ex. 2, p. 12, ¶ 5(b).

**Response:** Undisputed, insofar as the two locations are comparable and the Agreement need not have listed both.

114. MFG has admitted that in 2000, 699 Madison was the "gallery of record." Id., Ex. 8 at 195:6-9.

**Response:** Disputed as mischaracterizing the testimony.
.

115. In 2006 (three years after Hirschfeld's death), without approval from AHF, Defendants closed the gallery at 699 Madison and transferred its contents to Feiden's townhouse, which has remained the gallery's sole location. Kaplan Decl., Ex. 6 at 195:11-14.

**Response:** Disputed insofar as the Settlement Agreement provides approval for the Gallery to be anywhere in the Borough of Manhattan so long as it maintains substantially similar quality. Kaplan Decl. Ex. 2 Section 5.

116. In contrast to the awning and artwork displayed in front of the Madison Avenue gallery, the gallery's current location displays on its weather-beaten front door only a recently added, small sign, printed on 8 ó x 11 paper, identifying its townhouse location as an art gallery, and not simply a residence. Kaplan Decl., Ex. 6 at 181:20 – 182:25, 206:19 – 207:7, Ex. 8 at 142:16-143:20, Ex. 61.

**Response:** Disputed as to the characterization "weather-beaten front door" and

117.    Moreover, the gallery keeps its curtains closed at all times to protect the artwork on display. Kaplan Decl., Ex. 7 at 70:2-18; Ex. 62 at 40:2-7.

> **Response:** Disputed.  The testimony cited was describing works hung in an office area.  The main ballroom of the Gallery gets ample natural light and the glass is a specialized glass that blocks out most harmful UV rays so that the works can be seen with natural lighting.  Feiden Decl. ¶ 20.

118.    MFG receives fewer walk-ins from individuals passing by the gallery than visitors who have scheduled appointments, and significantly fewer walk-ins now than when the gallery was on Madison Avenue. Kaplan Decl., Ex. 6 at 220:14 – 18; Ex. 7 at 70:2 – 11, 97:4 – 98:16. Surry Decl., ¶ 9.

> **Response:** Disputed insofar as this statement implies the Madison Avenue location is the cause as opposed to, e.g., the rise of e-commerce.

119.    The current gallery is not handicap-accessible: there are stairs at the entry and the only way to access the main ballroom is by stairs. Kaplan Decl. Ex. 6 at 174:6-8; Ex. 62 at 48:3– 15.

> **Response:** Undisputed.

120.    Visitors to the gallery are typically greeted by Javier Portillo, a handyman employed by Ms. Feiden who lives in the townhouse. Id., Ex. 62 at 16:15-21, 48:3-8.

> **Response:** Disputed as to characterization of Portillo as a "handyman" since he also serves as a doorman and provides general security as most building doormen do.

121.    The Agreement requires Defendants to operate a gallery "devoted primarily" to sales of Hirschfeld's original drawings. Id., Ex. 2, ¶ 5(b).

> Response: Disputed to the extent this seeks a legal conclusion, as factors outside of Defendants control render this commercially unreasonable or impossible (such as the reduction of inventory of original drawings).

122.    The gallery is restricted to several rooms on the first and second floors of the townhouse containing numerous trinkets and collectibles (such as figurines and antique glass), and antique furniture unrelated to Hirschfeld. Id., Ex. 6 at 153:15 – 155:8; 156:8 – 160:6; 161:12–162:10, Ex. 62 at 28:16 – 31:23, 33:24 – 34:14, and Ex. 63.

**Response:** Disputed as to characterization of "trinkets," (i.e. Civil War era glassworks), "collectibles" (i.e. original furniture from the Chaplin estate), etc. Further disputed to the extent the assertion is non-factual opinion. Undisputed to the extent the Gallery as accessible to visitors does not take up the entirety of the townhouse.

123. There were no such figurines, antique glass, or other trinkets at the gallery at 699 Madison. Id., Ex. 6 at 193:21-194:5.

**Response:** Disputed as to characterization. The Madison Avenue gallery was also designed to resemble a residence with furniture and other features. Id., Ex. 6 at 193:21-194:5.

124. The townhouse's third, fourth, and fifth floor contain the respective apartments of Feiden, Katherine Solomon, and Javier Portillo. Id., Ex. 4 at ¶ 22, Ex. 5 at ¶ 22, Ex. 6 at 247:8-19, and Ex. 7 at 30:22-31:19; 55:12-56:2.

**Response:** Undisputed, except as to relevance or materiality.

125. The gallery's wall space, however, is devoted primarily to lithographs and other reproductions. Id., Ex. 5 at 63:6-19, Ex. 7 at 63:6 – 19, and Ex. 62 at 27:18 – 28:13; 32:22 –33:12.

**Response:** Undisputed insofar as the Gallery's inventory of original drawings on consignment has been severely reduced.

126. Defendants' sole stated bases for believing that their current gallery is sufficient is that Al and Louise Hirschfeld came to a party that Feiden threw for them a year after their wedding, that Louise Hirschfeld was "bedazzled" by the space, and that "[t]he people at that reception said to [Feiden] over and over again that it was the most beautiful space that they had ever been to in New York." *Id.*, Ex. 6 at 558:25-560:10.

**Response:** Disputed as to the characterization of Al and Louise Hirschfeld's wedding reception as a "party." Disputed as to "sole" basis. Feiden recalls many visitors stating that the Gallery at its current location was the most beautiful space they had ever been to in New York.

127. In 2013, of the roughly $400,000 Defendants made in gross sales, AHF was paid only $33,466; in 2014, of the roughly $475,000 Defendants earned in gross revenue, AHF was paid only $18,560. *Id.*, Ex. 6 at 87-18-88:9, Ex. 64, and Ex. 65.

**Response:** Disputed as to the characterization of "only" and the lack of distinction between monies paid to Plaintiff which are "net" and gross revenues of Defendants which do not account for costs that often use up the entirety or more of the gross revenue.

128. Since then, payments to AHF have not exceeded $25,000 per year. *Id. See also Id.*, Ex. 67.

**Response:** Undisputed

129. Since the gallery at 699 Madison closed, Defendants have not had sales of items that belong to AHF in an amount of six figures or more. *Id.*, Ex. 8 at 387:10-15. Surry Decl., ¶ 10.

**Response:** Disputed to the extent the assertion implies a causal relationship between the Gallery location and the sales drop as opposed to, e.g. Plaintiffs refusal to provide the Gallery any new inventory for 15 years. Feiden Decl. ¶ 40.

130. Finally, the Gallery is not even located on a parcel zoned for commercial activity. Kaplan Decl., Ex. 4 at ¶¶ 17 – 19 and Ex. 5 at ¶¶ 17 – 19.

**Response:** Dispute as to characterization as "not even," particularly as many galleries in New York City are not located in commercially zoned parcels.

131. Feiden has never made the effort to confirm whether or not a commercial gallery can be legally operated from the townhouse. *Id.*, Ex. 6 at 210:4 – 14.

**Response:** Undisputed, except as to the characterization "never made the effort to confirm."

132. Despite the gallery's stated hours of 9:00 a.m. – 6:00 p.m., Feiden sleeps through most of the morning and, more often than not, well into the afternoon. *Id.*, Ex. 7 at 57:15 – 58:10; 58:11 – 14 and Ex. 67.

**Response:** Disputed. Kaplan Decl. Ex. 62 24:21-27:2. Noting that Fieden works all morning, that Katherine Solomon has called her at all hours, and that Feiden works from bed with her computer but is otherwise working and actively giving instruction.

133.    Perhaps in part for the above-stated reason, the Settlement Agreement requires Defendants to employ a person at the gallery, in addition to Feiden, who is knowledgeable in the arts. *Id.,* Ex. 2, ¶ 5(g).

**Response**:   Disputed as to the reason the Settlement Agreement requires employment of a person knowledgeable in the arts which reason is not relevant given that the text of the agreement is the best guide for the intent of the parties.   Undisputed as to the requirement.

134.    Defendants' primary employee since 1988 has been Daria Enrick, Defendants' so- called "Curator." *Id.*, Ex. 4 at ¶ 37, Ex. 5 at ¶ 37, and Ex. 7 at 10:7-9, 11:10-14, 168:13-29.

**Response**:   Disputed as argumentative as to "so-called."   Disputed as to "primary" as confusing in this context Moreover, disputed as to relevance, since the Gallery employs Katherine Solomon who is knowledgeable in the arts as required by the Settlement Agreement

135.    Ms. Enrick has no background or training in the arts. *Id.*, Ex. 7 at 9:2 – 17, 201:8 – 13.

**Response:**  Disputed as to relevance, since the Gallery employs Katherine Solomon who is knowledgeable in the arts. Further disputed because Ms. Enrick has worked with the Gallery for several decades, and has acquired a background and training in the arts in an identical way to, e.g. Lynn Surry, the Plaintiff's President.  Rao Decl. Ex. 22.

136.    Ms. Enrick's training is in cosmetology. *Id.* at 8:5 – 25.

**Response:**   Disputed as to relevance or materiality.   Further disputed as to the characterization that cosmetology is Ms. Enrick's only training, since Ms. Enrick has in fact worked at the Gallery for several decades, much of that full time.  Kaplan Decl. Ex. 7.

137.    Ms. Enrick retained this license until 2010. *Id.* at 193:23-194:8.

**Response:** Disputed as to materiality, otherwise undisputed.

138.    Ms. Enrick met Feiden because the latter was a client of the beauty salon in which Ms. Enrick worked. *Id.* at 11:1 – 9. 138.

**Response:** Disputed as to materiality, otherwise undisputed.

139.    Ms. Enrick knows almost nothing about Al Hirschfeld, does not know how to handle artwork, and does not even know how to use a computer, though Defendants maintain a price list for the Consigned Works on a computer and they sell online. Kaplan Decl., Ex. 6 at 410:7-15 and Ex. 7 at 73:10 – 74:4, 197:25-198:19. Indeed, MFG's sales information is kept primarily on computers, including in e-mail. *Id.*, Ex. 6 at 21:9-15; Ex. 8 at 280:5-282:10; 270:1- 13; 306:2-13.

**Response:**    This asserted fact is compound, argumentative, conclusory, and

incapable of a straightforward response.  Undisputed that Ms. Enrick does not use a computer.

Disputed that the Gallery's sales information is kept primarily on computers, as many of the

Gallery's records are in paper format.  Otherwise disputed.  Rao Decl. Ex. 22.

140.    Ms. Enrick is unaware of the number of original drawings and limited editions in the Gallery. *Id.*, Ex. 7 at 62:13 – 63:5, 89:2 – 21.

**Response:** Disputed as mischaracterizing testimony.

141.    She is also unaware of the value of the Consigned Works. *Id.* at 89:22 – 90:5, 182:24 – 183:6.

**Response:**  Disputed as mischaracterizing testimony

142.    Ms. Enrick cannot differentiate between the drawings consigned by AHF and the drawings owned by Ms. Feiden outright. *Id.* at 164:14-25.

**Response:**  Disputed as mischaracterizing testimony

143.    According to Ms. Enrick, a "curator" is one who "maintains records" and is essentially a "bookkeeper of artwork." *Id.* at 164:14 – 25.

**Response:** Disputed.  Ms. Enrick later testified that her role also encompasses giving tours to customers, being knowledgeable about the works and the people depicted and interfacing with Gallery clients.  Rao Decl. Ex. 22.

144.    Defendants have supplemented this individual with a revolving cast of characters, including family members with no art training and friends who have no background in the arts at all. *Id.* at 15:6 – 17:17; Kaplan Decl., Ex. 6 at 31:24-32:13, 35:19-37:9, 37:18-20.

Indeed, prior employees similarly served only as assistants to Ms. Feiden and Ms. Enrick, with their primary roles to use computers because Ms. Feiden learned to use one only approximately two years ago, and Ms. Enrick declines to have any interest in learning to use one. Kaplan Decl., Ex. 6 at 23:20-24:11; 281:10-14 and Ex. 8 at 126:11-14.

> **Response:** Disputed as to characterization, as compound, confusing, and incapable of a straightforward response. Further disputed as to the family members with no art training or friends with no knowledge of the arts as the cited testimony shows these individuals were former art dealers, professional artists, theater lovers, etc.

145. Defendants' other full-time employee, Katherine Solomon, is a recent college graduate. *Id.*, Ex. 68.

> **Response:** Disputed as to "recent" and as to relevance and materiality. The Feiden Defendants further note that Solomon graduated from college one year apart from Katherine Eastman, Plaintiff's Archives Maanger.

146. Ms. Solomon has no training in, nor has she ever read a book on, art preservation, art storage, gallery management, or even Al Hirschfeld. *Id.*, Ex. 62 at 9:25 – 10:3; 9:7 – 9:24.

> **Response:** Disputed as Katherine Solomon has a degree in studio art and has worked as a professional photographer and therefore has training in these subjects even if she does not read books about them. Kaplan Decl. Ex. 68.

147. Ms. Solomon performs only administrative or personal assistant-type tasks. *Id.*, Ex. 62 at 12:15 – 13:17, 62:10-15 and Ex. 8 at 228:6-18. 147.

> **Response:** Disputed as to relevance and materiality, further disputed as to "only." Undisputed that Ms. Solomon primarily has an administrative role.

148. Ms. Solomon has little input (or even awareness of) the gallery's operations. Ex. 62 at 14: 3 – 23, 18:16 – 19:13, 20:4-6, 22:7 – 12, 40:8 – 41:6, 41:24 – 43:6, 54:25 – 56:4, 58:19 – 21.

> **Response:** Disputed as to characterization as to Solomon's awareness.

149. To the extent Ms. Solomon has questions or is in need of guidance, she looks to Ms. Enrick. *Id.* at 50:10 – 51:6.

> **Response:** Disputed insofar as Ms. Solomon testified she also looks to Feiden.

Further disputed as to the materiality or relevance of Solomon looking to her seniors at work for guidance.

150.    Despite having worked at the Gallery for a year, Ms. Solomon remains uninformed as to the mission or activities of AHF. *Id.* at 61:13 – 62:9.

**Response:**  Disputed as to the implied relevance of the mission or activities of AHF in education initiatives to MS. Solomon's job function at the Gallery.

151.    Ultimately, Ms. Solomon cannot definitively state that her studio art major assists her with, or is any way relevant to, the performance of her job responsibilities. *Id.* at 58:22 – 59:12.

Response: Undisputed, except that Ms. Solomon also cannot definitively say she never uses or benefits from a studio art major.  Also disputed as to materiality or relevance.

152.    Since receiving notice, Defendants have taken no steps to cure this breach. Kaplan Decl., Ex. 4 at ¶ 5 and Ex. 5 at ¶ 5.

**Response**:  Disputed as argumentative and conclusory as to breach.  Since there has been no breach, Defendants were not required to take any steps.

153.    During Feiden's most recent hospital stay, Defendants' employees were incapable of processing a customer return through Paypal. Ex. 69; Surry Decl., ¶ 13.

**Response**:  Disputed as the cited declaration does not support the asserted fact. Further disputed as this email correspondence demonstrates Plaintiff put up an individual to attempt to purchase an item that had been removed from the website to comply with the injunction, presumably to cause a violation and in the hopes that it could claim damages. Plaintiff could not otherwise have come into possession of this correspondence.  Therefore, this situation was an unusual one and is not typical of the Gallery's operations nor does it demonstrate the Gallery is "incapable" of processing a customer return through PayPal. Further disputed because the refund was processed after the Gallery had mailed a refund check, and at the request of the customer that the refund be made through PayPal instead.

154.     Other customers have complained about slow response times and refusals to give refunds. Exs. 70, 71, 72.

**Response**:  Disputed.   As the Plaintiff is aware, Howard Kalendar was attempting to extort the Gallery for money due to this lawsuit by threatening the Gallery's reputation if it did not pay it money to which he is not owed.  Kaplan Decl. Ex. 6.  As to the referenced Exhibits 71 and 72, the correspondence speaks to confusion as to whether delay was caused by UPS (as stated by Feiden) or in some other way.

155.     The Settlement Agreement provides that "[a]ll Works in Feiden's possession, custody, or control, other than those Works . . . owned by Feiden . . . are on consignment." Kaplan Decl., Ex. 2, ¶ 6(e).

**Response**:  Disputed insofar as it also includes works purchased by Feiden in the future as not on consignment.  Otherwise disputed to the extent this seeks a legal conclusion.  Undisputed as to language in the Settlement Agreement.

156.     Defendants do not know the location of over 20 original drawings consigned to them. Kaplan Decl., Ex. 4 at ¶ 108 and Ex. 5 at ¶ 108.

**Response**:  Disputed as argumentative and as to "consigned to them." Defendants and Plaintiffs disagree as to the location of 20 drawings Plaintiff insists has gone missing.

157.     Indeed, Defendants admit that the drawings were not in Defendants' possession as of January 9, 2017. Kaplan Decl., Ex. 8 at 345:24-347:15.

**Response**:  Undisputed, except as to characterization of "admit," as if it is Defendants fault that drawings are not consigned to them on a certain date.

158.     MFG claims that the drawing titled "Famous Feuds: Zanuck and Greco" (inventory number 121) was returned to Louise Hirschfeld, but the drawing appears on a 2015 MFG consigned drawing list. *Id.,* Ex. 73.

**Response**:  Disputed as argumentative.  The cited consignment list was a draft being revised over email listing works to be put on the website.  It is not a finalized inventory list.

159.    MFG claims that she does not recognize the drawing titled "S.J. Perelman: Readying Myself for My Debut" (inventory number 379). Dkt. No. 105. However, a 1973 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of December 30, 1973. Leopold Decl., ¶ 21, Ex. 3.

**Response**: Disputed.  The cited Declaration of David Leopold does not support

the assertion, nor do the exhibits filed with the declaration support the statements in the

Declaration.  [Dkt. 105].  Furthermore, that a Gallery document from 1973, dated over forty

years ago, lists this drawing does not evidence that the drawing was actually consigned to the

Gallery in 2001 or anytime after the date of the Settlement Agreement.

160.    Defendants claim that the drawing titled "Comedy and Tragedy Masks" (inventory number 599) was not consigned under the Settlement Agreement, but a 1973 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as early as December of 1973. Dkt. No. 105; Leopold Decl., ¶ 22, Ex. 4.

**Response**: Undisputed as to Defendants' claim that the drawing is not in their

current inventory.  Otherwise disputed as argumentative.  Further disputed because a Gallery

document from 1973, dated over forty years ago, that lists this drawing in inventory does not

evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the

date of the Settlement Agreement.

161.    MFG claims that the drawing titled "Dick Shawn in the World of Sholom Aleichem" (inventory number 704) was not consigned under the Settlement Agreement, but a 1973 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as early as December of 1973. Dkt. No. 105; Leopold Decl., ¶ 23, Ex. 5.

**Response**:  Undisputed as to Defendants' claim that the drawing is not in their

current inventory.  Otherwise disputed as argumentative.  Further disputed because a Gallery

document from 1973, dated over forty years ago, that lists this drawing in inventory does not

evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

162.    MFG claims that the drawing titled "Curtis and Leigh in Houdini" (inventory number 935) was not consigned under the Settlement Agreement, but a 1973 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of December of 1973. Dkt. No. 105; Leopold Decl., ¶ 24, Ex. 6.

**Response**: Undisputed as to Defendants' claim that the drawing is not in their current inventory.  Otherwise disputed as argumentative.  Further disputed because a Gallery document from 1973, dated over forty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

163.    MFG claims that the drawing titled "Outdoor Life" (inventory number 1303s) was returned to Al Hirschfeld, but a 1983 MFG drawing list demonstrates that the drawing was in Defendants' possession as of April 14, 1983. Dkt. No. 105; Leopold Decl., ¶ 25, Ex. 7.

**Response**:  Undisputed as to Defendants' claim that the drawing is not in their current inventory.  Otherwise disputed as argumentative.  Further disputed because a Gallery document from 1973, dated over forty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

164.    MFG claims that the drawing titled "Artists and Models: 300 Girls Paraded Before Monte Prosser and Wally Wanger" (inventory number 1456i) was not consigned under the Settlement Agreement, but a 1983 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of December 15, 1983. Dkt. No. 105; Leopold Decl., ¶ 26, Ex. 8.

**Response**: Undisputed as to Defendants' claim that the drawing is not in their current inventory.  Otherwise disputed as argumentative.  Further disputed because a Gallery document from 1983, dated over thirty years ago, that lists this drawing in inventory does not

evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

165. MFG claims that the drawing titled "Hit Plays in England" (inventory number 1738) was not consigned under the Settlement Agreement, but a 1985 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of June 15, 1985. Dkt. No. 105; Leopold Decl., ¶ 27, Ex. 9.

**Response:** Undisputed as to Defendants' claim that the drawing is not in their current inventory. Otherwise disputed as argumentative. Further disputed because a Gallery document from 1985, dated over thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

166. MFG's October 2001 monthly statement lists the drawing titled "Swiss Family Perelman p.6, "Go Ahead" I Shouted, "Milk Me, Drain Me Dry," Mr. and Mrs. S. I. Perelman" (inventory number 1926) as a pending sale. An undated consigned drawing list identifies the drawing as "sold," but no payment was ever made to AHF. Leopold Decl., ¶ 28, Exs. 10-11.

**Response:** Disputed. The cited Declaration of David Leopold does not support the exertion, nor do the attached exhibits. Exhibit 10 lists only "Swiss Family Perelman #I-1926" as pending; Exhibit 11 lists the above-named drawings with a handwritten note stating they were sold.

167. MFG claims that the drawing titled "Carmen" (inventory number 1997) was not consigned under the Settlement Agreement, but a 1987 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, shows that the drawing was in Defendants' possession as of February 15, 1987. Dkt. No. 105; Leopold Decl., ¶ 29, Ex. 12. The drawing was sold through Heritage Auctions in 2014, but AHF was never paid for the sale, in 2014 or prior. Leopold Decl., ¶ 30, Ex. 13.

**Response:** Undisputed.

168. MFG claims that the drawing titled "Every Barn's a Stage: Life with Father" (inventory number 2210) was not consigned under the Settlement Agreement, but a 1988 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records,

demonstrates that the drawing was in Defendants' possession as of May 11, 1988. Dkt. No. 105; Leopold Decl., ¶ 31, Ex. 14.

**Response:** Disputed as argumentative. A Gallery document from 1988, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

169. MFG claims that the drawing titled "Checkmates" (inventory number 2243) was returned to AHF. Dkt. No. 105. A 1988 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of August 11, 1988. Leopold Decl., ¶ 32, Ex. 15.

**Response:** Undisputed as to Defendants' claim that the drawing is not in their current inventory. Otherwise disputed as argumentative. Further disputed because a Gallery document from 1988, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

170. An undated MFG sales invoice indicates that the drawing was sold in August 2001, with an initial deposit made in 2001. *Id.* at ¶ 33, Ex. 16 (MFG invoice).

**Response:** Undisputed.

171. Additionally, MFG's November 2001 statement lists the drawing as a pending sale; by September of 2002, the sale was no longer listed as pending. *Id.* at ¶ 34, Exs. 17-18 (November 2001 statement; August 2002 statement). An undated consigned drawing list produced by MFG indicates that the drawing was sold. Kaplan Decl., Ex. 74.

**Response:** Undisputed.

172. MFG claims that the drawing titled "Westward Ha: Lazy Days on the Poop's Mortician, Missionary, Perelman Boy Meets Gull" (inventory number 2437) was returned to AHF. However, AHF has no record of the drawing being returned, and a 1986 MFG consigned drawing list demonstrates that the drawing was in Defendants' possession as of September 1986. Leopold Decl., ¶ 35, Ex. 19.

**Response:** Undisputed as to Defendants' claim that the drawing is not in their current inventory. Otherwise disputed as argumentative. Further disputed because a Gallery document from 1989, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was never returned to AHF before or after the Settlement Agreement.

173. MFG claims that the drawing titled "Directing Minds of Russian Cinema and Theatre" (inventory number 2459) was not consigned under the Settlement Agreement. Dkt. No. 105.

**Response:** Undisputed

174. Yet, deposition testimony indicates that the drawing was consigned. Kaplan Decl., Ex. 7 at 101:20 – 103:08.

**Response:** Disputed as Plaintiff's cited exhibit does not attach pages 101 through 103. Moreover, Daria Enrick's guess about what works have been consigned while at a deposition and without access to records is not indicative of what may have been consigned to the Gallery over a period of decades.

175. Indeed, a 1989 MFG consigned drawing list provided to Hirschfeld and now in AHF's records demonstrates that the drawing was in Defendants' possession as of September 11, 1989. Leopold Decl., ¶ 36, Ex. 20.

**Response:** Disputed. A Gallery document from 1989, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

176. MFG claims that the drawing titled "The Filming of Stolen Hours a/k/a Summer Flight" (inventory number 2566) was not consigned under the Settlement Agreement, but AHF has no record of the drawing being returned. Dkt. No. 105; Leopold Decl., ¶ 20. Furthermore, a 1990 MFG consigned drawing list demonstrates that the drawing was in Defendants' possession as of February 1990. Leopold Decl., ¶ 37, Ex. 21.

**Response:** Undisputed as to Defendants' claim that the drawing is not in their current inventory. Otherwise disputed as argumentative. Further disputed because a Gallery

document from 1990, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

177.    MFG claims that the drawing titled "Walking Happy" (inventory number 2740) was not consigned under the Settlement Agreement, but a 1991 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of June 15, 1991. Dkt. No. 105; Leopold Decl., ¶ 38, Ex. 22.

**Response:**  Disputed.  A Gallery document from 1991, dated over twenty-five years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

178.    MFG claims that the drawing titled "Duke Ellington" (inventory number 3267) was not consigned under the Settlement Agreement, but a 1996 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of February 15, 1996. Dkt. No. 105; Leopold Decl., ¶ 39, Ex. 23.

**Response:**  Disputed.  A Gallery document from 1996, dated approximately thirty years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

179.    The drawing titled "Dizzy Gillespie" was consigned under the Settlement Agreement, as reflected in a consigned drawing list compiled after execution of the Agreement. Leopold Decl., ¶ 40, Ex. 24.

**Response:**  Disputed as to the characterization of Exhibit 24 as a "consigned drawing list complied after execution of the Agreement."  Exhibit 24 is undated, as recognized by Plaintiff in paragraph 40 of the Declaration of David Leopold (describing Exhibit 24 as an "excerpt from undated drawing list").

180.    Indeed, a November 30, 2001 monthly statement, post-dating the Agreement, lists the drawing as a pending sale. *Id.* at ¶ 40, Ex. 25.

**Response:**  Undisputed.

181.    MFG claims that the drawing titled "Lorabid Doctor Waiting for Phone Call for Eli Lilly" (inventory number 3321) was not consigned under the Settlement Agreement, but a 1996 MFG consigned drawing list provided to Hirschfeld, and now in AHF's records, demonstrates that the drawing was in Defendants' possession as of July 15, 1996. Dkt. No. 105; Leopold Decl., ¶ 41, Ex. 26.

**Response:** Disputed.  A Gallery document from 1996, dated approximately twenty-five years ago, that lists this drawing in inventory does not evidence that the drawing was actually consigned to the Gallery in 2001 or anytime after the date of the Settlement Agreement.

182.    The drawing titled "The Cast of 45 Seconds from Broadway" (inventory number 3927) was consigned to MFG and in its possession as of October 2001, when it was listed as a pending sale. Leopold Decl., ¶ 42, Ex. 27.

**Response:** Undisputed as to Exhibit 27 listing the drawing.  Disputed as to whether the drawing was listed as a "pending sale" as no heading exists above where the drawing is listed.

183.    The drawing appears on a 2013 consigned drawing list, as well as a 2015 consigned drawing list. *Id.* at ¶ 42, Exs. 28-29.

**Response:** Disputed.  The identified lists were drafts being exchanged by Gallery personnel over email concerning checking records on the website.  They do not support the assertion.

184.    AHF has not been paid for the sale of any of the drawings identified above. Leopold Decl., ¶ 20.

**Response:** Undisputed insofar as Defendants generally do not pay Plaintiff for sales of works not consigned to Defendants.

185.    Nor are these works in AHF's possession or inventory. *Id.*

**Response:** Disputed.  Defendants have no access to Plaintiff's inventory in part because Plaintiff refused to produce such documents in this action.  Based on Defendants records Defendants believe many of these works to have been in Plaintiff's inventory or possession at one time.

186. Upon recently taking an inventory, Feiden discovered that she owned over 200 Hirschfeld drawings, when she previously thought she had around 100. Kaplan Decl., Ex. 8 at 514:21-24.

**Response:** Disputed as a mischaracterization of testimony. Also disputed as to relevance because the statements concern works Feiden owns as opposed to consigned works. Further disputed as Feiden clarified she doesn't often take inventory or exhibit the original drawings which she owns. Feiden testified that she "thought it was about 100" but she "think(s) now that it's probably over 200." Kaplan Decl., Ex. 8 at 514:14-24.

187. It is possible that Defendants sold the works to themselves, but Defendants have refused to identify purchasers or licensees, despite that doing so is required under Paragraph 7(d). Leopold Decl. ¶ 43; Kaplan Decl., Ex. 2 at p. 20, ¶ 7(d).

**Response:** Disputed as argumentative and not a statement of fact. Also disputed as pure speculation. Also disputed as a legal conclusion as to what is required under Paragraph 7(d) of the Agreement. Defendants have not outright refused to identify purchasers or licensees to Plaintiff, rather Defendants have expressed confidentiality concerns and other concerns because Plaintiff has decided to compete with Defendants commercially in the selling and licensing of Hirschfeld works.

188. If Defendants have sold to themselves without consulting AHF as to price and receiving consent to the sale, Defendants are also in violation of Paragraph 9 of the Settlement Agreement. Ex. 2 at p. 23, ¶ 9.

**Response:** Disputed as a legal conclusion and as speculative.

189. Paragraph 11(b)(i) of the Settlement Agreement lists material breaches of Paragraphs 7 and 9 as cause to terminate. Ex. 2 at p. 25, ¶ 11(b)(i).

**Response:** Disputed as a legal conclusion. Undisputed that Paragraph 11(b)(i) of the Agreement states that "[f]or purposes of this Settlement Agreement, Cause shall mean any of the following: (i) A material breach by Feiden of any provisions of paragraphs . . . 7, 9 . . ."

190.    As to Defendants' care of the drawings in their possession, Defendants permit visitors to handle the original artwork in their possession. Kaplan Decl., Ex. 7 at 163:21 – 165:5.

**Response:**  Disputed as to characterization of testimony suggesting that visitors are given full access to "handle" artwork.  In her deposition, Daria Enrick, employee of the Gallery, testified that certain "plain proofs" are "in sleeves, protective sleeves so people can look through them and see if there's something that they're interested in."  Kaplan Decl., Ex. 7 at 163:6-11.  When asked whether that was the only artwork that visitors can "handle," Ms. Enrick answered, "Generally, yes."  *Id*. at 163:21-23.

191.    While the townhouse in which the gallery is located has an alarm system, neither Ms. Enrick nor Ms. Solomon know how often it is set. *Id.,* Ex. 7 at 86:18 – 87:6 and Ex. 62 at 42:12-43:6.

**Response:**  Undisputed as to the fact that neither Ms. Enrick nor Ms. Solomon knew specifically when the alarm is set.

192.    There is no formal security system in place protecting the room in the townhouse in which framed original drawings are stored. *Id.,* Ex. 7 at 80:7 – 82:11, 82:14 – 83:23.

**Response:**  Disputed as to what constitutes "formal security system."  Katherine Solomon testified that there are two locks on the front door to the building.  Kaplan Decl., Ex. 62 at 43:10-11.  She also testified that the gallery space has a separate locked door (*id*. at 43:17-21), as did Daria Enrick (Kaplan Decl., Ex. 7 at 81:17-24).   Ms. Solomon opined in her deposition that Javier, the security guard, may set the alarm (*see* Kaplan Decl., Ex. 62 at 42:21-23).  She also testified that she knew the alarm code (*id*. at 42:12-16).

193.    This room also lacks any type of climate control system, as does the room in which unframed original drawings are stored. *Id.* at 80:7 – 82:11, 82:14 – 83:23.

**Response:**  Undisputed as to there being no formal climate control system. Disputed as to relevance and materiality since Plaintiff does not state the Madison Avenue

Gallery had rooms with a "formal climate control system," or whether such climate control is even required.

194.     The Settlement Agreement requires that Defendants maintain a fire and theft insurance policy in a face amount of "two million dollars ($2,000,000.00) pending determination of an approved price list, and thereafter in an amount not less than the amount of [AHF's] consigned interest. . ." Kaplan Decl., Ex. 2 at p. 13, ¶ 5(f).

**Response:**  Undisputed.

195.     While the Agreement was executed in 2000, Defendants have not provided AHF with copies of their 2000 – 2002 insurance policies. Kaplan Decl. ¶ 76.

**Response:**  Disputed as to relevance and materiality.

196.     Defendants did not provide their insurance policies from 2009 to the present until October of 2016, well past thirty days' of AHF's service of its notice of termination. Kaplan Decl., Ex. 4 at ¶ 4 and Ex. 5 at ¶ 4.

**Response:**  Undisputed, except as to relevance and materiality since the notice of termination does not discuss failure to provide policies as a ground for termination, or at all. Kaplan Decl. Ex. 3.

197.     Defendants did not provide their insurance policies from 2003-2008 until March of 2017. Kaplan Decl. ¶ 77.

**Response:**  Undisputed, except as to relevance and materiality, given that the statute of limitations for contract claims is six years.

198.     While Defendants maintained insurance coverage in the amount of $3 million dollars from 2003 – 2007, the insurance policy obtained by Defendants during this time period and thereafter covered more than just consigned artwork: it covers "antiques and objects of art of every nature and description," "reference library and other reference material," and "furniture and fixtures of a fine arts nature belonging to the [i]nsured." Exs. 75-76.

**Response:**  Disputed as to relevance and materiality, especially as the statue of limitations for contracts claims is six years.

199.     Moreover, Defendants' 2003-04 insurance policy does not name AHF as an additional insured, as required by paragraph 5(f) of the Settlement Agreement. Kaplan Decl., Ex. 2 at 5(f); Ex. 77.

**Response:** Undisputed, except as to relevance given Lee Snow advised Feiden of AHF's corporate formation by letter dated December 7, 2004, and the Feiden Defendants could not have known to list AHF as an additional insured until a later policy period. Rao Decl. Ex. 4.

200. In 2008, without notice to AHF, Defendants reduced their insurance coverage to $1.25 million. Surry Decl., ¶ 12; Ex. 76.

**Response:** Disputed insofar as Feiden recalls providing copies of insurance polices to Lee Snow.

201. The current value of Defendants' insurance policy is $1.25 million. Ex. 75. Despite testifying to the existence of a $2 million policy until recently, Kaplan Decl., Ex. 6 at 388:9-391:5; 395:9-17, Defendants never had a policy in the face amount of $2 million. Dkt. 68, ¶ 5.

**Response:** Disputed. Defendants in fact had a policy in a face value of $3 million which is inclusive of $2 million in coverage. Moreover, Defendants have an umbrella policy with coverage amounts equal to $2 million.

202. As with Defendants' previous policy, the policies from 2008 to the present cover consigned artwork as well as the contents of Feiden's home, including what Feiden characterizes as an antique glass collection. Ex. 75 at 1. Ex. 7 at 156:8-15.

**Response:** Disputed as to relevance and materiality. Pursuant to the policy, the basis of valuation is the value of the consigned interest plus 10 percent. Kaplan Decl. Ex. 75 Section 6.B. Moreover, MFG has additional umbrella coverage through Chubb. Rao Decl. Ex. 3.

203. Defendants maintain that $1.25 million actually exceeds what they believe to be the value of their consigned inventory. Kaplan Decl., Ex. 4 at ¶ 43; Ex. 5 at ¶43; and Ex. 6 at 395:14-17.

**Response:** Undisputed.

204.     Defendants admitted, however, that this amount is based on fifty percent of the value of the consigned artwork (*i.e.,* AHF's share). *Id.*, Ex. 6 at 404:15-406:21.

Response:  Disputed.  Plaintiff fails to attach the relevant pages of the cited transcript.

205.     In the event that the insurance policy were to be paid out, Defendants maintain that AHF should trust that Defendants would permit AHF to be paid first. *Id.* at 401:17-402:18.

Response:  Disputed.  Plaintiff fails to attach the relevant pages of the cited transcript.

206.     The amount of insurance that Defendants are required to maintain, subsequent to the initial $2,000,000 face value of the policy, must be "determined by reference to the [Foundation] approved price list" of Hirschfeld's artwork in Defendants' possession. Kaplan Decl., Ex. 2, ¶ 5(f).

Response:  Disputed as to "must" since the contract is capable of a reasonable interpretation in the absence of a price list.

207.     Defendants admit that they have not provided a 2016 price list to AHF. Kaplan Decl., Ex. 4 at ¶ 50 and Ex. 5 at ¶5 0; Dkt. No. 84-1, ¶¶ 269-270.

Response:  Disputed. Defendants have provided a 2016 price list to AHF.  See

208.     Defendants also admit that they have failed to provide price lists in previous years, including in the previous six years." Kaplan Decl., Ex. 4 at ¶ 51; Ex. 5 at ¶ 51; and Ex. 6 at 292:21-293:6; 294:14-21; Dkt. No. 84-1 at ¶¶ 269-70; DKt. No. 89, ¶¶ 269-270.

Response:  Disputed. Plaintiff mischaracterizes Defendants' testimony.  Margo Feiden testified that the prices of unframed and framed works are available publicly, that they are on MFG's website, and as to prices of artworks in 2010 or 2013, she could not recall whether they were or were not available on the website. Moreover, Ms. Feiden testified that AFG never asked for a price list.  Kaplan Decl. Ex. 6 at 290:1 – 297:25.

209. Defendants admit that if the Consigned Works were destroyed, the way to determine the value would be to look at Defendants' website and then "infer[ ]" the value from anything not listed on the website. Kaplan Decl., Ex. 6 at 406:14-409:8.

**Response:** Disputed. Plaintiff mischaracterizes Defendants' testimony. Margo Feiden testified that there were electronic files available as backup for the insurance company that show the pricing. Kaplan Decl. Ex. 6 at 408:8 – 409:2.

210. To obtain a near-complete price list of consigned works, Defendants must run several searches on a computer located in the gallery.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 6 at 406:14-409:8.

211. Feiden would then have to correct any errors or omissions from memory. Kaplan Decl., Ex. 6 at 347:16-24.

**Response:** Disputed. Plaintiff fails to attach the relevant pages of the cited transcript. Therefore, there is no way to verify the truth of Plaintiff's statement.

212. Yet, at MFG's deposition, Feiden had difficulty recognizing price lists that MFG produced to AHF, and she did not remember that Al Hirschfeld had informed her that there were 300 works that were not to be sold. *Id.* at 298:24-299:15; 354:4-9; [Dep Ex.] 25.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Moreover, Plaintiff's interpretation of Ms. Feiden's mental state, that she had "difficulty recognizing" price lists is not a fact but an opinion. In addition, Plaintiff attaches only a portion of the deposition testimony and fails to attach further relevant pages of the cited transcript. Therefore, there is no way to verify the truth of Plaintiff's statement.

213. A price list could, according to Defendants, be compiled from artwork prices listed on MFG's website, but MFG's website does not list the prices of all consigned artwork. Kaplan Decl., Ex. 5 at 73:10 – 74:4.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 5 at 73:10 – 74:4.

214.     The seemingly complete price lists produced by MFG to AHF during the course of this litigation were characterized by MFG as rough drafts. Ex. 7 at 409:3-8.

**Response:**  Disputed as to characterized.  Some of these were emailed internally with notations to make revisions, and were obviously drafts.  Plaintiff mischaracterizes and misstates Defendants' testimony.

215.     The Settlement Agreement provides that the parties' relationship will be governed by the Arts Law. Kaplan Decl., Ex. 2, ¶ 6(a).

**Response:**  Undisputed to the extent "Arts Law" as referenced here is as defined in the Settlement Agreement ¶ 6(a), and except insofar as some provisions of the Settlement Agreement provide otherwise.

216.     Defendants do not view the Settlement Agreement as requiring that they promote Hirschfeld's work and legacy, and in fact they took no material steps to do so. Kaplan Decl., Ex. 4 at ¶ 202 and Ex. 5 at ¶ 202; Ex. 8 at 7:15-11:15; 14:5-18:4; 49:19-50:17.

**Response:**  Disputed.  Plaintiff's opinion as to Defendants' point of view or mindset is irrelevant, immaterial and argumentative.

217.     When negotiating licensing deals on AHF's behalf, Defendants determine licensing fees based not on the interests in maintaining a proper price for AHF's works, but based whatever the licensee wishes to pay. Kaplan Decl., Ex. 5 at 35:14-35:23; 36:21-37:7; 207:19-208.

**Response:**  Disputed.  Plaintiff mischaracterizes and misstates Defendants' testimony.  Kaplan Decl., Ex. 5 at 35:14-35:23; 36:21-37:7; 207:19-208.

218.     In one instance involving a prospective licensee that had limited funds, Defendants accepted zero dollars for a license in exchange for free advertising for Defendants that made no reference to AHF. Kaplan Decl., Ex. 5 at 35:14-35:23; Ex. 78.

**Response:**  Disputed.  Plaintiff mischaracterizes and misstates Defendants' testimony.  Kaplan Decl., Ex. 5 at 35:14-35:23; Ex. 78.

219.     In setting licensing fees, Defendants also look to prior licensing agreements, dating as far back as ten years ago. Kaplan Decl., Ex. 5 at 187:6-188:5.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 5 at 187:6-188:5.

220. Similarly, Defendants do not update their price list for original drawings, having recently sold a drawing titled "The Sunshine Boys" to a private for $4,200, a number written on the back of the drawing when the gallery was at 699 Madison over a decade ago. Kaplan Decl., Ex. 8 at 104:5 – 20; Ex. 6 at 319:1-321:2.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 8 at 104:5 – 20; Ex. 6 at 319:1-321:2.

221. Defendants were well aware that the minimum price for "The Sunshine Boys" was $6,500 on the last inventory list that Defendants provided to Hirschfeld in 2001, which suggested prices for the consigned drawings. *Id.*, Ex. 6 at 311:22-313:21; 393:5-13; Exs. 79-80.

**Response:** Disputed as to "well aware" and "minimum price" as it relates to a document from 2001 which Feiden testified is not entirely clear as to its purport. Plaintiff mischaracterizes and misstates Defendants' testimony. *Id.*, Ex. 6 at 311:22-313:21; 393:5-13; Exs. 79-80.

222. Paragraph 5(d)(ii) of the Settlement Agreement permits discounts only in limited amounts and in limited circumstances not applicable to the sale of "The Sunshine Boys." Kaplan Decl., Ex. 2 at p. 13, ¶ 5(d)(ii).

**Response:** Undisputed as to the reference to the Settlement Agreement. However, disputed as to Plaintiff's mischaracterization of the sale of "The Sunshine Boys."

223. Defendants do not ask prospective licensees whether or not the licensee has previously reached out to AHF for a licensing estimate. Kaplan Decl., Ex. 5 at 36:13 – 17.

**Response:** Disputed as to relevance and materiality.

224. As a result, Defendants have, on at least one occasion, undercut AHF by offering a below-market license to a prospective licensee. Exs. 81-82.

**Response:** Disputed as to below-market. Further disputed, as Plaintiff mischaracterizes and misstates Defendants' testimony and the asserted fact is contrary to the cited evidence. Moreover, disputed as to materiality.

225. In August 2015, Defendants gave a two-year license for fifteen Hirschfeld images to a condominium building to display on a wraparound banner and in sales and promotional materials for $3,750. Ex. 83.

**Response:** Undisputed, except insofar as the cited document does not reference other conversations which shed light on the parties understanding a to the limitations of this license.

226. While Feiden testified that such license was solely for newspaper use, contemporaneous correspondence between Defendants and the condominium building reflect Defendants' awareness of the building's more extensive intended use. Kaplan Decl., Ex. 8 at 209:23-213:8; Ex. 84.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 8 at 209:23-213:8; Ex. 84.

227. The condominium building failed to adhere to the terms of the license by including the proper copyright notice and credit lines. Ex. 8 at 212:22-24, 214:11- 216:14.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Ex. 8 at 212:22-24, 214:11- 216:14

228. Defendants did not report the existence of the license until March 30, 2015, and did not seem particularly rushed to do so, even knowing that AHF was concerned about potential copyright infringement of multiple Hirschfeld images. Kaplan Decl., Ex. 85. Defendants have also offered or sold prints for purported charities without informing AHF or proving that they were paid for. Ex. 8 at 326:22-332:12.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion as to whether Defendants were "rushed" to report potential copyright infringement.

229. Defendants undertake no efforts to enforce the terms of the licenses they enter into on AHF's behalf, including the Watson license, and in some instances have not paid

AHF for licenses granted within six years of the filing of this lawsuit. Kaplan Decl., Ex. 4, ¶¶ 151, 153-156, Ex. 5, ¶¶ 151, 153-156; Ex. 7 at 222:18-224:20.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind.

230. At times, Defendants were slow to respond to a licensing request, sent the wrong image, or otherwise underpriced images. *See, e.g.,* Ex. 86.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind.

231. Nearly all of the works on display at the gallery are limited edition prints. Kaplan Decl., Ex. 5 at 63:6-19; Ex. 62 at 27:18 – 28:13; 32:22 – 33:12; Ex.7 at 63:6 - 19.

**Response:** Undisputed that Plaintiff has caused Defendant's inventory of original work to reduce, thus reducing the Gallery's ability to display original works.

232. As outlined in the Settlement Agreement, once limited edition prints have been paid for upon creation, AHF is owed no further compensation in connection with their sale. Kaplan Decl., Ex. 2 at 11, ¶ 4(a)(v).

**Response:** Undisputed as tautological, i.e. once AHF is paid in full there are no further payment obligations.

233. The price book that Ms. Enrick carries with her when she conducts gallery tours lists only limited edition prints. Kaplan Decl., Ex. 7 at 106:3 – 107:10.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony. Kaplan Decl., Ex. 7 at 106:3 – 107:10.

234. When Defendants reach out to prospective customers, they call primarily to discuss the sale of limited edition prints, not original artwork. *Id.* at 181:16 – 182:9, 204:23 – 207:18.

**Response:** Disputed insofar as Defendants call customers to discuss those works in which customers are interested, and do not try to interest customers in limited edition prints as opposed to original work. Plaintiff mischaracterizes and misstates Defendants' testimony.

235. When told not to sell works on a "not for sale" list, Defendants disregarded the list entirely because some of the items on the list had been previously sold. Kaplan Decl., Ex. 8 at 360:14-20.

**Response:** Disputed as to disregard entirely. Plaintiff mischaracterizes and misstates Defendants' testimony. In addition, disputed as argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind and behavior.

236. In fact, in 2014, Defendants sold a work titled "Love's Old Sweet Song," which Al Hirschfeld had informed Feiden in 2001 should not be sold. Ex. 88.

**Response:** Disputed, insofar as Plaintiff's own documents submitted with the Kaplan Declaration show that Hirschfeld preferred that Feiden work with a client to sell a work, even on the not for sale list, by redisgnating it, rather than forego a sale. Therefore, it is unclear what his precise instructions were or were intended to convey in 2001.

237. At other times, she deferred to the judgment of her off-again, on-again employee Caxton Kaback (who did not have any formal training in the arts) to determine what works belonged in which category, rather than working with AHF's President to clarify any confusion. Kaplan Decl., Ex. 8 at 361:20-364:8; 455:10-456:3.

**Response:** Disputed as to confusion and as to the assumption that Gallery staff are incapable of presenting works on their own or that AHF is entitled to or even wants to instruct the Gallery how to organize its inventory.

238. Defendants' recordkeeping of sales is unreliable. *Id.* at 124:8-128:25, 272:21- 274:5.

**Response:** Disputed as argumentative and as it concerns Plaintiff's opinion and not a fact.

239.    Defendants cannot be sure whether a work was returned to AHF, or whether it was sold. Kaplan Decl., Ex. 8 at 331:3-332:18; 332:21-340:23; 367:19-368:10.

**Response:** Disputed, as making a general claim based on a specific instance of confusion during a deposition.  Kaplan Decl., Ex. 8 at 331:3-332:18; 332:21-340:23; 367:19-368:10.  Plaintiff mischaracterizes and misstates Defendants' testimony.

240.    Defendants have failed to report the sale of at least one drawing, called "Follow the Girls," sold recently through an auction house, and did not pay AHF for the sale. Surry Decl., ¶ 11; Leopold Decl., ¶ 44.

**Response:** Disputed as to the requirement to report a sale of a drawing not owned by the Foundation.

241.    At deposition, Defendants obfuscated heavily and aggressively about the sale through the auction house (Heritage Auctions), to support their position that they had never sold through an auction house, including arguing that the work had been sold to a third party and exchanged hands, where eventually someone else sold it. Kaplan Decl., Ex. 6 at 465:8-470:11; 477:21-478:9, Ex. 8 at 121:4-124:3; 129:4-134:14; 138:21-140:19; 267:17-268:19; Ex. 89.

**Response:** Disputed as to obfuscated heavily and aggressively, support their position.  In actuality the testimony shows that Feiden was attempting to understand a document placed in front of her for the first time and explain what on its face appeared to be an anomaly.  Plaintiff mischaracterizes and misstates Defendants' testimony.

242.    Only after AHF subpoenaed Heritage for records did Feiden suddenly and conveniently "remember" that she had sold the work to herself (claiming she had paid for it 30 years before) and had resold the work through Heritage Auctions. Kaplan Decl., Ex. 8 at 328:2- 330:7. AHF has no record of receiving payment in connection with this purported sale.

**Response:** Disputed as to suddenly and conveniently or as to the connection between Plaintiff's subpoena and Feiden's memory due to the passage of time and the ability to

review and consider her own records.  Further disputed as argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind.

243.    "Follow the Girls" appeared in Defendants' inventory as of June 21, 2016, on the list provided to the Court as ordered, and was on a list of consigned works from 2000 and 2003 when Defendants received 500 works and gave back works to be left with 250 works. Ex. 90. Defendants' also included the drawing on a list of possible drawings for a client named "Scott." Kaplan Decl., Ex. 91.

**Response:**  Disputed.  Plaintiff mischaracterizes and misstates Defendants' testimony and evidence.

244.    In addition to "Follow the Girls," the following works that Defendants report as sold do not appear on any statements and were not paid for: "The Many Faces of Bob Hope" (inventory no. 2188); "David Dukes in M. Butterfly, 9/30/88" (inventory no. 2269); "Born Yesterday, 1989 (inventory no. 2359); and "*Mr. President*. Redrawing of 1962 Drawing, 12/01" (inventory no. 3932). Surry Decl. ¶ 11; Leopold Decl., ¶ 45. Kaplan Decl., Ex. 92.

**Response:**  Disputed because it is contrary to Defendants' testimony and is argumentative.

245.    One of the missing works, "Carmen," was sold through Heritage Auctions in 2014. Ex. 93.

**Response:**  Disputed as to Plaintiff's characterization of "missing works."

246.    Defendants undertake almost no marketing or advertising efforts to further sales. Kaplan Decl., Ex. 7 at 99:3 − 8, 98:11 − 99. For instance, Defendants failed to notify their customers of two major New York City museum exhibitions of Hirschfeld's artwork organized by AHF in 2013 and 2015. Leopold Decl., ¶ 49.

**Response:**  Disputed.

247.    In contrast, Defendants have given free licenses of AHF-owned images in exchange for advertising for the gallery. Kaplan Decl., Ex. 94.

**Response:**  Disputed.  Plaintiff's statement is contrary to Defendants' testimony and evidence.

248.    Ms. Enrick appears to work from an incomplete price list. If she cannot find the price of a particular drawing on her price list, she must wait for someone to retrieve the information for her from the computer, which she does not know how to use, or must ask Feiden. Kaplan Decl., Ex. 7 at 90: 12 – 91:8.

Response:    Disputed as argumentative and because it mischaracterizes Defendants' testimony.

249.    As a result of Defendants' careless and/or lazy approach to serving AHF's best interests, AHF has suffered significant loss of value of artwork to the extent such artwork has been mishandled, and a total loss of value of consigned drawings that Defendants have lost. Leopold Decl., ¶ 47.

Response:    Disputed.    Plaintiff mischaracterizes and misstates Defendants' testimony.    In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind and attitude.

250.    Moreover, to the extent Defendants' books and records are incorrect, Defendants have violated Paragraph 5(c) of the Settlement Agreement, which requires Defendants to "maintain complete and accurate books and records of all transactions subject to this Settlement Agreement sufficient to enable Hirschfeld to exercise Hirschfeld's rights under this Settlement Agreement, including without limit Hirschfeld's right to an audit set forth in paragraph 7[.]" Kaplan Decl., Ex. 2 at p. 12, ¶ 5(c).

Response:    Disputed because Defendants' have complied with the terms of the Settlement Agreement and Plaintiff's statement is argumentative and seeks a legal conclusion.

251.    Rather than discuss issues with AHF directly with AHF, Feiden instead contacts her lawyer. Kaplan Decl., Ex. 8 at 173:20-178:8; Kaplan Decl., Ex. 13.

Response:    Disputed for relevance and materiality.

252.    Feiden continues to maintain a large amount of jealousy over AHF Creative Director David Leopold's connection to Al Hirschfeld, a connection formally acknowledged in the Settlement Agreement. Kaplan Decl., Ex. 2 at p.14, ¶ 5(h)(i), p. 17 ¶ 6(h)(v); Kaplan Decl., Ex. 8 at 504:13-505:11.

**Response:** Disputed for relevance and materiality. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind and attitude.

253. Feiden believes that the Settlement Agreement permits her to disparage Leopold. Kaplan Decl., Ex. 8 at 427:2-7; 508:20-510:22.

**Response:** Disputed. Plaintiff mischaracterizes and misstates Defendants' testimony.

254. In fact, the Agreement expressly states that Hirschfeld contemplated Leopold as an agent for Hirschfeld's reserved rights. Kaplan Decl., Ex. 2 at p. 17, ¶ 6(h)(v).

**Response:** Undisputed only to the extent that it is an accurate recitation of the Settlement Agreement. Otherwise, disputed because it is argumentative and seeks a legal conclusion.

255. Indeed, Feiden publicly criticizes and attacks Leopold with reckless abandon. Exs 95-97.

**Response:** Disputed for relevance and materiality. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind and attitude.

256. AHF has stood by its Creative Director – who, unlike Feiden, is qualified and credentialed in the art world – but for AHF's local dealer to cast aspersions as to AHF's decision to do so communicates a negative and odd message to the public that makes third parties uncomfortable dealing with either Defendants or AHF. Surry Decl., ¶ 15.

**Response:** Disputed for relevance and materiality. In addition, disputed because it is argumentative and as it concerns Plaintiff's opinion about Defendants' state of mind and attitude.

257. MFG has never served a notice identifying AHF's alleged breaches of the Settlement Agreement, or providing an opportunity for AHF to cure such breaches. Kaplan Decl., Ex. 8 at 183:2 – 14; 187:20-188:5.

**Response:** Disputed because it is contrary to the evidence.

258. The Settlement Agreement, by its nature as a consignment and representation agreement, does not impose many obligations on the principal, and AHF has complied with the letter of the Agreement and beyond, even in the face of Defendants' behavior. Surry Decl. ¶ 14.

**Response:** Disputed because it is argumentative and is Plaintiff's opinion.

259. Nonetheless, MFG claims that AHF has "forced" the number of Consigned Works in MFG's possession to "less than the Consignment Number" (Dkt. No. 84-1 at 49, ¶ 419), the Agreement provides for a maximum number of consigned works, not a minimum. Kaplan Decl., Ex. 2 at ¶ 2(a)(i).

**Response:** Undisputed only to the extent it is a recitation of the terms of the Settlement Agreement, otherwise disputed because it is argumentative and a mischaracterization of Defendants' testimony.

260. MFG also claims that AHF is required to display MFG's credit line on AHF's website. Dkt. No. 84-1 at 50, ¶ 427.

**Response:** Undisputed.

261. Such requirement is absent from the Settlement Agreement, which provides that AHF must use reasonable efforts to require each work licensed for reproduction by AHF under the Settlement Agreement to bear the credit line. Kaplan Decl., Ex. 2 at ¶ 8(d).

**Response:** Disputed as to the interpretation of the terms of the Settlement Agreement.

262. With respect to a small number of licensed reproductions, the credit line did not appear, often due to the fault of the party printing the licensed reproduction. Leopold Decl., ¶ 40.

**Response:** Disputed because it is Plaintiff's opinion concerning the reasons why a credit line does not appear on licensed reproductions and an estimate that such failures are "small" in number.

263.    Defendants claim that there were "hundreds of failures" to provide credit, but Defendants have no proof of that. Kaplan Decl., Ex. 8 at 180:18-20. *AHF Did Not Breach the Covenant of Good Faith and Fair Dealing*

> **Response:** Disputed because it mischaracterizes Defendants' testimony.

264.    MFG claims that AHF breached the implied covenant of good faith and fair dealing by, *inter alia*, "strategically removing the best Hirschfeld works from those available to the Gallery to sell." Dkt. No. 84-1 at 52, ¶ 448.

> **Response:** Undisputed.

265.    Under the Settlement Agreement, MFG's consigned drawings are selected from the group of works that AHF "in [its] sole and absolute discretion" chooses to offer for sale. Kaplan Decl., Ex. 2 at pp. 2-3.

> **Response:** Undisputed to the extent it references the Settlement Agreement.

266.    The Settlement Agreement allowed MFG to select those five hundred drawings it wishes to hold on consignment from the works made available for sale. Kaplan Decl., Ex. 2 at p. 2.

> **Response:** Undisputed to the extent it references the Settlement Agreement.

267.    Following Hirschfeld's death and the contractual reduction of consigned inventory, MFG was similarly entitled to select the two hundred and fifty works it wished to hold on consignment. Kaplan Decl., Ex. 2 at p. 3.

> **Response:** Undisputed to the extent it references the Settlement Agreement.

268.    In June of 2016, AHF issued a press release, posted on its website, that read: "The Al Hirschfeld Foundation (a not-for-profit organization) announced today that it is terminating the September 29, 2000 agreement between Al Hirschfeld and Margo Feiden/The Margo Feiden Galleries because Margo Feiden and The Margo Feiden Galleries have ceased operating in a manner consistent with the terms and spirit of the parties' agreement. The Al Hirschfeld Foundation was established in 2004 by the will of Al Hirschfeld, who died on January 20, 2003." Kaplan Decl., Ex. 98.

> **Response:** Undisputed.

269.    AHF crafted its statement to soften the message it anticipated would be sent by its Complaint once unsealed. Surry Decl., ¶ 16.

> **Response:** Disputed because it is Plaintiff's opinion.

270.    The same day AHF issued its press release, AHF's Creative Director David Leopold, in his personal capacity, posted to his Facebook page a statement "Free at last." Underneath his statement, Mr. Leopold shared a link to AHF's web page displaying its statement regarding termination of the Settlement Agreement. Mr. Leopold's post was "liked" by his close friends, none of whom are prior or potential customers of Defendants. Leopold Decl., ¶ 51.

        **Response:**  Disputed only to the extent of Plaintiff's characterization that Mr.

Leopold's post was "liked" by "his close friends, none of whom are prior or potential

customers of Defendants" because this is Plaintiff's opinion, is argumentative and is contrary to

the fact that at least one of the individuals who "liked" the post was Defendants' customer.

Dated: New York, New York
    May 19, 2017

_____
SIDDARTHA RAO