USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/1/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                                 :
AL HIRSCHFELD FOUNDATION,                                        :
                                                                 :
                                      Plaintiff,                 :
                                                                 :
                    -v-                                          :
                                                                 :
THE MARGO FEIDEN GALLERIES LTD.                                  :
and MARGO FEIDEN,                                                :
                                                                 :
                                      Defendants.                :
                                                                 :
-----------------------------------------------------------------X

16 Civ. 4135 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    This case, now on summary judgment, involves claims of a breach of an agreement between the renowned cartoonist Al Hirschfeld and a gallery licensed to represent him. Plaintiff is the Al Hirschfeld Foundation ("the Foundation"), which, upon Hirschfeld's death in 2003, succeeded to Hirschfeld's interests and obligations under a 2000 Settlement Agreement (the "Agreement") with defendants Margo Feiden and the Margo Feiden Galleries, Ltd. (singly, the "Gallery"; and together with Feiden, the "Galleries"). The Galleries had represented Hirschfeld during his lifetime and, governed by the Agreement, continued that relationship with the Foundation after his death. The Foundation, however, claims that the Galleries have materially breached the Agreement in multiple respects, and in 2016, took steps to terminate the Agreement.

    The central question in this action is whether that termination was valid. The Foundation seeks a declaratory judgment to that effect. It brings other claims against the Galleries, including for copyright infringement, violations of the Lanham Act, breach of contract, breach of fiduciary duty, replevin, conversion, and negligence, all arising out the Galleries' supposed disregard of or

1

noncompliance with obligations under the Agreement. The Galleries dispute these claims, and counterclaim for breach of contract, breach of the covenant of good faith, and defamation. This Court has granted the Foundation preliminary relief—including to safeguard original works by Hirschfeld—to protect its interests during the litigation.

The Foundation now moves for summary judgment on several claims. The Galleries have cross moved. In this decision, the Court limits itself to resolving the issues necessary to decide the parties' central dispute: whether the Foundation's termination of the Agreement was valid. For the reasons that follow, the Court grants the Foundation's summary judgment motion on that question, finding termination warranted for multiple reasons.

## I.    Background[1]

### A.  Overview of the Hirschfeld/Feiden Business Relationship

Al Hirschfeld was a renowned cartoonist, famous for his depictions of Broadway stars and other celebrities and for his weekly cartoon in the *New York Times*. Margo Feiden began

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of their instant motions, including the Declarations (including attachments) of Brittany L. Kaplan, Dkt. 156 ("Kaplan Decl."); Margo Feiden, Dkt. 165 ("Feiden Decl."); Siddhartha Rao, Dkt. 170 ("Rao Decl."); Brittany L. Kaplan (declaration in opposition), Dkt. 179 ("Kaplan Opp. Decl."); and the parties' respective Rule 56.1 statements and counterstatements.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The parties' counter-statements of facts mark certain statements as "disputed" but, instead of identifying an actual factual inconsistency, often only offer additional context or dispute the

selling Hirschfeld's works on consignment in 1969. Def. 56.1 ¶ 2.   That relationship was formalized in a 1974 agreement, which governed Hirschfeld's and Feiden's business relationship through the end of the century.  Feiden is, and at all relevant times was, the principal and owner of the Gallery.  Feiden Decl. ¶ 1.

In 2000, Hirschfeld and Feiden agreed to settle a dispute, the details of which are not relevant here, and to continue doing business together.  The Settlement Agreement they reached that year has since governed Hirschfeld and Feiden's relationship.  In 2003, Hirschfeld died.  The Al Hirschfeld Foundation succeeded to his rights and obligations under the Agreement.

### B.   The Types of Works at Issue

Hirschfeld's works exist and have been sold or licensed in several forms relevant here.

*Originals and limited edition lithographs:*   During his lifetime, Hirschfeld created line drawings and color illustrations that were later printed as limited-edition lithographs.  Originals and limited editions of these are still sold today.  The Agreement contains provisions governing such works.  *See* Agreement ¶ 2(a)(i).

*Media-Commissioned Works*:  Some of Hirschfeld's drawings were commissioned from him by third parties, including most notably the *New York Times*.  The Agreement also covers such works, to which it refers as "Media Commissioned Works."  *See id.* ¶ 2(a)(iii).

*Photostatic Reproductions*:  The Agreement also addresses photostatic copies of the Works, to which it refers as "Photostatic Reproductions."  *See id.* ¶ 2(a)(iv).

*Limited purpose licenses*:  The Agreement contains provisions authorizing the parties to license third parties to use the works for limited purposes, either for a fee or for free.  Both

---

relevance of the underlying facts.  Where these counter-statements do not identify a true factual dispute, the Court treats the statement as undisputed.

Hirschfeld (and later the Foundation) and the Galleries have licensed third parties to do so. *See* Agreement ¶¶ 2(a)(ii), 6(h)(i), 6(h)(ii), 6(h)(iii); Rao Decl. Ex. 2 ("Eastman Dep.") at 11. When the Galleries facilitate a licensing or reproduction relationship, they retain a percentage of the licensing fee. Agreement ¶ 4(a)(ii).

*Giclees*: A central area of dispute involves a form of reproduction known in the art world as a "giclee." A *giclee* is a "high quality photo-static reproduction of a work of art;" that is, a high-quality reproduction made via an inkjet printer. *See* Def. 56.1 ¶ 39; Pl. Counterstatement 56.1 ¶ 39; Rao. Decl. Ex. 5 ("Snow Dep.") at 100. The Agreement does not contain any provisions addressing *giclees* as such. As reviewed below, the parties take different positions as to whether the Galleries have the right to sell *giclees* of Hirschfeld's works.

### C. Central Terms of the Agreement

The Agreement's central terms, as relevant here, are as follows.

*Sales and licensing*: The Agreement authorizes the Galleries to serve as the Foundation's "exclusive representative," Agreement ¶ 2(a), for the sale of up to 250 original Hirschfeld works on a consignment basis, *id.* ¶ 2(a)(i)[2]; for the licensing of reproductions of certain Hirschfeld works, *id.* ¶ 2(a)(ii); for the sale on consignment of certain "Media Commissioned Works"—that is, works that were previously commissioned by third parties, *id.* ¶ 2(a)(iii); and for the sale of photostatic reproductions of Hirschfeld's work, *id.* ¶ 2(a)(iv). The Agreement also authorizes the Galleries to produce new, limited-edition prints of Hirschfeld's work, subject to several limitations. Agreement ¶ 3(c). The Galleries are authorized to produce up to 18 series of limited-edition prints per year of 100 to 550 prints per edition. *Id.*

---

[2] Under the terms of the Agreement, the Galleries were authorized to sell on consignment 500 works until Hirschfeld's death, at which time the "Consignment Number" was reduced to 250. *See* Agreement ¶ 2(a)(i).

*Fees*:  The Agreement entitles the Galleries to certain fees, depending on the type of work sold:  for the sale of Consigned Works, the Galleries receive 50% of the sale price, *id* ¶ 4(a)(i); for the licensing of a reproduction, 20% of the licensing fee, *id.* ¶ 4(a)(ii); for arranging the creation of new Media Commissioned Works, 15% of the sales price of such works, *id.* ¶ 4(a)(iii); for the sale of photostatic reproductions, 36.5% of the sale price, *id.* ¶ 4(a)(iv); and for the sale of limited-edition prints as authorized by ¶ 3(c), 100%, minus certain fees for the Foundation, *id.* ¶ 4(a)(v).

*The Foundation's retained rights*:  Although the Galleries are thus authorized to sell and, in certain instances, reproduce, Hirschfeld's work, the Agreement provides that the Foundation "retain[s] all rights in the Works not expressly granted to [the Galleries] in this Settlement Agreement." *Id.* ¶ 6(h).  The Agreement describes the Foundation's retained rights as including, but not limited to, "sole proprietorship of copyright, trademark, privacy, publicity and related rights in the Works and in Hirschfeld's name, likeness and signature, subject to [the Galleries'] right . . . to use Hirschfeld's name, likeness (including self-portraits), biographical material and to reproduce Works in connection with [the Galleries'] promotion, advertising and marketing in furtherance of [the Galleries'] rights under this Settlement Agreement." *Id.*

*Termination*:  The Agreement sets out provisions governing its termination. *See id.* ¶ 11. The Agreement "shall terminate" 90 days after "written notice by [the Foundation] to [the Galleries] of termination by [the Foundation] for Cause which remains uncured for a period of thirty (30) days following such notice." *Id.* ¶ 11(a).  "Cause," in turn, is defined to include a "material breach" of several of the paragraphs of the Agreement. *Id.* ¶ 11(b)(i).  As relevant here, these include Paragraph 5, which imposes requirements governing the Galleries'

operations, and Paragraph 6, which governs the relationship of the parties, including the copyright rights retained by the Foundation.

## II.     Procedural History of This Litigation

### A.     The Foundation's Complaint and Motion for Emergency Relief

On June 6, 2016, the Foundation initiated this action, filing, initially under seal, both a complaint and a motion for emergency relief. *See* Dkt. 1, 6.

In brief, the Complaint alleged a series of escalating breaches by Feiden and the Gallery over the preceding months. Among other things, it alleged that Hirschfeld's works were being mishandled; that the Gallery space itself was poorly maintained and disorganized so as not to comply with the requirements of the Agreement; and that the Gallery staff also did not meet the qualifications required by the Agreement. *Id.* ¶¶ 34–40. The Complaint also alleged that Feiden and the Galleries had refused to return to the Foundation certain Hirschfeld works consigned to the Galleries. *Id.* ¶¶ 41–50. Finally, the Complaint alleged that the Galleries had infringed the Foundation's copyright rights by making various unauthorized reproductions, including of two Hirschfeld works, "Carol Burnett" and "Bob Hope," for use by Time Life without the Foundation's permission. *Id.* ¶¶ 51–63.

The Complaint sought declaratory, injunctive, and monetary relief. *Id.* at 16–19. As to declaratory relief, the Galleries sought declaratory judgments that (1) the Galleries had infringed its copyright rights; and (2) the Foundation had a superior possessory interest over the works that the Galleries refused to return. *Id.* at 16. As to injunctive relief, the Foundation sought to enjoin the Galleries from reproducing and selling unauthorized works, *id.* at 16–17; from representing that the unauthorized works had been endorsed or authorized by the Foundation, *id.* at 17; and from hiding or disposing of any Hirschfeld works in the Galleries' possession, *id.* The Foundation sought damages for the Galleries' copyright infringement and for violations of the

6

Lanham Act. *Id.* The Foundation relatedly sought an order compelling an accounting of the Galleries' profits from the sale of infringing works, requiring those profits be held in trust, and authorizing the seizing and impounding of infringing works. *Id.* at 18.

The Foundation also sought a temporary restraining order and, ultimately, a permanent injunction, seizing and impounding several works in the Galleries' possession and barring the Galleries from selling, licensing, or reproducing works. *Id.* at 19.

**B.    The *Ex Parte* Hearing**

On June 7, 2016, the Court held an emergency, *ex parte* hearing on the Foundation's request for a preliminary injunction. *See* Dkt. 23 (transcript).   At that hearing, counsel for the Foundation elaborated on the Foundation's basis for claiming risk to Hirschfeld works in the custody of the Galleries.   Counsel explained that the Galleries had refused to return 35 original works that the Foundation believed were in their possession, *see id.* at 4, 29–32, and, based on the observations of an investigator, had been mistreating other Hirschfeld works in their possession, *id.* at 4–5; *see also id.* at 22–24.  Counsel explained the Foundation's position that, as to works consigned to the Galleries, the Foundation had an unconditional right to request the return of any work and have the work returned within 10 days. *Id.* at 32–33.   Counsel further explained the basis for the Foundation's claims that the Galleries were selling unauthorized *giclee* prints of Hirschfeld works entitled "Bob Hope" and "Annie Hall," *id.* at 10–12, and were misrepresenting the exclusivity rights granted them under the Agreement, *id.* at 12–15.  Counsel explained that the Foundation planned to issue a termination notice to the Galleries, but had not yet done so out of concern that, absent the protection of a court order, the notice might provoke the Galleries to take action injurious to the artwork and/or the Foundation's rights. *See id.* at 2–3, 6–9, 18–20.

7

At the close of the *ex parte* hearing, the Court issued an order to show cause that granted the Foundation temporary relief and scheduled an emergency hearing, Dkt. 14, while unsealing the record, Dkt. 3.  The Court's order directed the Galleries to deliver to the Court on Friday, July 10, 2016, 34 works whose return the Foundation had requested, as well as the Bob Hope and Annie Hall *giclees*.  *See* Dkt. 14 at 3–4.  The order further required the Galleries to produce "an accounting identifying, work-by-work, the precise location and whereabouts of each of the Original Works listed" on an attached exhibit.  *Id.* at 4–5.  The Court also ordered that the Galleries show cause why a temporary restraining order and preliminary injunction should not issue barring them from (a) producing and selling *giclee* or photostatic reproductions for which the Agreement does not authorize them; (b) holding themselves out as authorized distributors of such unauthorized works; and (c) selling, hiding, or destroying any Hirschfeld works in the Galleries' possession.  *Id.* at 1–2.

### C.    The Foundation's June 2016 Notice of Termination

Later on June 7, 2016, the Foundation served a notice of termination (dated June 6, 2016) on the Galleries.  *See* Kaplan Decl., Ex. 3 (the "Termination Notice"); Pl. 56.1 ¶ 7; *see also* Dkt. 44 at 74.  The Termination Notice claimed numerous material breaches of the Settlement Agreement.  Specifically, the Foundation asserted that:

- The Galleries failed to maintain gallery space similar in quality to the space the Galleries had previously maintained at 699 Madison Avenue, in violation of paragraph 5(b) of the Agreement;

- The Galleries failed to maintain adequate fire and theft insurance for the Hirschfeld works in their possession, in violation of paragraph 5(f) of the Agreement;

8

- The Galleries failed to employ a person knowledgeable in the arts at the gallery, in violation of paragraph 5(g) of the Agreement;

- The Galleries failed to comply with the Foundation's reasonable requests in furtherance of its rights under the Agreement, in violation of paragraph 5(i) of the Agreement;

- The Galleries failed to return works consigned to them by the Foundation, in violation of paragraphs 6(a) and 6(e) of the Agreement; and

- The Galleries violated the Foundation's copyright rights by making reproductions of Hirschfeld works, in violation of paragraph 6(h)(i).

Termination Notice at 1–2.

In more general terms, the Termination Notice also asserted that the Galleries had "prioritized short-term financial gain, disregarding both the Foundation's legal rights and the extensive harm [the Galleries'] unlawful actions have caused, and will continue to cause, to Hirschfeld's name and artistic legacy." *Id.* at 2.  In light of those breaches, the Termination Notice concluded, the Foundations had "no choice but [to] sever its relationship" with the Galleries. *Id.*

The Termination Notice gave the Galleries an effective termination date of September 6, 2016, meaning that if the asserted breaches were not were cured within 30 days of the notice, the Agreement would be terminated on September 6, 2016. *Id.* at 1.

**D.     The Show Cause Hearing and the Preliminary Injunction**

On June 10, 2016, the Court held a hearing on the order to show cause. *See* Dkts. 18, 44. At that hearing, the Galleries produced 33 original works in their possession. *See* Dkt. 44 at 12. The Galleries also produced to the Court a *giclee* copy of the Bob Hope drawing. *See id.* at 13–

9

14. After reviewing those works, the Foundation conceded that three of the 33 rightly belonged

to the Galleries, *id.* at 14–15, and one of the works sought was already in the Foundation's

possession, *id.* at 16.  The Foundation was allowed to take possession of the works, including

the *giclee* copies of the Bob Hope work, on the condition that it not sell any of the works during

the pendency of the litigation. *Id.* at 17–20. The Court ordered the Galleries not to make further

copies of the Bob Hope work. *Id.* at 24–25. As to the Annie Hall work, the Galleries

represented to the Court that they no longer had any copies of that work, in *giclee* or other form.

*Id.* at 30.

The Court also considered the parties' arguments as to whether the Agreement authorizes

the Galleries to make *giclee* prints.  On a preliminary basis, the Court concluded, based on its

assessment of the Agreement and its examination of a photostatic and a *giclee* reproduction of a

Hirschfeld work, that "it is more likely than not that the word 'photostat,' the word that appears

in the agreement, was not intended to embrace a giclee." *Id.* at 48.  The Court found it likely

that the Foundation would prevail on the merits on that question. *Id.*

Following the hearing, the Court entered a preliminary injunction. Dkt. 18; *see* Dkt. 44 at

66.  Applying the familiar preliminary injunction factors, *see, e.g., HarperCollins Publishers,*

*LLC v. Gawker Media, LLC*, 721 F. Supp. 2d 303, 305–306 (S.D.N.Y. 2010), the Court found

that the Foundation had demonstrated a likelihood of success on the merits with respect to both

its claim that the printing and sale of the Bob Hope and Annie Hall *giclees* infringed the

Foundation's copyright, *id.* at 68–70, and its claim to replevin with respect to the 30 works the

Galleries had presented in Court, *id.* at 70–71.  Absent an injunction, the Court found, the

Foundation was likely to suffer irreparable harm from the Galleries' making of unauthorized

*giclee* reproductions and from the Galleries' refusal to turn over the 30 works as to which the

Foundation claimed a superior possessory right. *Id.* at 72.  The Court further found that the balance of hardships tipped decidedly in the Foundation's favor with respect to injunctive relief as the Court fashioned it, and that such relief was consistent with the public interest. *Id.* at 72– 73.  The preliminary injunction barred the Galleries from selling unauthorized works, holding themselves out as sellers of unauthorized works, and destroying any Hirschfeld works in their possession. *See* Dkt. 18.

### E.      The Amended Complaint and the Galleries' Answer

On July 26, 2016, the Foundation filed an amended complaint, the operative complaint today. Dkt. 42.  It added allegations regarding the Galleries' mishandling of works and improper gallery space, *see id.* at 8–10; failure to maintain adequate insurance on the works, *id.* at 11–12; unresponsiveness to the Foundation's requests to have works returned, *id.* at 12–21; unauthorized sale of *giclee* prints and unauthorized licensing deals, *id.* at 23–26; failures to comply with the Agreement's recordkeeping requirements, *id.* at 26–29; and violations of the Lanham Act, *id.* at 29–30.  It also sought additional declaratory relief, including to the effect that (a) the Galleries had violated their fiduciary duties to the Foundation; (b) the Galleries were in material breach of the Agreement; (c) the Galleries had been negligent in handling of the Foundation's artwork; (d) the Galleries converted Foundation artwork; and (e) the Foundation had validly terminated the Agreement. *Id.* at 42–43.

On August 17, 2016, the Galleries answered. *See* Dkt. 54–55.  As affirmative defenses, they asserted that the Foundation's claims were barred by its own breaches and by the doctrines of laches and ratification. Dkt. 54 at ¶¶ 397–407.  The Galleries also brought counterclaims. They alleged that the Foundation had breached the Agreement by reducing the number of Hirschfeld works consigned to the Galleries below the number the Agreement required, *id.* at

¶¶ 416–17, by consigning works to other galleries in violation of the Agreement's exclusivity provision, *id.* at ¶¶ 419–23, and by making disparaging remarks about the Galleries, *id.* ¶¶ 437–40. The Galleries also brought claims of trade libel, defamation per se, and breach of the covenant of good faith and fair dealing. *Id.* ¶¶ 442–67.

On December 13, 2016, the Galleries amended their answer with leave from this Court. Dkt. 89; *see* Dkt. 86 (granting leave); Dkt. 83–85 (motion for leave to amend). The amended answer consolidated the two defendants' answers. *See* Dkt. 89.

### F.     The Modification of the Initial Injunction

On March 8, 2017, the Court, acting on an application by the Foundation, modified its initial injunction. Dkt. 132. The Court found that the Foundation had shown a likelihood of success on its claim that the Galleries had sold at least one work without the Foundation's prior approval, which the Settlement Agreement and the Court's preliminary injunction had required. *See id.* at 2. The Court therefore enjoined the Galleries from selling any consigned Hirschfeld work without both (1) the Foundation's prior approval, and (2) the public filing on this case's docket, at least three business days prior to the proposed sale, of written notice of the intent to sell the work and the proposed sale terms. *Id.* The purpose of the public filing requirement was to give the Foundation sufficient notice of any sale to enable it to determine whether the sale infringed the Settlement Agreement. *See id.*

At the same time, the Court also refused to rule, as the Galleries sought, that the Galleries are free under the Settlement Agreement to manufacture, reproduce, and sell *giclees*. The Court again declined to resolve that issue, while noting that on its initial reading, "it appear[ed] that the Settlement Agreement permits such reproductions to be made to assist in the Gallery's marketing and advertising efforts, but not for sale themselves." *Id.* at 3.

12

G.     **The Motions for Summary Judgment**

On April 26, 2017, following discovery, the Foundation moved for summary judgment,

filing a brief, Dkt. 152, and supporting factual materials, Dkts. 153–160.  On May 19, 2017, the

Galleries filed a brief in opposition and a cross motion for summary judgment, Dkt. 164, and

supporting factual materials, Dkts. 165–170.  Each party later filed a reply.  *See* Dkts. 175

(Foundation), 182 (Galleries).[3]

II.     **Applicable Legal Standards**

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P.

56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only

disputes over "facts that might affect the outcome of the suit under the governing law" will

---

[3] On September 8, 2017, the Foundation sought further interim relief, claiming that the burden of
doing business with the Galleries pending resolution of its claims was causing irreparable harm.
Dkt. 183.  After directing, Dkt. 184, and receiving a response, Dkt. 185, the Court declined to
order additional relief, while noting the Foundation's "interest in a prompt resolution" of its
claim of valid termination.  Dkt. 186.

preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). In determining whether there are genuine issues of material fact, the Court is "required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)

(quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not grant judgment as a

matter of law for one side or the other, but must evaluate each party's motion on its own merits,

taking care in each instance to draw all reasonable inferences against the party whose motion is

under consideration." *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431,

435 (S.D.N.Y. 2016) (internal quotations omitted).

## III.    Analysis

Although the parties have brought a wide range of claims and counterclaims, the central

question before the Court is whether the Foundation has validly terminated the Agreement that

has governed their business relationship since 2000. The Foundation asserts that it had valid

cause to terminate based on eight distinct material breaches by the Galleries. These are: (1)

infringement of the Foundation's copyright rights; (2) exceeding the permissions granted the

Galleries under the Agreement to use Hirschfeld's name and likeness; (3) failing to comply with

reasonable requests to return artwork belonging to the Foundation; (4) failing to maintain a

gallery of the same quality as the Galleries' original gallery space on Madison Avenue; (5)

failing to employ a person knowledgeable in the arts; (6) losing, destroying, or otherwise failing

to properly care and account for artworks entrusted to the Galleries; (7) failing to maintain

proper insurance coverage; and (8) putting the Galleries' own interests ahead of the Foundation's

in violation of the Galleries' fiduciary obligations. The Galleries counter that they have not

14

breached the Agreement.  They further argue that the Foundation has breached the Agreement, so as to preclude it from terminating by (1) violating the Agreement's exclusivity provisions, (2) failing to append credit lines mentioning the Galleries to works appearing on the Foundation's website, (3) defaming the Galleries, and (4) breaching the implied covenant of good faith and fair dealing.

The Court's judgment is that, given the parties' paramount business interest in prompt resolution of whether the agreement between them remains in effect, priority is properly given to whether the Foundation's termination of the Agreement was valid.  For the reasons that follow, the Court finds, based on the undisputed facts, that the Galleries have materially breached the Agreement in at least two respects, that the Galleries have not adduced evidence supporting a finding of corresponding breaches by the Foundation, and that the Foundation's termination of the Agreement was valid.  The Court therefore grants the Foundation summary judgment on its claim seeking a declaration that termination was valid.  In light of this ruling, the Court does not have occasion to consider the Foundation's claims of other breaches that might also support termination.  The Court reserves for later resolution the other claims in this case, including for damages.

The ensuing analysis proceeds as follows.  The Court first explains its finding that the Galleries materially breached the Settlement Agreement in two respects; next addresses the Foundation's purported breaches; and finally, addresses the availability of termination.

### A.    The Galleries' Material Breaches of the Settlement Agreement

#### i.  Unauthorized Sale of *Giclee* Prints

As noted, *giclees* are high-quality photostatic reproductions of existing works.  Although the parties spar over how to describe the difference between *giclees* and conventional photostatic

copies,[4] it is undisputed that *giclees* are of higher quality and are priced significantly above a photostatic copy of the same work. Pl. 56. 1 ¶ 31; Def. Counterstatement 56.1 ¶ 31. And it is undisputed that the Galleries have produced and sold *giclee* prints of Hirschfeld works in substantial volume.

Two sets of *giclee* prints are at issue.

First, as is undisputed, the Galleries collaborated with the Time Life Company to offer *giclee* prints of the Hirschfeld works known as "Carol Burnett" and "Bob Hope" for sale on Time Life's website. *See* Pl. 56.1 ¶¶ 17, 18; Def. Counterstatement 56.1 ¶¶ 17, 18; Kaplan Decl. Ex. 12. Although these works are *giclees,* not lithographs, the Galleries characterized the Time Life *giclees* as "lithographs," Pl. 56. 1 ¶ 16; Def. Counterstatement 56.1 ¶ 16, and offered these works on Time Life's website as "lithographs," Pl. 56.1 ¶ 17; Def. Counterstatement 56.1 ¶ 17. The Galleries sold the Bob Hope and Carol Burnett *giclees* to Time Life for $45 per print, in editions containing 105 prints. Pl. 56.1 ¶ 37; Def. Counterstatement 56.1 ¶ 37.[5]

Second, as is also undisputed, the Galleries offered other *giclees* for sale on their own website. The Galleries admit having offered for sale *giclee* prints of at least six other Hirschfeld works. Def. Counterstatement 56.1 ¶ 20. And Feiden acknowledges generally that for years she reproduced and sold *giclees* prints of Hirschfeld works, which the Galleries termed "[p]hotostats." *See* Feiden Declaration ¶ 36 (stating that the Galleries have "reported sales of *giclee* reproductions to [the Foundation] under the category 'Photostats'"); *id.* ¶ 38 ("I always

---

[4] *See* Def. 56.1 ¶¶ 39, 40; Snow Dep. at 100, 123-124; Pls. 56.1 ¶¶ 15, 30; Kaplan Decl. Ex. 6 ("Feiden 30(b)(6) Dep."), at 59–60; Kaplan Decl. Ex. 7 ("Enrick Dep."), at 145–46; Kaplan Decl. Ex 8 ("Feiden Dep."), at 158.

[5] The Galleries have offered for sale a limited edition lithograph of the same "Bob Hope" image for $6,500. *See* Def. Counterstatement 56.1 ¶ 50.

understood the rights I had under the Settlement Agreement to include the right to make reproductions of Hirschfeld's works, including *giclee* reproductions."); *id.* ¶¶ 41–45.   Certain *giclee* prints the Galleries sold were "posthumous" limited editions, *see* Kaplan Decl. Ex. 8 ("Feiden Dep.") at 238–239, while others were offered in unlimited quantity, *see id.*  Among the works the Galleries offered for sale in *giclee* form on their website are works known as "Washington Square," "West Side Story." "The Golf Ball," "Laurel & Hardy, 'Long & Wide,'" "Artist and His Muse," and "Zabar's."  Pl. 56. 1 ¶ 20; Def. Counterstatement 56.1 ¶ 20; *see, e.g.*, Kaplan Decl. Ex. 16.  As an example, the drawing known as "Laurel & Hardy, 'Long & Wide'" appears below as it was offered on the Galleries' website in a format the Galleries admit to be a *giclee* print.



© AL HIRSCHFELD. MARGO FEIDEN GALLERIES LTD.

Excerpted from Kaplan. Decl. Ex. 16.

The Galleries' sales, and its facilitation of the sales, of *giclee* prints of Hirschfeld's works violated the Agreement. No part of the Agreement refers to such prints or permits such sales. And the only provision to which the Galleries point as purported authorization to sell *giclee* works of Hirschfeld's, Agreement ¶ 6(h)(i), clearly does not authorize the Galleries to reproduce *giclees* for sale.

Paragraph 6(h)(i) states, in pertinent part, that the Galleries may reproduce works "in connection with [the Galleries'] promotion, advertising and marketing in furtherance of [the Galleries'] rights under this Settlement Agreement." But even construing that language in favor of the Galleries, as the Court must do on its adversary's motion for summary judgment, the language cannot bear the Galleries' interpretation. *Gallo v. Prudential Residential Serv., Ltd. P'sihp.*, 22 F.3d 1219, 1223 (2d Cir. 1994); *see, e.g.*, *Lavastone Capital LLC v. Coventry First LLC*, No. 14-CV-7139 JSR, 2015 WL 4940471, at *1 (S.D.N.Y. July 30, 2015). Paragraph 6(h)(i) does not give the Galleries unconditional authority to "reproduce works," so as to allow them to produce and sell *giclee* prints of Hirschfeld's works. *See* D. Mem. at 4. Rather, by its terms, the paragraph creates a limited carve-out to the copyright, trademark, privacy, and publicity rights explicitly retained by the Foundation, so as to permit the Galleries to reproduce such works "*in connection with  [their] promotion, advertising and marketing*" in furtherance of the Galleries' other rights under the Agreement. Agreement ¶ 6(h)(i).

Under that provision, to be allowed, any reproduction of a work must be "*in furtherance*" of another right conferred elsewhere in the Agreement. Thus, for example, this provision might authorize the Galleries to reproduce, on a poster or flier, an image advertising a work or works that the Galleries were permissibly offering on consignment. *See* Agreement ¶ 2(a)(i). Or, this provision might authorize the Galleries to print a low-quality or small-scale exemplar for review

or approval by a prospective licensee. *See* Agreement ¶ 2(a)(ii). But this provision is not a source of freestanding authority for the Galleries to mount a new category of sales not identified by the Agreement. The *giclee* sales made by the Galleries, or by the third parties licensed by the Galleries to make such sales, were not "in furtherance of" the Galleries' other rights. They are simply additional—but wholly unauthorized—reproductions.

The Court thus reaffirms its preliminary construction of Paragraph 6(h)(i) as articulated during earlier stages of this action. *See* Dkts. 18, 132. In March 2017, on the Foundation's application for added injunctive relief, the Court thus construed the Agreement:

> [O]n the Court's initial reading of the Settlement Agreement, it appears that the Settlement Agreement permits such [*giclee*] reproductions to be made to assist in the Gallery's marketing and advertising efforts, but not for sale themselves. The Court, therefore, declines, at this time, to adopt the Gallery's interpretation of the Settlement Agreement to permit such sales. The Court looks forward to evaluating this issue following full briefing on summary judgment.

Dkt 132 at 3. That construction, the Court now holds, is correct. In addition to reflecting the plain text of Paragraph 6(h)(i), three other provisions, or sets of provisions, in the Agreement, undermine the claim that Paragraph 6(h)(i) authorizes the Galleries to produce *giclees* for sale.

First is Paragraph 3(c). It authorizes the Galleries to produce a certain number of limited-edition prints. However, to do so, Paragraph 3(c) requires the Galleries first to seek and obtain the Foundation's consent in writing. *Id.* Viewed in light of that provision, it is implausible to read Paragraph 6(h)(i) to authorize the Galleries, without the Foundation's consent, to make substantially similar prints to sell in unlimited quantity. And the Galleries here do not claim to have sought or ever obtained the Foundation's assent to the making or sale of *giclees*. Nor do the Galleries claim to have complied with the other requirements of Paragraph 3(c)—namely, that the editions be limited in number and that the Galleries submit to the Foundation an advance list "identifying all subjects, images, persons or events to be depicted."

20

Second, the Galleries' construction of Paragraph 6(h)(i) is also in tension with the provisions of the Agreement that authorize the Galleries to license or sell Hirschfeld works or derivative works. As noted earlier, each of these provisions puts in place a fee structure in which the proceeds of such sales are shared with the Foundation using a negotiated percentage or formula keyed to the type of work licensed or sold. *See, e.g.*, Agreement ¶ 4(a)(i)–(v). That Paragraph 6(h)(i) does not contain such a fee provision is further evidence that it is not a source of authority to sell copies (in *giclee* form or otherwise) of Hirschfeld works. Had the Agreement anticipated sales by the Gallery of *giclees* and the Gallery's retention of at least some of the proceeds of such sales, the Agreement presumably would have said so.

Third, the Galleries' position that *giclee* sales are contractually authorized is undermined by Paragraph 2(a)(iv). It authorizes the Galleries, subject to conditions including a fee-division arrangement with the Foundation, to sell "Photostatic Reproductions of the Works." Agreement ¶ 2(a)(iv). Among the categories of works addressed in the Agreement, such photographic reproductions appear to be closest in nature to *giclees*. *See supra* note 4 (noting dispute whether *giclees* are properly termed a species of photostatic reproductions). Notably, the Galleries do not contend that that Paragraph 2(a)(iv) authorizes their reproduction of *giclees*. The Galleries instead rely on Agreement Paragraph 6(h)(i). *See* D. Mem. at 2–7; Def. Reply Br. at 5–6. But the contrast between these provisions is revealing, and undercuts the Galleries' claim that Paragraph 6(h)(i) authorizes the reproduction for sale of *giclees*. The provision governing sale of photostatic reproductions, unlike Paragraph 6(h)(i), appears within Paragraph 2 of the Agreement, along with all other provisions setting out the Galleries' rights to sell or license other works. *See* ¶ 2(a)(i), (ii) and (iii). The provision governing photostatic reproductions, unlike paragraph 6(h)(i), explicitly refers to sales of the works in questions. And this provision, unlike

21

Paragraph 6(h)(i), has a companion provision in Paragraph 4 of the Agreement, setting out the terms under which fees from such sales will be divided between the Foundation and the Galleries; it provides that the Galleries will retain 36.5% of the net sales price of Photostatic Reproductions.  Agreement ¶ 4(a)(iv).  Together, these features render untenable the Galleries' claim that Paragraph 6(h)(i) tacitly empowers the Galleries to make and sell unlimited numbers of *giclees*.

Unable to justify the *giclee* sales under the terms of the Agreement, the Galleries make a separate argument based on Second Circuit case law involving copyright infringement.  They argue that, as an "exclusive licensee" of certain of the Foundation's copyright interests, they cannot be held liable "for infringing the copyrights conveyed to [them]." *See* D. Mem. at 3 (quoting *U.S. Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991). For two independent reasons, this argument misses the mark.

First, a licensee is not inherently immune from liability for copyright infringement.  To be sure, "[w]hen a copyright owner grants a nonexclusive license, he generally 'waives his right to sue the licensee for copyright infringement.'" *Fioranelli v. CBS Broad. Inc.*, 232 F. Supp. 3d 531, 537 (S.D.N.Y. 2017) (quoting *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)). However, a copyright owner may grant a *limited* license, and where "'a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement.'" *Id.* (quoting *BroadVision, Inc. v. Med. Protective Co.*, No. 08 Civ. 1478(WHP), 2010 WL 5158129, at *3 (S.D.N.Y. Nov. 23, 2010)); *see Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008); *Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 228 (S.D.N.Y. 2000) ("[A] licensor may bring a claim for infringement where a licensee uses copyrighted material beyond the scope of a license.").  The point is basic: A licensee's use of a license cannot give

rise to a claim of copyright infringement, but a licensee's use of copyright rights *beyond* the scope of its license can.

Second, this line of case law does nothing to defuse the Foundation's *contract* claim. Even if the Galleries were correct that the Foundation must sue only in contract, and not under the copyright laws, the Foundation *has* brought a contract claim. It asserts both a claim of copyright infringement and a claim of breach of contract based on the Galleries' making of reproductions beyond the scope of the license granted to them by the Agreement. *See* Dkt. 42 at 31, 34–35. Here, the Foundation points to the breach of that contractual obligation as one justifying termination.

The Galleries next defend their making and sale of *giclees* of Hirschfeld's works on the ground that *giclees* are a "new use" implicitly authorized by the original license. *See* D. Mem. 4. The new use doctrine allows a copyright licensee to put that license to "any uses which may reasonably be said to fall within the medium as described in the license." *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir. 1968). But, for two independent reasons, that doctrine does not avail the Galleries here.

First, even if *giclees* were a type of use that could reasonably be said to fall within a medium ("Photostatic Reproductions") covered by the license, *see supra* note 4, the text of the Settlement Agreement does not suggest that the parties intended that medium to be extended in the future to embrace such a use. Under the "new use" doctrine, "[t]he key interpretive principle to be applied is that the language of the contract itself governs." *HarperCollins Pubs. LLC v. Open Rd. Integrated Media, LLP*, 7 F. Supp. 3d 363, 371 (S.D.N.Y. 2014); *see Boosey & Hawkes Music Pubs., Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487–88 (2d Cir. 1998). Here, there is no language in the Settlement Agreement such as "in 'all forms,' 'now or hereinafter known,'"

to suggest that the parties contemplated that the Agreement's "Photostatic Reproductions" clause might expand to cover modes of reproduction. *See HarperCollins Pubs.*, 7 F. Supp. 3d at 372 (provision referencing electronic means "now known or hereinafter invented" supported finding of new use); *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 355 (S.D.N.Y. 2008) (provision licensing phonograph records and recordings by other means "hereinafter known" brought future new uses within license); *Boosey & Hawkes*, 145 F.3d at 486 (finding new use authorized by a license to record a musical composition "in any manner, medium or form" for use in a motion picture). Second, where the Second Circuit has upheld a "new use" as authorized under a preexisting license, that new use, at the time of the agreement, had been *foreseeable*, but not already deployed. *See, e.g., Boosey & Hawkes*, 145 F.3d at 486; *Bartsch*, 391 F.2d at 155; *cf. HarperCollins Publishers*, 7 F. Supp. 3d at 372 (finding license applicable to a new use—the e-book market—where that market had not existed at the time of the original license). Here, in contrast, *giclees* are not "new"; on the contrary, it is undisputed that they were a known and available technology in use at the time of the Agreement. The Galleries concede that *giclee* printing existed at the time the parties entered into the Agreement. *See* Feiden Dep. at 160 ("All of our printing in the last 20 years has been giclee method."); Kaplan Opp. Decl. Ex.1 ("Second Feiden Dep.") at 71.

Finally, the Galleries argue that the Foundation is estopped from claiming this breach because it waived its right to do so. That argument is squarely foreclosed by the Agreement's no-waiver provision, which provides that "[n]o course of dealing or delay or omissions on the part of the Parties in exercising any rights shall operate as a waiver thereof or otherwise be prejudicial thereto." Agreement ¶ 19.

The Court therefore finds that the Galleries' sale of *giclee* reproductions of Hirschfeld's works was a breach of the Settlement Agreement.

### ii.  Missing Original Works

On the undisputed facts, the Galleries separately breached the Agreement by failing to maintain custody of 20 original Hirschfeld works, whose whereabouts the Galleries is unable to account for today.   These works—to which the parties refer as the "Missing Works"—are:

- "Famous Feuds: Zanuck and Greco," Pl. 56.1 ¶ 157;

- "S.J. Perelman: Readying Myself for My Debut," *id.* ¶ 158;

- "Comedy and Tragedy Masks," *id.* ¶ 159;

- "Dick Shawn in the World of Sholom Aleichem," *id.* ¶ 160;

- "Curtis and Leigh in Houdini," *id.* ¶ 161;

- "Outdoor Life," *id.* ¶ 162;

- "Artists and Models: 300 Girls Paraded Before Monte Prosser and Wally Wanger," *id.* ¶ 163;

- "Hit Plays in England," *id.* ¶ 164;

- "Swiss Family Perelman p.6, 'Go Ahead' I shouted, 'Milk Me, Drain Me Dry,' Mr. and Mrs. S. I. Perelman," *id.* ¶ 165;

- "Carmen," *id.* ¶ 166;

- "Every Barn's a Stage: Life with Father," *id.* ¶ 167;

- "Checkmates," *id.* ¶ 168;

- "Westward Ha: Lazy Days on the Poop's Mortician, Missionary, Perelman Boy Meets Gull," *id.* ¶ 171;

- "Directing Minds of Russian Cinema and Theatre," *id.* ¶ 172;

- "The Filming of Stolen Hours a/k/a Summer Flight," *id.* ¶ 175;

- "Walking Happy," *id.* ¶ 176;

- "Duke Ellington," *id.* ¶ 177;

- "Dizzy Gillespie," *id.* ¶ 178;

- "Lorabid Doctor Waiting for a Phone Call for Eli Lilly," *id.* ¶ 180; and

- "The Cast of 45 Seconds from Broadway," *id.* ¶ 181.

It is undisputed that the Foundation entrusted those 20 works with the Galleries.  *See* Pl.

56. 1 ¶ 155; Def. Counterstatement 56.1 ¶ 156.  It is also undisputed that those works are now

missing.  In its response to the Foundation's First Set of Requests to Admit, the Galleries

admitted not to "know the location or locations of the Missing Works."  Kaplan Decl. Ex. 4, at

¶ 108; Kaplan Decl. Ex. 5 at ¶ 108.  And in her deposition, Feiden admitted that she does not

have in her possession any of the 20 works identified as missing.  *See* Feiden Dep. at 345–348.

Finally, it is undisputed that, under the Agreement, all works in the Galleries' possession other

than those works owned by the Galleries are "on consignment."  Agreement ¶ 6(e).  The

Galleries do not claim to own any of the Missing Works.

Under these circumstances—whether the Missing Works were sold, misplaced, stolen or

missing today for some other reason—the Galleries' failure to account for them to their rightful

owner, the Foundation, is a clear breach of the Settlement Agreement.  Paragraph 6(e) provides

that all "works in [the Galleries'] possession, custody, or control, other than those Works now

owned by the [Galleries] or which are purchased by [the Galleries] in the future . . . are on

consignment to [the Galleries'] within the meaning of the Arts Law" of New York State.

Agreement, ¶ 6(e).  Under that law, consigned art work is "trust property in the hands of the

consignee for the benefit of the consignor."  N.Y. Arts & Cult. Aff. Law § 12.01 (1)(a)(ii).

26

Failure "to treat the trust property . . . in accordance with the requirements of fiduciaries in section 11-1.6 of the estates, powers and trusts law . . . shall constitute a violation of this article." *Id.* § 12.01(3). The estates, powers and trusts law, in turn, requires that fiduciaries keep trust property segregated from their own and avoid any use of the property for his own benefit. N.Y. Est. Powers & Trusts Law § 11-1.6 (McKinney).

With the Foundation having adduced undisputed evidence that the 20 original works were entrusted to the Galleries, the Galleries' failure to account for these 20 works was a violation of Paragraph 6(e) of the Agreement. The Galleries have come forward with no factual defense, and make only the rhetorical rejoinder that that they "could as easily accuse Plaintiff of losing these works." D. Mem. 19. The Galleries have adduced no evidence of this, *e.g.*, that after taking custody of these works the Galleries returned them to the Foundation. On a motion for summary judgment, the Galleries' speculation that this perhaps was so, unsupported by admissible evidence, will not do. *See Hicks,* 593 F.3d at 166 ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

The Court therefore finds that the Galleries' inability to account for 20 original works of Hirschfeld's that were consigned to it was a breach of the Settlement Agreement.

### iii.  The Galleries' Breaches Were Material

Termination under the Agreement is permitted for "cause" where the Galleries have committed a "material breach" of particular provisions of the Agreement. Agreement ¶ 11(a)(i). The two breaches here were material. "Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quoting *Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)). Where a breach goes to the root of the

27

agreement, and therefore "is so substantial that it defeats the object of the parties in making the contract," the non-breaching "party's obligation to perform under a contract is . . . excused." *Id.*

The unauthorized sale of numerous *giclees* and the Galleries' failure to maintain control or records of 20 missing valuable artworks constitute material breaches. The "root of the agreement" between the parties is the creation of a fiduciary-like relationship between the Foundation and the Galleries. *See* N.Y. Arts & Cult. Aff. Law § 12.01. The loss of the original Foundation artwork, which under New York law is to be treated as "trust property in the hands of" the Gallery, squarely defeats the object of the Agreement. *See id.* § 12.01(a)(ii). The loss of such artwork makes impossible the Galleries' core role under the agreement—to sell the works entrusted to it by the Foundation, for the benefit, in part, of the Foundation.

By the same token, the Galleries' sale of unauthorized *giclees* thwarts the Agreement's purpose. Instead of selling the works contemplated by the Agreement, and for the benefit of the Foundation, the Galleries sold unauthorized copies of works, largely for their own benefit, and with the risk of diluting the market for authorized copies of these works. While the damages attributable to these unauthorized sales are to be calculated at a later date, it suffices for present purposes to recognize that the Galleries' unauthorized sale of reproductions undercuts the essential purpose of the Agreement, and hence was a material breach.

**B.      The Absence of Evidence of Breaches by the Foundation**

As ostensible affirmative defenses excusing their material breaches, the Galleries argue the Foundation has failed to perform under the Agreement by: (1) improperly consigning media commissioned works in violation of the Agreement's exclusivity provision; and (2) failing to append the required credit lines to licensed images.

The Foundation now seeks summary judgment in its favor on these affirmative defenses, which the Galleries also cast as counterclaims.  Summary judgment may be granted in favor of a party where its adversary fails to come forward with evidence sufficient to carry a burden of proof that it bear.  *See, e.g.*, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Here, the Galleries bear the burden of proof on these affirmative defenses, but, for the reasons that follow, have failed to adduce affirmative evidence to support them.  Accordingly, the Court grants summary judgment in favor of the Foundation on these affirmative defenses and counterclaims, and denies the Galleries' cross-motion for summary judgment.  Therefore, even if, in theory, offsetting breaches by the Foundation could undermine the Foundation's entitlement to terminate the Agreement, no such breaches by the Foundation have been established here.

### i.   Exclusivity

The Galleries argue that the Foundation has breached the Agreement by consigning "Media Commissioned Works" to a London art dealer, the Chris Beetles Gallery, in violation of the Agreement's exclusivity provisions.  *See* D. Mem. at 9–10.

The Agreement contains three exclusivity provisions.  First, the Agreement has a *geographic* exclusivity provision, which provides that the Galleries "shall have the exclusive right to operate a gallery within the City and State of New York and the State of New Jersey . . . for the Retail Sales of Works and/or Derivative Works."  Agreement ¶ 2(c).  Second, the Agreement has a *customer* exclusivity provision, which provides that the Galleries will be the exclusive gallerist for certain customers, detailed in a schedule appended to the Agreement.  *Id.* ¶ 2(b).  Finally, the Agreement has a *works* exclusivity provision, which provides that the Gallery will be the exclusive representative of the Foundation for certain works, including for the sale of 250 consigned works, *id.* ¶ 2(a)(i); for the licensing of all reproductions, save for a few

defined exceptions, *id.* ¶ (a)(ii); for the sale on consignment of all "Media Commissioned Works," *id.* ¶ 2(a)(iii); and for the sale of Photostatic Reproductions of Works, *id.* ¶ 2(a)(iv).   As defined by the Agreement, "Media Commissioned Works" are "Works" "commissioned by third parties for publication." "Works," in turn, means "all of Hirschfeld's original works of art." *Id.* at 1.

The Galleries argue that the Foundation has consigned works to the Beetles Gallery in violation of the works-exclusivity provision, Paragraph 2(a)(iii), which makes the Galleries the sole representative for the sale of "Media Commissioned Works."   The Galleries assert that the Foundation has consigned over $500,000 worth of Hirschfeld "Media Commissioned Works" to the Beetles Gallery in London. *See* D. Mem. at 9–10.

Critically, however, the Galleries do not support this claim with evidence.  Instead, they point the Court to a website, chrisbeetles.com, at which prints of Hirschfeld drawings are available for sale. *See id.*   But the Galleries cite no record evidence of any consignment by the Foundation to the Beetles Gallery.  Nor do they cite any record evidence demonstrating that the works offered on the Beetles Gallery website are "Media Commissioned Works."   The Galleries assert that the Foundation "admits it has consigned media commissioned works to other galleries," D. Mem. at 9, but the record evidence they cite in support of that allegation, a paragraph in the Foundation's Statement of Facts, does not support that allegation, *see* Pl. 56.1 ¶ 60.  Rather, the Galleries' only proof of this supposed violation is the existence of the Beetles Gallery website and the Galleries' assumption that the works offered for sale there are Media Commissioned Works on consignment from the Foundation.

At summary judgment, those speculative and conclusory allegations will not do. *See Weinstock*, 224 F.3d at 41.  In the absence of any admissible evidence that the Foundation has

consigned works to the Beetles Gallery in violation of the Agreement, the Galleries' motion for summary judgment on this counterclaim must be denied. And because "unsupported allegations do not create a material issue of fact," *id.*, summary judgment is warranted in the Foundation's favor given the Galleries' failure to come forward with proof sufficient to support their claim. Accordingly, the Court grants summary judgment in favor of the Foundation on the Galleries' affirmative defense that the Foundation violated the Agreement's exclusivity provisions.

### ii.   Credit Lines

For much the same reasons, the Court must grant summary judgment to the Foundation on the Galleries' affirmative defense that the Foundation breached the Agreement by failing to attach credit lines to licensed images.

The Agreement provides that the Foundation "shall use [its] reasonable efforts to require each Work licensed for reproduction by Hirschfeld pursuant to the terms of this Settlement Agreement to bear a separate credit line 'Al Hirschfeld is represented by the Margo Feiden Galleries Ltd., New York.'" Agreement ¶ 8(d).

The Galleries identify two infractions. First, they assert that "[t]housands of images reproduced on Plaintiff's website do not bear this credit line." D. Mem. at 10. However, the Galleries do not cite any record evidence supporting their claim that this provision was breached. And the Galleries do not explain how the Foundation's reproduction on its own website of Hirschfeld images implicates the requirements of Paragraph 8(d). Paragraph 8(d) directs the Foundation to use reasonable efforts to require that works "*licensed for reproduction*" bear a credit line. Because the works in question presumably belong to the Foundation, the Foundation presumably requires no license to present them on its website, and there is no reason to treat the works reproduced there as having been "licensed for reproduction."

As to the other infraction, relating to a book by a Mr. Leopold titled "The Hirschfeld Century," the Galleries again do not adduce any record evidence supporting or explaining this supposed breach. The Galleries assert that Mr. Leopold's book contains "hundreds of images licensed for reproduction," all of which contain "no credit lines." D. Mem. at 11. But the Galleries again do not support this allegation with record evidence of conduct by the Foundation. Leopold's book is not in the record; there is no deposition testimony cited by either Leopold or any representative of his regarding how the book came to exist in its present form; and there is no record evidence supporting the claim that the Foundation failed to use "reasonable efforts" to secure credit lines with respect to it.

In the absence of any record evidence, the Galleries' allegations do not create an issue of material fact. *Weinstock*, 224 F. 3d at 41. Accordingly, the Court must grant summary judgment to the Foundation on the Galleries' asserted affirmative defense.

### C.    The Settlement Agreement Was Properly Terminated

In light of the foregoing holdings, the Court finds that the Settlement Agreement was properly terminated. The Agreement gives each party an opportunity to terminate the Agreement upon written notice to the other of a breach, followed by a failure to cure. *See* Agreement ¶ 11(a), (b)(i) (agreement terminates upon notice by Foundation to Galleries of a material breach of any of several provisions that remains uncured for 30 days); *id.* ¶ 11(d) (agreement terminates upon notice by Galleries of a material breach by Foundation of any of several provisions that remains uncured for 30 days).

Here, the Foundation has established two material breaches by the Galleries: (1) making and offering for sale *giclee* prints, which violated the rights the Foundation reserved in Paragraph 6(h)(i); and (2) failing to maintain custody or control of 20 missing artworks, also in violation of

Paragraph 6.  And Paragraph 6 is a provision whose material breach supplies "cause" for termination under the Agreement.  *See* Agreement ¶ 11(b)(i).  Beginning on June 7, 2016, the Foundation gave the Galleries the requisite notice of these breaches.  Each went uncured for 30 days (and remains uncured today).

The Court has further found that the Galleries have failed to adduce evidence to support their claims, cast as affirmative defenses, that the Foundation breached the Agreement.  Thus, these purported breaches do not undermine the finding that the Foundation validly terminated the Agreement.[6]

## IV.    Other Claims and Next Steps

In light of the finding of two material breaches justifying termination, the Court has no need to resolve at this time the Foundation's other claims of material breaches.  The two material breaches the Court has found supply a more than sufficient basis on which to find that the Foundation validly terminated the Agreement.  The Court so finds, and will enter a declaratory judgment effective immediately to the effect that the Agreement has been validly terminated.  The Court's ruling limiting itself to these two breaches should not be taken as an indication of

---

[6] Even assuming *arguendo* that material breaches by the Foundation had been established, such that both parties had committed material breaches, the Court is unpersuaded that termination would have been unavailable to the Foundation as a remedy.  To terminate, the Agreement requires that the Foundation serve notice of "cause," with cause defined as particular material breaches of the Agreement.  *See* Agreement ¶ 11(a), (b)(i).  The Agreement does *not* require, however, that the Foundation demonstrate its own performance, or provide a mechanism for the Galleries to object to the Foundation's notice of termination on the grounds that the Foundation has failed to perform.  The Agreement permits the Galleries to cure their breaches within 30 days, *see id.* ¶ 11(a), or to seek termination in their own right, *see id.* ¶ 11(d), but it does not provide a mechanism to block the Foundation from terminating the Agreement based on the Foundation's own breaches.  The existence of breaches by the Foundation, if established, would have instead been relevant to the remedies (*e.g.*, damages) available to Galleries.

the Court's views as to the other breaches claimed by the Foundation, including whether and the extent to which these claims are capable of resolution—in either direction—on summary judgment.

The Court is mindful that the Foundation seeks other relief in this litigation including various forms of monetary, injunctive, and declaratory relief. Although aspects of some of these forms of relief follow or may follow from the findings the Court has made of two material breaches, other relief the Foundation seeks appears independent of those two breaches.

The Court's judgment, at this stage, is that prudent case management requires giving the parties, at this juncture, a meaningful opportunity to take stock of their respective interests. Although there are numerous unresolved claims, it is not clear to the Court that, with the parties' contractual relationship having been found terminated, it is economically sensible for the parties to invest significantly in damages litigation.

The Court accordingly will give the parties four weeks from the date of this decision to discuss next steps and, hopefully, arrange a resolution to this matter. The Court invites the parties to avail themselves for this purpose of the services of Magistrate Judge Netburn, to whom the case has been referred for settlement purposes. In the event a settlement has not been reached, the parties are to submit, four weeks from today, a joint letter setting forth the parties' proposal(s) as to next steps in this litigation.

## CONCLUSION

For the reasons stated above, the Court holds that, in light of two material breaches on the part of the Galleries, the Foundation has validly terminated the Agreement pursuant to Paragraph 11(a). The Foundation is entitled to, and the Court enters, declaratory relief to this effect. The

Court further enters judgment in favor of the Foundation on the two counterclaims addressed above.

The Court directs the parties to meet and confer within two weeks of this Opinion and Order to discuss a potential resolution of this matter, and, if no resolution is had, next steps. In the event the case is not resolved, the parties are to submit a joint letter four weeks from today setting forth the parties' views as to next steps in this litigation.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 151, 164, and 183.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 1, 2017
       New York, New York