USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                :

AL HIRSCHFELD FOUNDATION,       :

                Plaintiff,      :

                :

        -v-           :

                :

THE MARGO FEIDEN GALLERIES LTD.  :
and MARGO FEIDEN,          :

                :

           Defendants.    :

                :
-------------------------------------------------------------------X

16 Civ. 4135 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This decision sets out the Court's findings as to damages owed by defendants Margo

Feiden ("Feiden") and the Margo Feiden Galleries, Ltd. (singly, the "Gallery," and together with

Ms. Feiden, the "defendants" or "Galleries") as to two areas of contract breach with respect to

which the Court has already found defendants liable. In a November 1, 2017 Opinion & Order

(the "Summary Judgment Opinion"), the Court held that the Galleries had breached the

settlement agreement (the "Agreement") that had long governed the relationship between the

Galleries and plaintiff, the Al Hirschfeld Foundation (the "Foundation"). Specifically, the Court

granted summary judgment as to liability on the Foundation's claims that the Galleries had

breached the agreement by (1) failing to maintain custody over, and records for, 20 works

consigned to them by the Foundation; and (2) selling *giclee* reproductions beyond the scope of

the license afforded by the Agreement.

      The parties then waived their rights to have a jury determine the damages owed for these

breaches. *See* Dkt. 200. The Court then held an evidentiary hearing limited to those issues. The

Court heard live testimony from four witnesses. For each, direct testimony was received in the form of a sworn affirmation and each was subject to live cross and redirect examination. Two were called by the Foundation: Harry L. Katz, an expert witness, *see* Pl. Br. Ex. 1 ("Katz Decl."); Dkt. 217 ("Rebuttal Katz Decl."), and David Leopold, the Foundation's Creative Director, *see* Pl. Br. Ex. 5 ("Leopold Decl."); Dkt. 216 ("Rebuttal Leopold Decl."). The Galleries called two witnesses: John Yavel, an employee of the Galleries, *see* Dkt. 209 ("Yavel Decl."), and Margo Feiden, *see* Dkt. 212 ("Feiden Decl.").[1] The Court also received certain documentary evidence via the declarations of counsel. *See* Pl. Br. Ex. 8 ("Kaplan-Peterson Decl."); Dkt. 215 ("Lackman Decl.").[2] Finally, the Court has also benefitted from the parties' helpful post-hearing letter briefs, in which the parties set out their respective calculations of the damages owed for unauthorized *giclees*. Dkt. 226 ("Pl. Post-Hr. Br."); Dkt 227 ("Def. Post-Hr. Br.").

## I.    Missing Works

As the Court found at summary judgment, the Galleries breached the Agreement by failing to maintain custody of 20 original Hirschfeld works, whose whereabouts the Galleries is unable to account for today. The parties have subsequently reduced the list of missing works to 19.[3] These works—to which the Court and the parties refer as the "Missing Works"—are:

- "Famous Feuds: Zanuck and Greco,"

---

[1] Ms. Feiden amended her declaration via sworn testimony, as reflected in the transcript. *See* 5/3/18 Tr. at 240–48.

[2] In assessing this evidence, the Court has benefited from the parties' helpful submissions, including plaintiff's memorandum of law, Dkt. 206 ("Pl. Br."), defendants' memorandum of law in opposition, Dkt. 212 ("Def. Br."), and plaintiff's reply, Dkt. 214 ("Pl. Reply Br.").

[3] The drawing known as "Comedy and Tragedy Masks," inventory no. 599, was found at the Galleries during the Foundation's December 14, 2017 visit, and returned to the Foundation. *See* Dkt. 195 (Dec. 20, 2017 Letter).

- "S.J. Perelman: Readying Myself for My Debut,"

- "Dick Shawn in the World of Sholom Aleichem,"

- "Curtis and Leigh in Houdini,"

- "Outdoor Life,"

- "Artists and Models: 300 Girls Paraded Before Monte Prosser and Wally Wanger,"

- "Hit Plays in England,"

- "Swiss Family Perelman p.6, 'Go Ahead' I shouted, 'Milk Me, Drain Me Dry,' Mr. and Mrs. S. I. Perelman,"

- "Carmen,"

- "Every Barn's a Stage: Life with Father,"

- "Checkmates,"

- "Westward Ha: Lazy Days on the Poop's Mortician, Missionary, Perelman Boy Meets Gull,"

- "Directing Minds of Russian Cinema and Theatre,"

- "The Filming of Stolen Hours a/k/a Summer Flight,"

- "Walking Happy,"

- "Duke Ellington,"

- "Dizzy Gillespie,"

- "Lorabid Doctor Waiting for a Phone Call for Eli Lilly," and

- "The Cast of 45 Seconds from Broadway."

The parties dispute the proper valuation of these works.

### A. The Measure of Damages For the Works

The parties agree that the Galleries' failure to account for the Missing Works, as found by the Court, is an act of conversion under New York law. *See* Pl. Br. at 1; Def. Br. at 3; *see also,*

*e.g.*, *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400 (2d Cir. 2006).[4] The parties dispute, however, how damages for such a conversion ought to be measured. The Foundation seeks to recover the market value of the works; the Galleries, on the other hand, argue that damages should be limited to the Foundation's lost profits. Because the Agreement provided that the Foundation would receive 50% of any profits from the Galleries' sales of the Missing Works, the Galleries argue that the Foundation's damages for the Missing Works should be 50% of their market value, not 100%.

The Court agrees with the Foundation that the market value of the works—without any discount for the Galleries' right to retain 50% of the profits—is the proper measure of damages. Under New York law, "[t]he usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest." *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326 (1980). "However, lost profits are allowed where either from the nature of the article or peculiar circumstances of the case they might reasonably be supposed to follow from the conversion." *Rajeev Sindhwani, M.D., PLLC v. Coe Bus. Serv., Inc.*, 861 N.Y.S.2d 705, 708 (2d Dep't 2008) (internal quotations omitted). But New York law allows for the recovery of lost profits *above and beyond* the market value of the lost or stolen property (in certain circumstances) not as an alternative, lesser measure of damages. *See id.*

In any event, whether the Galleries might have sold the Missing Works, and thereby earned a commission, is of no moment here because the Agreement, which provided the

---

[4] Under New York law, conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights. This includes a denial or violation of the plaintiff's dominion, rights, or possession over her property. It also requires that the defendant exclude the owner from exercising her rights over the goods." *Thyroff*, 460 F.3d at 403–04 (internal citations and quotations omitted).

Galleries their only authority to make such sales, has been terminated, for multiple reasons. And upon termination of the Agreement, all rights in consigned works—that is, 100% of their value—reverted to the Foundation. The proper measure of damages, therefore, is the fair market value of the works at the time and place of the conversion—that is, New York City on December 14, 2017, the date on which the Foundation demanded the Missing Works' return and on which the Galleries, having been unable to account for them, were unable to produce them. *See* Leopold Decl. ¶ 4.

On that basis, the Court proceeds to consider the proper value of the Missing Works.

### B.      The Parties' Valuation

Based on the work-by-work valuation of their expert, Harry Katz, the Foundation values the Missing Works at $328,000. Pl. Br. at 2; Katz Decl. ¶ 54.

The Galleries do not advance or substantiate an alternative valuation. Instead, they argue that the value of the works should be limited to approximately $10,000 per work, *see* Def. Br. at 4, a calculation which would yield a total valuation of approximately $190,000.

### C.      The Court's Findings

The Court finds Katz's valuations, anchored in sales prices for Hirschfeld works that Katz contends to be comparable, to be thoughtful and helpful. Katz's valuations provide an appropriate starting point for valuing the missing works. As explained further below, however, depending on the missing work, the sales of Hirschfeld works to which Katz likens a missing works are more apposite—and his valuations more persuasive—than others. Katz's approach is also fairly critiqued for examining only certain fora in which Hirschfeld works have been offered for sale. Accordingly, while the Court begins with Katz's valuation, it does not end there.

Below, the Court addresses Katz's qualifications, reviews the Galleries' critiques of Katz's approach to valuation, and sets out its overall assessment. The Court then explains, work by work, its valuation of the 19 works.

### 1. Katz's Qualifications

The Court finds Katz clearly qualified to appraise the works. He served for 13 years as Curator of Popular & Applied Graphic Art and Head Curator in the Prints and Photographs Division of the Library of Congress. Katz Decl. ¶ 2. Since then, he has served as Curator of the Herb Block Foundation and has worked as an independent curator of fine and graphic art. *Id.* ¶¶ 1, 4; *see also id.* Ex. 1 (Katz CV). Katz has particular expertise in the work of Al Hirschfeld. He has written about Hirschfeld and his work and has collected Hirschfeld's work for the Library of Congress. Katz. Decl. ¶ 6. He also put on a Hirschfeld exhibition at the Library of Congress. Tr. at 24. In his work as a curator and acquirer for the Library of Congress, Katz was repeatedly called on to appraise the value of Hirschfeld works. *See* Katz Decl. ¶ 9; Tr. at 26–29. He has been appraising works for one client or another since 1991. Tr. at 23.

And Katz's valuation is, for the most part, credible and convincing. Katz's valuation involved comparing each Missing Work to Hirschfeld works which he deemed comparable. For example, Katz appraised the drawing "Dick Shawn in the World of Shalom Aleichem" (inventory no. 704), a drawing that first appeared in *The New York Times*'s Friday Theater column. *Id.* ¶¶ 20–21. Katz compared this "Friday Drawing" to other "Friday Drawings" the Foundation has recently sold, including one depicting Maurice Hines, sold for $12,000, and another depicting Robert Reed, also sold for $12,000. *Id.* ¶ 21. Based on those sales, Katz opined that the missing "Dick Shawn" drawing is worth $12,000. *Id.* ¶ 20.

As Katz testified, this method of appraisal is typical, and the materials on which he relied are "the type of documentation [he] would typically review and rely on in conducting an appraisal of a particular work." *Id.* ¶ 14.

## 2. The Galleries' Critiques

The Galleries challenge Katz's valuation on several global grounds.

First, the Galleries note, because the Missing Works are missing, Katz was unable to assess the condition of the missing drawings. The Galleries argue that Katz's valuations are based on the "extraordinary assumption" that the works are in good condition. *See* Tr. at 35. The Galleries dispute that assumption as to all missing works. *See* Def. Br. at 6; Tr. at 31–38. The Galleries' critique is overbroad. As for works created prior to 1970, when Hirschfeld's practice was not consistently to use archival paper, there is a colorable reason—separate from any possible mishandling by the Galleries—to surmise that the condition of a work could have deteriorated over time. *See* Tr. at 31 (Katz); *id.* at 388–89 (Feiden). As to the post-1970 works, however, there is no basis to assume such deterioration. Of the 19 missing works, this critique applies only to six, because, as Ms. Feiden testified, only six date from the period in which Hirschfeld tended to use non-archival paper. *See* Tr. at 388 (Feiden) (testifying that low inventory numbers correspond to pre-1970 drawings). Also problematic for the Galleries, the testimony was not that deterioration of works on non-archival paper was inevitable, only that it was possible. The works were last held in the custody of the Galleries, and they have not come forward with affirmative evidence, *e.g.*, testimony by a percipient witness, that when observed most recently, their condition was compromised. Under these circumstances, given the nature of Katz's task, his assumption that the missing works were in good condition is justified. There

was simply not any concrete evidence that any of the earlier drawings had, in fact, deteriorated before the Galleries disposed of (or lost) them.

Second, the Galleries challenge the fact that Katz took as truthful the data he was given by the Foundation as its own prior sales, a number of which he used as comparables. *See* Def. Br. at 5. In addition to relying on auction records, Katz relied on the Foundation's reports of its sales prices for particular works. *Id.*; Tr. at 51–52 (Katz). While the better practice undoubtedly would have been for Katz to verify the Foundation's representations, that is ultimately not a basis to discount his opinions as having a "flimsy basis," as the Galleries urge. *See* Def. Br. at 5. The Galleries do not offer any concrete basis to treat as inaccurate the Foundation's sales figure. And the Galleries, which had the opportunity to conduct full discovery of the Foundation, has not come forward with any evidence impeaching any of these sales records. Katz's consideration of the Foundation's reported sales figures, therefore, was justified.

### 3. Other Considerations

Nevertheless, the evidence elicited at the damages hearing by the Galleries brought to light certain methodological limitations to Katz's approach to valuation. The Court has taken account of these limitations, as relevant, in assigning values to missing works.

First, the Foundation's own website lists several original Hirschfeld drawings for sale. Those works are offered from between $4,000 and $15,000, but never more. *See* Def. Br. at 4; Tr. at 146; *The Official Al Hirschfeld Store*, Al Hirschfeld Foundation, https://alhirschfeldfoundationshop.org/product-category/drawings/?orderby=price. Katz testified that he ignored these asking prices altogether because they do not represent actual, realized sales. *See* Tr. at 147, 154–56. The Court's view, however, is that these offering prices are a relevant data point. Notably, the Foundation's website does not provide for an auction in which the listed

price functions as a floor, not a ceiling. Rather, the website allows a customer to purchase a work at the listed price. Therefore, there is no persuasive reason for Katz to discount these listings on the ground that the works listed on the Foundation's website might sell for above the listed price. That a work has not sold at the listed price might suggest, if anything, that a lower price might be necessary to achieve a sale. In all events, the Foundation's own asking price for a Hirschfeld work, where fairly comparable, is germane, in the Court's view, to the valuation inquiry.

Second, Katz's valuation did not take into account the prices at which several original Hirschfeld drawings have sold in recent years on alternative art-sales fora. Katz testified that the Foundation provided him with records of auction sales in the form of printouts from the website ArtNet, which aggregates auction results from a range of auction houses. *See* Tr. at 149–50 (Katz) (describing ArtNet). The prices realized at these auctions for original Hirschfeld works range from $200 to $15,000. *See* Katz Decl. Ex. 3. Katz did not, however, take those sales into account in his appraisal, apparently skeptical that sales in such fora yield maximal prices. Tr. at 140–46. But the works sold did not differ significantly in kind from the Missing Works or the works sold by the Foundation which Katz was prepared to treat as comparables. Tr. at 144 (Katz). And some of these sales were more recent than those on which he relied. And while Katz relied on certain sales by the Galleries, he did not account for more recent sales, despite being aware of them. *See* Katz Decl. ¶ 33; *id.*, Ex. 3 at 83–84; Tr. at 105, 168–69 (Katz). In the Court's view, a complete appraisal would have considered sales prices for Hirschfeld works yielded on these other fora, while taking into account any well-founded bases to conclude that auctions in these venues tend to produce lower prices.

Third, to some degree, Katz can be faulted for assigning significance to particular features of missing artworks only when they supported a higher valuation. In certain instances, Katz's report noted that a particular missing work depicts a celebrity—or a backstage scene, or an opera—as evidence of the drawing's significance and, therefore, presumably a heightened valuation. But Katz's report never makes the contrary point—that the contents of particular missing works are, by nature, more quotidian, *e.g.*, depicting persons whose modern cachet is limited. *See, e.g.*, Tr. at 70 (Katz). In the end, the decisive factor in the Court's valuation analysis is the guidance offered by fairly comparable sales, but the Galleries' critique of Katz for seeming to treat the subjects of artwork as a one-way ratchet—favoring upward, but no downward, adjustments in valuation—has some traction.

Fourth, for certain missing works, Katz was unable to identify comparable sales. These include "Directing Minds of Russian Cinema and Theatre" ("Directing Minds"), "Duke Ellington," and "Dizzy Gillespie." *See* Katz Decl. ¶¶ 40–41 ("Directing Minds"); 46–47 ("Duke Ellington"); 48–49 ("Dizzy Gillespie"). For "Dizzy Gillespie" and "Duke Ellington," Katz testified that relevant comparable sales exist but are in his head, not on paper. Tr. at 137 (Katz). As finder of fact, however, the Court is unable to test any such claim, as Katz did not elucidate the particular sales of works in his head that he believes are comparable. As to "Directing Minds," Katz testified that no comparable sales exist because few, if any, comparable works exist. Tr. at 78–79. That may be: The "Directing Minds" work is indeed extraordinary, and Katz's testimony as to the significance—both political and art-historical—of this work was persuasive. *See id.* In the end, however, Katz's numerical valuation of this landmark work is limited by the lack of evidence of comparable sales.

Finally, as to several missing works, Katz's valuation is limited because no images of those works were available for Katz to consult. *See id.* ¶ 25 (no images or measurements available of "Outdoor Life");[5] *id.* ¶ 28 (no images or measurements available of "Hit Plays in England").

### 4. Works for Which Comparable Sales Support Katz's Valuations

Notwithstanding these considerations, the Court finds Katz's valuations persuasive as to those works for which a sale that the Court finds fairly comparable has recently occurred and for which the Galleries have not provided any competing comparable sales. As to these works, the Court finds that Katz's valuation is proper. Accordingly, the Court assigns the following valuations to the following 13 missing works:

- "S.J. Perelman: Readying Myself for My Debut": $8,000.

- "Dick Shawn in the World of Sholom Aleichem": $12,000.

- "Curtis and Leigh in Houdini": $18,000.

- "Artists and Models: 300 Girls Paraded Before Monte Prosser and Wally Wanger": $18,000.

- "Swiss Family Perelman p.6, 'Go Ahead' I shouted, 'Milk Me, Drain Me Dry,' Mr. and Mrs. S. I. Perelman": $8,000.

- "Carmen": $20,000.

- "Every Barn's a Stage: Life with Father": $15,000.

- "Checkmates": $25,000.

---

[5] Katz's report describes the "Outdoor Life" drawing as an illustration Hirschfeld drew for the *Outdoor Life* magazine. *Id.* ¶ 25. Katz's valuation of this drawing is based on recent sales of other drawings Hirschfeld created for *Outdoor Life*, which Katz attests were for "$6,000 or more." *Id.* But Katz's report provides no evidence substantiating those sales, and the materials provided to Katz by the Foundation do not include such sales. *See id.* Ex. 3.

- "Westward Ha: Lazy Days on the Poop's Mortician, Missionary, Perelman Boy Meets Gull": $8,000.

- "The Filming of Stolen Hours a/k/a Summer Flight": $20,000.

- "Walking Happy": $15,000.

- "Lorabid Doctor Waiting for a Phone Call for Eli Lilly": $5,000.

- "The Cast of 45 Seconds from Broadway": $25,000.

The total value of these 13 works is $197,000.

### 5. Works for Which Katz's Valuation Is Inadequate

As to the remaining six works, one or more limitations of Katz's valuation methodology compel discounting his appraisal. The Court's analysis is as follows.

#### a. Four works for which Katz does not provide comparable sales

As to "Famous Feuds: Zanuck and Greco," Katz's valuation ($30,000) does not rest on a solid basis. The only comparable sale on which Katz relies is the sale of a *TV Guide* cover—which the "Famous Feuds" drawing is not—which sold for $25,000. Katz's $30,000 valuation, moreover, is among the highest of any works he evaluated. It is considerably above the price for which the Foundation—or the Galleries—offers any Hirschfeld work for sale.

Accordingly, the Court finds that a discount of 50% (*i.e.*, to $15,000) is necessary. This discount accounts for the fact that there has not been a sale of a comparable work brought to the Court's attention. Such a discount brings the valuation in line with the highest prices for which the Foundation offers Hirschfeld works for sale. It brings the valuation for this work into rough

accord with the average valuation for the other missing works for which comparable sales have been found.[6]

For both "Duke Ellington" and "Dizzy Gillespie," Katz has not specified comparable sales figures although, as noted above, he attested, in general terms, that comparable sales have occurred. Absent specification of such sales, the Court is constrained to discount Katz's valuation of these works. For each work, Katz's valuation was $18,000. The Court finds that a valuation of $15,000 is appropriate for these works, too. The Court is again guided by the prices for which the Foundation offers works for sale, which do not exceed $15,000. This outcome, too, brings the valuations for these works into broad accord with the other valuations the Court has reached. Therefore, while no precise comparable has been found for this missing work, the valuation figure used by the Court is one that it is reasonable to infer a willing buyer would pay for such a Hirschfeld work.

The final of these works, "Directing Minds of Russian Cinema and Theatre," presents a particularly difficult question. Katz valued this 1928 portrait work, "conservatively," at $45,000, the highest of his valuations. *See* Katz Decl. ¶¶ 40–41. As he explained, "by far," "this drawing is the most significant missing work in this collection" because of its historical importance and subject matter. *Id.* ¶ 41 (work "features eight top Russian film and stage directors," "is one of the few remaining works from a five-month trip Hirschfeld took to Russia in that year," and "is also an important historical document" because "it captures Hirschfeld at a seminal moment in his career" and "is the only portrait from life of all these directors from the zenith of Russian film

---

[6] For the 12 works listed above, valued at $197,000 in the aggregate, the average price per work is $16,416.67.

and stage"). However, precisely because of its unique nature, there exist no comparable sales on which to base a valuation. *See* Tr. at 77–79 (Katz).

The Court finds that a discount of Katz's valuation is necessary as to this work, too. The Court appreciates the unique nature of this work and is persuaded that its historical and artistic significance justify a heightened valuation. But in the absence of comparable sales, the Court cannot accept this valuation so far above all others. Accordingly, the Court believes that a fair approximation is found by taking the average of the five highest sales prices reported by the Foundation: $50,000, $40,000, $25,000, $20,000, and $18,000. *See* Katz Decl., Ex. 3. That average is $30,600.

The total for these four works is $75,600.

### b. Two works for which no surviving image exists

As noted, for certain works no image of the work exists. This complicates the valuation of those images: Not only was Katz unable to appraise the actual work (a problem for all 19 of the missing works), but he was unable to even know for certain the features of the work he was appraising.

For one such image, "Outdoor Life," the parties agree, however, that the image is one of the Hirschfeld illustrations published in the magazine *Outdoor Life*. *See* Katz Decl. ¶ 6; Tr. at 58–60. This work is therefore identifiable, to a degree. As noted above, however, Katz provided no evidence substantiating the sale, for $6,000, of a comparable *Outdoor Life* illustration. *See* note 5, *supra*. The materials that the Foundation furnished to Katz do not include any such sale. Accordingly, Katz's valuation as to this work relies unduly on conjecture.

Although the Galleries do not offer an alternative valuation, the Court's assessment is that $5,000 is an appropriate measure for this work. That value accords with the bottom range of

prices for which the Foundation offers Hirschfeld drawings for sale. And such a discount accounts for the other potential shortcomings in Katz's valuation.

Finally, the Court considers the work, "Hit Plays in England." Again, no image of this work exists. Katz was, however, able to determine, based on the Foundation's archives, that the drawing "featured portraits of legendary playwright Emlyn Williams and the well-known actor Alec Guinness" and was further unusual in that "it was drawn on paper rather than board, which makes it a rarity among Hirschfeld's nine decades of work." Katz Decl. ¶ 29. And again, Katz's assessment of the work is not based on a comparable sale. His valuation of $12,000, even accepting his word that this valuation was conservative, *id.*, therefore, lacks a solid foundation in any verifiable fact. Accordingly, the Court will impose a proportionate discount for this work. A valuation of $10,000 accounts for the several potential shortcomings in Katz's valuation, and brings the valuation into accord with the prices for which the Foundation offers Hirschfeld works for sale and with the broad middle.

The total for these two works, therefore, is $16,000.

The Court thus finds that the proper valuation for the 19 missing works is $288,600.[7]

## II.    Sales of *Giclees*

The Court also determined the Galleries were liable for selling *giclee* reproductions beyond the scope of the license afforded by the Agreement. The Court heard testimony and received documentary evidence as to the number and nature of *giclees* sold. As noted above, the

---

[7] In a November 29, 2017 joint letter to the Court, the Galleries represented that they estimated the works at no more than $250,000. *See* Dkt. 191 at 6. Although the Court has not relied on this statement, the Court notes that this outcome is not significantly above this figure, which the Galleries, at one point, assigned to the Missing Works in total.

Court has also benefitted from the parties' helpful post-hearing letter briefs, in which the parties set out their respective calculations of the damages owed for unauthorized *giclees*.

The proper measure of damages is not in dispute: the parties and the Court agree that the Foundation's damages are measured by the profits the Galleries attained through the sale of unauthorized *giclees*. The Court's task, therefore, is largely arithmetical: to quantify the Galleries' unlawful profits, the Court must first determine the number of *giclees* sold, second, the price at which each *giclee* was sold, and finally, the costs to the Galleries—including any amount remitted to the Foundation—associated with producing the *giclee*. The Court proceeds with that task on a category-by-category basis.

## A.    Time Life

The parties are almost entirely in agreement as to the damages owed for the Galleries' sale of the *Time-Life* prints. These were two Hirschfeld drawings, of Bob Hope and Carol Burnet, which the Galleries sold directly to *Time-Life*. The parties agree that the Galleries earned $9,650 on the sale of 210 of these prints. *See* Pl. Post-Hr. Br. at 1; Def. Post-Hr. Br. at 1. The parties dispute only the cost basis for these works and whether the Galleries remitted any profits from these sales to the Foundation.

The parties' dispute over the cost basis turns on two documents: (1) the Galleries' own report to the Foundation in the February 2, 2016 monthly statement, reporting costs of $1,418.26 for these prints; and (2) an invoice from Duggal Visual Solutions, the Galleries' printer, for the printing of these prints for $818.26. The Galleries concede, however, that there is no "record evidence" substantiating its claim to the Foundation of an additional $600 in costs, *see* Def. Post-Hr. Br. at 7, and the Galleries have not concretely explained what the additional costs

represented. The Court, accordingly, applies the cost basis for which there is record evidence—the Duggal invoice—and assesses the Galleries' costs at $818.26.

The parties also disagree whether the Galleries remitted to the Foundation any of the profits earned on the sale of the Time Life prints. The Foundation claims defendants' profits equaled $8,831.74 (*i.e.*, $9,650 in revenue, less $818.26 in expenses). But the record reflects that the Galleries remitted $4,115.87 (*i.e.*, half the Galleries' revenue, less $1,418.26 in reported expenses) to the Foundation. *See* Kaplan-Peterson Decl., Ex. 2. The Foundation does not dispute the fact of this remittance. Accordingly, the Court finds the Galleries' profit was, and hence that the damages owed to the Foundation are, **$4,715.87.**

### B.    Hirschfeld Spectacular

There are two sets of works at issue arising from the Galleries' relationship with the department store Henri Bendel and the Galleries' creation of *giclees* for Bendel.

#### 1.    "Poster"

In connection with a 2013 window display at the Manhattan department store, the Galleries created posters for Bendel. The parties agree that the Galleries' costs on these posters were zero because Bendel covered these costs. And the parties agree that that the Galleries remitted nothing to the Foundation for these sales. The parties also agree that the posters were sold for $255 each. The parties' dispute is therefore limited to the number of such *giclees* sold. That dispute is readily resolved.

Plaintiffs argue that 24 of these were sold. Defendants argue only six were sold. Ms. Feiden testified that the Galleries sold "approximately 24" of these Posters. *See* 5/11/18 Tr. at 336. Indeed, her testimony as to this point was among the most clearly established points of fact during the three days of testimony. *See id.* at 338 ("Ms. Lackman, I just said that we sold 24.

17

Did you not hear me?"). The Court credits that testimony and finds that the Galleries did sell 24 such posters. The Galleries identify no evidence to the contrary.

Accordingly, the Court finds damages of **$6,120** for the Hirschfeld Spectacular Posters.

## 2.    Installation *giclees*

As part of the Galleries' work with Bendel, they also created 91 *giclees* to install in the windows of the store. *See* Hr. Tr. at 336. The parties dispute whether any of these "Installation" *giclees* were ever sold. The Galleries contend they sold none of these works. The Foundation argues that six were sold.

The Court finds plaintiffs have not carried their burden to establish any sales of these *giclees*. Ms. Feiden testified that none of these *giclees* were sold. *See* 5/11/18 Tr. at 336. The Foundation's argument that six were sold is based entirely on the inference that, because the Galleries affirmatively destroyed 85 of these works, they must have sold the remaining six. *See* Pl. Post-Hr. Br. at 3. That inference is not persuasive. The more credible inference, drawing on Ms. Feiden's credible testimony on this point, is that these works were never intended for sale— and were never sold—because they "were simply there to be displayed and they were not put up with the care that one would take for any sort of original art . . . [T]hey were just displays. That's all that they were." Hr. Tr. at 378 (Feiden).

Accordingly, the Court finds no damages owed for these *giclees*.

## C.    PBS Premiums

Defendants concede they sold 20 *giclees* of a work referred to as "MacNeil Lehrer" to PBS. *See* Def. Post-Hr. Br. at 1, 7. They concede, too, that PBS paid the Galleries $3,000 for these works. *Id.* at 7. And they estimate their costs for the production of these works at $1,497.

*Id.* On the resulting $1,503 in profits, defendants represent that they paid half—$751.50—to the Foundation, resulting in net damages owed to the Foundation of $751.50. *Id.*

The Foundation does not contest any of these facts. *See* Pl. Post-Hr. Br. Ex. 1 (entry for "MacNeil Lehrer"). Accordingly, the Court assesses damages for these "PBS Premiums" at **$751.50**.

### D.     "Ordinary" *giclees*

The bulk of the Galleries' disputed sales were of what the defendants refer to as "ordinary" *giclees*—that is, works unrelated to a particular project or client. The parties are almost entirely in agreement, however, as to nearly all of the substantiated sales of these *giclees*. Both parties rely on the records from Duggal, invoices from the Galleries, and monthly statements from the Galleries to the Foundation reflecting sales. *See* Def. Post-Hr. Br at 4–5; *id.* Ex. 1 ("Duggal Master Chart"); Pl. Post-Hr. Br. at 2; *id.* Ex. 1. The Court's review of the underlying materials largely tracks the parties' submissions. The Court details its assessment of the Galleries' revenue, costs, payments to the Foundation, and profits below, as well as in a chart annexed to this decision. *See* Appendix.

### 1.     Revenue

Defendants concede selling 68 *giclees*. Def. Post-Her. Br. at 4–5. All but two of these sales were for $900; the other two were for $1,200. Defendants thus calculate total revenue on these sales as (66 x $900) + (2 x $1,200), for a total of $60,600.[8]

---

[8] The Court notes that this sum is actually $61,800. Defendants' calculation appears to account for only one sale at $1,200. The record evidence, too, shows only one such sale. *See* Pl. Post-Hr. Br. Ex. 1 ("Washington Square" sale for $1,200). The "Washington Square" print is considered separately below as a "posthumous edition."

The Foundation's post-hearing briefing does not detail the number of infringing *giclees* in this category (as it does for the other categories) or the price at which the Foundation believes they were sold. *See* Pl. Post-Hr. Br. at 2. In the chart attached to their brief, however, plaintiffs enumerate 65 works—aside from the *Time Life* prints, the Hirschfeld Spectacular Posters, the PBS prints, and the posthumous edition (discussed below)—from this category that they allege were sold. The revenue figure represented in that chart for the *giclees* plaintiffs allege the Galleries sold (other than the *Time Life*, Hirschfeld Spectacular, and PBS *giclees*), is $57,900. *See* Pl. Post-Hr. Br. Ex. 1.[9]

The Court therefore need not resolve what, if any, discrepancies may underlie the parties' differing calculations: The Court accepts the Foundation's sales and revenue figures—65 works sold for $57,900—as effectively conceded by the Galleries.[10] The Court's independent review of the record evidence, as summarized in the appended chart, reflects nearly the same figures. *See* Appendix.

The Court's figures do not include the *giclees* the Foundation claims were sold where this claim is based solely on the evidence that Duggal invoiced the Galleries for the printing of those works. *See* Pl. Post-Hr. Br. at 6–7; *id.* Ex. 2. Those *giclees* include works known as "Elvis,"

---

[9] This number reflects the Court's totaling of the Foundation's revenue estimates for all line items save for (1) Time Life Prints, (2) Hirschfeld Spectacular Posters, (3) PBS "MacNeil Lehrer" prints, and (4) the "Washington Square" posthumous edition.

The Court has excluded from this number the sums the Foundation includes for revenue it alleges the Galleries received for the sale of frames in connection with the sale of *giclees*. *See* Pl. Post-Hr. Br. at 2; *id.* Ex. 1 ("Frame" column). Plaintiffs' theory of the Galleries' liability for framing appears for the first instance in their post-hearing brief; the Court did not receive evidence on this point (including, most importantly, as to the Galleries' framing costs) and has not heard any argument on this point from the Galleries.

[10] For example, plaintiffs claim the Ricky Jay & David Mamet *giclee* was a single print sold for $1,800; Defendants claim it was two *giclees*, each sold for $900.

20

"Funny Feet," "Pull That Train," "Redboard Family," and "Tony Randall." To be sure, the Duggal records do reflect charges for the printing of these *giclees*. But that evidence is too thin a reed on which to rest liability. As the evidence adduced at the hearing reflected, the Galleries often commissioned *giclee* prints from Duggal for purposes other than for selling those prints. And the record evidence reflects that the Galleries' monthly statements and invoices, while imperfect, largely align both with each other and with the Duggal records. For most sales that Court has credited, evidence from all three sources—the monthly statements, the Galleries' invoices, and the Duggal records—corroborate each other. For the *giclee* sales evidenced only by Duggal invoices, by contrast, there is no comparable corroboration.

The Court's total does reflect, however, a decision to credit AHF's contention—*see* Pl. Post-Hr. Br. Ex. 2—that a work known as "Romeo & Juliet" was sold, even though AHF does not include this work in its tally of documented sales, *see id.* Ex. 1. Like the works just discussed, the Galleries paid Duggal to prepare such a work. *See* Def. Post-Hr. Br. Ex. 4 at AHF-DUGGAL-0044. But unlike those several works, the Galleries remitted payment to the Foundation for the sale of this work. *See* Statement of September 31, 2015 at 1. There is, therefore, corroborating evidence of a sale. Accordingly, the Court finds it more likely than not that the Galleries, having paid to have such a work made and then having remitted payment to the Foundation for such a sale, did actually sell this work.

Thus, as is reflected in greater detail in the Court's chart, the Court concludes that the Galleries sold 66 infringing works for a total of $58,800. *See* Appendix.[11]

---

[11] The Court includes in this total two works, "My One & Only" and "Steven Spielberg," that, the parties agree, were given away for free. The Court treats the Galleries' profits on these as zero. Because the Court's task is to assess the Galleries' profits on unauthorized sales of *giclees*, the Court does not include any costs associated with the production of these works in its calculation, *see infra*, of the costs the Galleries incurred. Nor does the Court include the

21

## 2. Costs

Much of the parties' efforts at the damages hearing was spent contesting the Galleries' costs in preparation of their *giclees*. In their post-hearing briefing, however, the parties prove largely in agreement.

The Galleries identify only two line-items as costs: Duggal's printing costs, and Yavel's time (a total of $1,800). *See* Def. Post-Hr. Br. at 2, 5. Defendants estimate Duggal's costs printing this category of *giclees* at $8,412. *See id.* Defendants' cost estimate for the printing of these *giclees* is based on records from Duggal. *See id.* Ex. 1.

The Foundation's post-hearing brief does not enumerate the costs attributable to the printing and sale of these *giclees*. The chart attached to it, however, details the Foundation's estimates of those costs. The Court's review of that chart shows the Foundation estimates the Galleries' printing costs for these works to have been $7,544.

On the Court's review of the record evidence, the Duggal printing costs that can be attributed to the sales of infringing *giclees* total: **$8,205.70**.

In reaching that accounting, the Court has considered the following discrepancies in the parties' claims:

- The Foundation apportions the costs of the Duggal bill for the Jerry Stiller and Anne Meara works across each work; defendants simply include the full cost from Duggal once. Nothing turns on this difference.

- The Foundation accounts for costs of Duggal's printing on works the Galleries did not sell. The Court does not credit those costs. Nor does the Court credit the

---

payment the Galleries made to the Foundation for the "Steven Spielberg" *giclee*. That payment appears to have been a mistake, given that the Galleries gave the Spielberg *giclee* away "gratis." *See* Def. Post-Hr. Br. Ex. 2 at 27.

Galleries' costs on works the Galleries provided for free to certain clients. There is no reason to deduct from the Galleries' profits its costs on other works on which it gained no profits (just as the Court does not deduct from its profits the costs it incurred in the preparation of non-Hirschfeld works). The Court's task is to determine the Galleries' ill-gotten profits.

- An April 19, 2012 Duggal line item, Order No. 142709, for which the record contains a Duggal bill, *see* Def. Post-Hr. Br. at AHF-DUGGAL-0021, does not specify what works were printed. The next monthly statement from the Galleries to the Foundation, however, indicates that two copies of "Merrily We Roll Along" and one copy of "George & Ira Gershwin" were sold. The Court apportions the charge for Order No. 142709 to those works.

- The Foundation indicates that the costs for Duggal's printing of the "Dick Hyman" *giclee* were $154. *See* Pl. Post-Hr. Br. Ex. 1. Defendants, however, attribute a Duggal $113 charge for "art of man with outstretched arms" to the Dick Hyman *giclee*. The Court can identify no basis in the record for either party's cost allocation here. The Court accepts, however, plaintiff's cost figure— $154—as conceded.

- Similarly, the Foundation puts the Duggal cost figure for "Chaplin-The End" at $147. The Galleries claim only $98. The Court can identify no non-speculative basis to determine the cost basis and takes plaintiff's figure as conceded.

- Similarly, the Foundation indicates that the Duggal costs for "Anne Meara," and "Anne Meara 'Rome & Juliet'" are each $227.25. The bases for plaintiff's claim as to costs for these works is not clear, and the Court cannot identify any non-

speculative basis to determine the correct costs. The Court therefore takes plaintiff's figure as conceded.

- So, too, for "Chaplin: The Gold Rush." Defendants claim only $116; the Foundation concedes $128. The Court cannot identify a non-speculative basis to determine the actual costs and, accordingly, accepts plaintiff's concession.

- For "Follow that Dream," it is unclear whether defendants claim any Duggal costs. Rather, they admit that there is no record of Duggal printing that work. Nevertheless, plaintiffs indicate that the Duggal costs for this work are $117. The Court accepts plaintiff's concession.

- As to certain costs, where the record evidence provides only speculative support for apportioning Duggal's costs to a particular work, the parties nonetheless agree on to which work the costs apply and in what amounts. *E.g.*, "Harry's Bar," "Dick Van Dyke," "Camelot," "Barnum," "Joseph and the Technicolor Dream Coat," "Saturday Night Live," "Guys & Dolls," "Winston Churchill," "Roger Rees in Nicholas Nickleby," "Sesame Street." The Court accepts the parties' agreed-upon tabulation of costs.

- There are also certain costs the Galleries claim, and which the Foundation does not concede, for which the Court finds no non-speculative basis to assign to any particular work. The Court cannot grant the Galleries costs for these works. *See* Appendix (entries for "My Fair Lady," "Paul Ford in Whoop Up").

The Court also apportions Yavel's costs ($1,800) for the preparation of these works. Yavel testified that the total cost to the Galleries for the time he spent on the preparation of

*giclees* for printing was $1,800. *See* 5/31/18 Hr. Tr. at 55; Def. Post-Hr. Br. at 2. The Court credits that testimony, which is not meaningfully in dispute.[12]

Accordingly, the Court finds the Galleries' total costs to have been: **$10,005.70**.

### 3.    Remittances

Based on monthly statements contemporaneously submitted by the Galleries to the Foundation, the Galleries contend they paid to the Foundation $19,500 in connection with these sales. *See* Def. Post-Hr. Br. Ex. 5. The Galleries' charts, however, represent this figure as either $19,200, *see id.* Ex. 6, or $18,451.50, *id.* Ex. 7.[13] The Foundation's briefs do not specify the amount they believe they received from the Galleries for these sales. The Foundation's chart, however, represents that the Foundation received payment for nearly all of the sales in question. Pl. Post-Hr. Br. Ex. 1. The Court's review of that chart shows the Foundation estimates that the Galleries remitted to the Foundation $18,300.

That discrepancy of $1,200 (between the Foundation's estimate and the Galleries' high estimate) is explained in part by the Foundation's omission, in its chart, of certain of these remittances. The Galleries' May 31, 2012, monthly statement reflects a payment to the Foundation for $600 for two sales of "Merrily We Roll Along" and $300 for one sale of "George and Ira Gershwin." *See* Def. Post-Hr. Br. Ex. 5 at AHF-119. Plaintiffs' chart, however, represents that the Foundation paid the Galleries nothing for these sales. *See* Pl. Post-Hr. Br. Ex.

---

[12] Plaintiffs' post-hearing brief does not discuss Yavel's costs, but the Court understands plaintiffs' chart to refer to Yavel's costs in the "additional costs" column. *See* Pl. Post-Hr. Br. Ex. 1,

[13] This latter figure appears to reflect a miscalculation. It is represented as reflecting the amount paid to AHF for all works "Less 'MacNeil/Leher,'" and the amount paid for MacNeil/Leher is reflected on the next line: $751.50. Accordingly, the subtotal reflected in Exhibit 7 ought to be $17,700.

1. The Court credits the May 31, 2012 statement.[14]

On the Court's review of the monthly statements, in conjunction with the parties' submissions, the Court concludes that the Galleries paid to the Foundation **$19,200**. *See* Appendix. That figure includes the payment the Galleries made for the "Romeo & Juliet" *giclee*, which, as discussed above, the Court finds to have been sold.

Subtracting the moneys paid to the Foundation ($19,200) and the Galleries' costs ($10,005.70) from the Galleries' total revenue ($58,800), yields a total profit figure for the Galleries' sale of "ordinary" *giclees* of $29,594.30. Those profits, the parties agree, are the appropriate measure of damages for the Galleries' sale of these *giclees*. Accordingly, the Court awards damages in the amount of **$29,594.30**.

### E. Posthumous Editions

The parties are, by far, farthest apart on the question of posthumous editions. These are works printed in limited editions following Hirschfeld's death (and thus, necessarily, unsigned). The Galleries contend that they sold only one such work and owe the Foundation just $1,200. The Foundation argues that the Galleries sold 1,122 posthumous editions and, accordingly, owe $1,130,124. The Court finds that the record evidence supports the sale of only one of the posthumous editions.

The parties' dispute has four parts: three relating to alleged sales and a fourth relating to allegedly offsetting expenses.

### 1. "Flower Drum Song"

---

[14] The Court's review of the monthly statements does not reveal any payment from the Galleries to the Foundation for the work known as "Anne Meara," of which the Galleries sold two *giclee* prints. The parties agree, however, that the Galleries remitted $600 to the Foundation for that work. The Court accepts the parties' agreement as to that point.

Ms. Feiden testified that the Galleries printed "one or two" copies of this drawing and sold one. *See* 5/11/18 Hr. Tr. at 347. But when the Galleries shipped the print to the buyer, she testified, "the person who had ordered it said, 'This is not the production of *Flower Drum Song* that I was buying.'" *Id.* The Galleries ended up making a new print for the customer of the correct image. *Id.*

Evidence of *that* sale—the second, reprinted image—is found in the Galleries' invoices: the Galleries charged a customer $900 for a "*giclee Flower Drum Song*, 16 x 20." *See* Def. Post-Hr. Br. Ex. 2 at 28. That sale is included in the parties' accounting of the "ordinary" *giclee* sales. *See* Pl. Post-Hr. Br. Ex. 1 ("Flower Drum Song"). Accordingly, there is no basis to include this sale in an accounting of posthumous editions.

### 2. "Washington Square"

Defendants concede having sold one copy of a posthumous edition known as "Washington Square." The Court therefore finds that the record evidence demonstrates a single sale of a posthumous edition—the "Washington Square" print—for $1,200.

The Galleries do not claim any costs associated with this print. *See* Def. Post-Hr. Br. at 6. The Galleries also concede that they did not remit any payment to the Foundation for this sale. *See id.* Accordingly, the Court calculates the Galleries' profits on this sale, and the Foundation's damages, as $1,200.

### 3. Alleged Sales of Other Posthumous Editions

The Foundation claims that the Galleries made and sold limited edition prints in editions of 100 to 300 in size. Its basis for this claim is that, in advertising certain of these limited-edition prints for sale on its website, the Gallery represented that the "edition size" was, variously, 100,

212, or 300. *See* Kaplan-Peterson Decl. Ex. 6. The Foundation also notes that the Galleries had purchased from the Foundation the right to make editions on this scale.

The Galleries dispute having made any sales of posthumous editions beyond the conceded sale of the "Washington Square" print. Ms. Feiden forcefully denied such sales. And, as the Galleries note, there is no documentary evidence substantiating that sales of such editions occurred, even if such sales may have been at some point contemplated.

On this issue, the Court holds for the Galleries. Whatever the Galleries' intentions might have been, the record evidence does not permit, except by means of speculation, a finding that the Galleries ever followed through on a plan to sell additional posthumous editions.

The Court is unpersuaded by the Foundation's three contrary arguments. The Foundation argues that Ms. Feiden's denial of such sales should be held incredible; that the Galleries' failure to produce records of additional posthumous sales merely reflects the Galleries' disorganized records, not the non-occurrence of such sales; and that the fact that the Duggal records do not reflect printing costs for the one posthumous edition defendants admit selling suggests that a different, unknown printer must have assisted the Galleries and could have created hundreds of posthumous editions.

As to the first argument, the Court will not categorically discredit Ms. Feiden's testimony. While the Court had concerns about aspects of her testimony—and while Ms. Feiden's serial changes to her sworn affidavit raised questions about the care with which she approached execution of this important submission—other aspects of her testimony rang true. On the issue of posthumous editions, the Court found Ms. Feiden's testimony credible and persuasive. She testified that her usual practice, when contemplating the creation of a limited-edition print, was to purchase from AHF the rights to sell the entire edition. *See* 5/11/18 Tr. at

290–92. But after Al Hirschfeld died, she testified, the Galleries "never, not even once," printed the full run of an edition. *Id.* at 293. That was because the Galleries "got almost no interest in the posthumous unsigned editions." *Id.* As she explained, the fact that the editions were not signed dampened purchasers' interest, as "the word 'posthumous' is off-putting." *Id.* at 348. Ms. Feiden also credibly testified as to the number of sales for each of the posthumous editions. *See id.* at 345–48. She testified that, although the Galleries printed one or two of each imprint, they sold only one print (from the "Washington Square" limited edition). *See id.*

As to the second argument, while the Galleries' inattentive recordkeeping and document-production practices justifiably have drawn the Foundation's dismay, these lapses do not rightly give rise to the inference that the Galleries secretly sold hundreds of posthumous edition *giclees* for more than $1 million. To be sure, the Galleries' invoices fail to account for certain sales. But there is no charter for claiming that the Galleries operated, off-the-books, a posthumous-edition business line that at times would have dwarfed their other operations, while leaving no documentary trace of this business. On the contrary, the Galleries' records reflect substantial diligence in informing the Foundation of other *giclee* sales (although inaccurately casting these as "Photostats"). The Court finds it much more likely than not that, had the Galleries produced and sold limited edition posthumous prints on the scale alleged, they would have informed the Foundation, at least to a substantial degree.

As to the third argument, the Court does not accept the speculative inference that, because the one "Washington Square" edition that was sold is not referenced on any Duggal invoice, it is likely that hundreds of others were sold and that the entirety of the alleged posthumous editions were created by some other printer. There are many potential explanations for the non-appearance of the single "Washington Square" print among the Duggal invoices.

The Court finds least likely plaintiffs' thesis that this event is a clue to a sizable alternative business arrangement between the Galleries and a third-party printer.

### 4.    Offsetting Expenses

The Galleries seek to offset their liability to the Foundation by the sum it paid ($33,000) to the Foundation for the Galleries' right to print posthumous editions. *See* Def. Post-Hr. Br. at 1–4. That argument is, quite, unpersuasive. The Galleries made a business decision to pay for the right to print such editions, just as the Galleries made a business decision not to exercise it. They are not entitled to a refund.

## CONCLUSION

For the reasons reviewed above, based on the evidence presented at the three-day hearing and in the parties' post-hearing submissions, the Court will award damages as follows with respect to the areas in which summary judgment has been entered in favor of the Foundation:

1.  For the 19 Missing Works: **$288,600**;

2.  For the Galleries' sale of the *Time/Life giclees*: **$4,715.87**;

3.  For the Galleries' sale of the Hirschfeld Spectacular Poster *giclees*: **$6,120**;

4.  For the Galleries' sale of the PBS Premiums *giclees*: **$751.50**;

5.  For the Galleries' sale of "ordinary" *giclees*: **$29,594.30**; and

6.  For the Galleries' sale of Posthumous Edition *giclees*: **$1,200**.

In total, therefore, the Court will award damages to the Foundation in the amount: **$330,981.67**.

The Court does not direct the Clerk of Court at this time to enter a formal judgment, because there are pending claims in the case, and because partial judgments are disfavored. An order as to next steps will follow shortly.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 25, 2018
New York, New York

| Name | No. | Sales Price | Revenue | Duggal Costs | Paid to AHF | Profit on each work |
|---|---|---|---|---|---|---|
| Angela Lansbury in Sweeney Todd | 1 | $ 900.00 | $ 900.00 | $ 248.00 | $ 300.00 | $ 352.00 |
| Anne Meara | 2 | $ 900.00 | $ 1,800.00 | $ 227.25 | $ 600.00 | $ 972.75 |
| Anne Meara "Eastern Standard" | 2 | $ 900.00 | $ 1,800.00 | $ 243.00 | $ 600.00 | $ 957.00 |
| Anne Meara "Romeo & Juliet" | 2 | $ 900.00 | $ 1,800.00 | $ 227.25 | $ 600.00 | $ 972.75 |
| Annie Hall (Woody Allen & Diane Keaton) | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Asti Spumanti Nina Champagne | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Barnum with Jim Dale | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Camelot with Roddy McDowal | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Carroll O'Connor and Jean Stapleton "All in the Family" | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Chaplin: The Gold Rush | 1 | $ 900.00 | $ 900.00 | $ 128.00 | $ 300.00 | $ 472.00 |
| Charlie Chaplin, The End | 1 | $ 900.00 | $ 900.00 | $ 147.00 | $ 300.00 | $ 453.00 |
| Cheers | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Christopher Keen | 1 | $ 900.00 | $ 900.00 | $ 133.20 | $ 300.00 | $ 466.80 |
| Christopher Plummer | 1 | $ 900.00 | $ 900.00 | $ 179.00 | $ 300.00 | $ 421.00 |
| Dean Martin & Jerry Lewis | 1 | $ 1,200.00 | $ 1,200.00 | $ 408.00 | $ 300.00 | $ 492.00 |
| Der Rosenkavalier | 1 | $ 900.00 | $ 900.00 | $ 179.00 | $ 300.00 | $ 421.00 |
| Dick Hyman | 1 | $ 900.00 | $ 900.00 | $ 154.00 | $ 300.00 | $ 446.00 |
| Flower Drum Song | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Follow That Dream | 1 | $ 900.00 | $ 900.00 | $ 117.00 | $ 300.00 | $ 483.00 |
| George and Ira Gershwin | 1 | $ 900.00 | $ 900.00 | $ 103.00 | $ 300.00 | $ 497.00 |
| Guys & Dolls 1950 | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Harry's Bar | 1 | $ 900.00 | $ 900.00 | $ 328.00 | $ 300.00 | $ 272.00 |
| Into the Woods Revival | 1 | $ 900.00 | $ 900.00 | $ 143.00 | $ 300.00 | $ 457.00 |
| Jerry Garcia | 1 | $ 900.00 | $ 900.00 | $ 179.00 | $ 300.00 | $ 421.00 |
| Jerry Garcia | 1 | $ 900.00 | $ 900.00 | $ 113.00 | $ 300.00 | $ 487.00 |
| Jerry Stiller "Hurlyburly" (full) | 2 | $ 900.00 | $ 1,800.00 | $ 1,818.00 | $ 600.00 | $ (618.00) |
| Jerry Stiller "Hurlyburly" (single) | 2 | $ 900.00 | $ 1,800.00 | $ - | $ 600.00 | $ 1,200.00 |
| Jerry Stiller "King of Queens" | 2 | $ 900.00 | $ 1,800.00 | $ - | $ 600.00 | $ 1,200.00 |
| Jerry Stiller "Much Ado About Nothing" | 2 | $ 900.00 | $ 1,800.00 | $ - | $ 600.00 | $ 1,200.00 |
| Jerry Stiller "The Ritz" (Movie) | 2 | $ 900.00 | $ 1,800.00 | $ - | $ 600.00 | $ 1,200.00 |
| Jerry Stiller "Three Men On a Horse" | 2 | $ 900.00 | $ 1,800.00 | $ - | $ 600.00 | $ 1,200.00 |
| Joan Rivers | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Joseph and the Amazing Technicolor Dreamcoat | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |

| Name | No. | Sales Price | Revenue | Duggal Costs | Paid to AHF | Profit on each work |
|---|---|---|---|---|---|---|
| Larry David & Jerry Seinfeld | 1 | $ 900.00 | $ 900.00 | $ 122.00 | $ 300.00 | $ 478.00 |
| Lori & Harley Bassman and Family | 3 | $ 900.00 | $ 2,700.00 | $ 278.00 | $ 900.00 | $ 1,522.00 |
| Martha Graham | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Merrily We Roll Along | 2 | $ 900.00 | $ 1,800.00 | $ 206.00 | $ 600.00 | $ 994.00 |
| Miracle Worker | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| My Fair Lady Puppet Strings | 1 | $ 900.00 | $ 900.00 | $ - | $ 300.00 | $ 600.00 |
| My One & Only | 1 | $ - | $ - | $ - | $ - | $ - |
| Paul Ford in Whoop-Up | 1 | $ 900.00 | $ 900.00 | $ - | $ 300.00 | $ 600.00 |
| Ricky Jay & David Mamet | 1 | $ 1,800.00 | $ 1,800.00 | $ 98.00 | $ 300.00 | $ 1,402.00 |
| Romeo & Juliet | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Roger Rees in Nicholas Nickleby | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Saturday Night Live | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Scarlet Pimpernel | 1 | $ 900.00 | $ 900.00 | $ 275.00 | $ 300.00 | $ 325.00 |
| Seinfeld Finale | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Sesame Street | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| Stephen Sondheim | 1 | $ 900.00 | $ 900.00 | $ 186.00 | $ 300.00 | $ 414.00 |
| Steven Spielberg | 1 | $ - | $ - | $ - | $ - | $ - |
| The Dick Van Dyke Show | 2 | $ 900.00 | $ 1,800.00 | $ 158.00 | $ 600.00 | $ 1,042.00 |
| What Did Santa Give Himself? | 1 | $ 900.00 | $ 900.00 | $ 98.00 | $ 300.00 | $ 502.00 |
| Winston Churchill 1945 | 1 | $ 900.00 | $ 900.00 | $ 92.00 | $ 300.00 | $ 508.00 |
| | 66 | | $ 58,800.00 | $ 8,205.70 | $ 19,200.00 | $ 31,394.30 |