USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/8/19

---

AL HIRSCHFELD FOUNDATION,

                        Plaintiff,

-v-

THE MARGO FEIDEN GALLERIES LTD. and MARGO
FEIDEN,

                        Defendants.

16 Civ. 4135 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This litigation arises from a contract between the renowned cartoonist Al Hirschfeld and the gallery licensed to represent him for much of his career. Plaintiff is the Al Hirschfeld Foundation (the "Foundation"), which succeeded to Hirschfeld's interests and obligations upon his death in 2003. Defendants are Margo Feiden and the Margo Feiden Galleries, Ltd. (singly, the "Gallery"; together with Feiden, the "Galleries"). From 2000 forward, this relationship was governed by a settlement agreement between Hirschfeld and Feiden (the "Agreement"). In 2016, the Foundation sued the Galleries, claiming violations of the Agreement.

On an earlier round of motions for summary judgment, the Court found two material breaches by the Galleries, on account of which, the Court held, the Foundation had validly terminated the Agreement. These consisted of the Galleries' (1) inability to account for 20 missing works and (2) their unauthorized sale of *giclee* prints. *See Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 296 F. Supp. 3d 627 (S.D.N.Y. 2017) ("*Hirschfeld I*"). The Court then held a bench trial on the issue of damages limited to those two breaches. The Court held that these breaches entitled the Foundation to a total of $330,981.67 in damages. *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 328 F. Supp. 3d 232 (S.D.N.Y. 2018) ("*Hirschfeld II*").

Ensuing settlement negotiations over the remaining claims proved unsuccessful. As a result, the parties have now cross-moved for summary judgment as to certain open (or allegedly open) claims. The Foundation seeks (1) a finding of liability, and a tabulation of damages, as to the Galleries' alleged conversion of an additional 12 Hirschfeld works, and (2) declaratory and injunctive relief to bar the Galleries from misrepresenting their relationship to Hirschfeld and the rights they hold post-termination. For their part, the Galleries seek (1) the return of several works possessed by the Foundation over which the Galleries claim ownership, (2) a finding of liability on the part of the Foundation on the Gallery's defamation and libel counterclaims, (3) a finding of liability on the Gallery's counterclaim for breach of contract, and (4) a finding of liability on the Gallery's counterclaim for breach of the covenant of good faith and fair dealing.

## I. Factual Background

The following background to the Hirschfeld/Feiden business relationship is relevant to all outstanding claims:

> Al Hirschfeld was a renowned cartoonist, famous for his depictions of Broadway stars and other celebrities and for his weekly cartoon in the *New York Times*. Margo Feiden began selling Hirschfeld's works on consignment in 1969. Def. 56.1 ¶ 2. That relationship was formalized in a 1974 agreement, which governed Hirschfeld's and Feiden's business relationship through the end of the century. Feiden is, and at all relevant times was, the principal and owner of the Gallery. Feiden Decl. ¶ 1.
>
> In 2000, Hirschfeld and Feiden agreed to settle a dispute, the details of which are not relevant here, and to continue doing business together. The Settlement Agreement they reached that year has since governed Hirschfeld and Feiden's relationship. In 2003, Hirschfeld died. The Al Hirschfeld Foundation succeeded to his rights and obligations under the Agreement.

*Hirschfeld I*, 296 F. Supp. 3d at 629–30.

The Court develops facts relevant to each claim in the section addressing those claims.

## II.     Procedural History of This Litigation

The history of this litigation is set out in detail in the Court's decision resolving the first round of summary judgment motions. *See id.* at 631–35. The Court reviews here only the history necessary to give context to the present motions.

### A.     The Amended Complaint

On July 26, 2016, the Foundation filed the Amended Complaint, the operative complaint today. Dkt. 42 ("AC"). The Amended Complaint brought eight claims against the Galleries: (1) copyright infringement, based on unauthorized reproductions of *giclee* prints of Hirschfeld works; (2) false affiliation under the Lanham Act, based on the Galleries' issuance of certificates of authenticity for *giclee* prints; (3) breach of contract; (4) breach of fiduciary duty for selling works that had been marked as "not for sale"; (5) replevin for the return of 28 original works to the Foundation; (6) conversion for missing original works entrusted to the Galleries; (7) negligence for failing to treat Hirschfeld works with the requisite care; and (8) a declaratory judgment that the Foundation had validly and effectively terminated the Settlement Agreement. *See id.* ¶¶ 313–83.

On August 17, 2016, the Gallery, Dkt. 54 ("Answer"), and Feiden, Dkt. 55, each answered; Feiden later amended her answer, Dkt. 89. The Gallery's Answer, which Feiden supports, contained four counterclaims: for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) defamation or trade libel; and (4) defamation *per se*. *See* Answer ¶¶ 411–67.

### B.     The First Motions for Summary Judgment

On December 21, 2017, the Court resolved certain issues raised on an initial round of cross-motions for summary judgment. *See Hirschfeld I*, 296 F. Supp. 3d at 647. The Court held that the Foundation had validly terminated the Agreement and granted declaratory relief to that

3

effect. *Id.* at 637–44. The Court also granted the Foundation summary judgment as to liability, finding that the undisputed facts established two of the Foundation's eight claims of material breach by the Galleries of the Agreement: that the Galleries (1) had made unauthorized *giclee* prints of Hirschfeld works, *id.* at 637–42, and (2) had failed to maintain custody of 20 original Hirschfeld works (the "Missing Works") and could not account for their current whereabouts, *id.* at 642–44. The Court did not reach the Foundation's other claims of material breaches. The Court also entered judgment for the Foundation on the Gallery's counterclaims for breach of contract alleging the Foundation "(1) improperly consign[ed] media commissioned works in violation of the Agreement's exclusivity provision; and (2) fail[ed] to append the required credit lines to license images." *Id.* at 644–46.

On December 5, 2017, after receiving briefing on outstanding issues, the Court ordered that the Galleries return all artwork consigned under the Agreement to the Foundation by December 17, 2017 and submit a written list of disputed drawings with supporting documentation to the Foundation by December 10, 2017. *See* Dkt. 194.

## C. The Bench Trial on Damages

On February 20, 2018, to facilitate settlement discussions, the parties waived their rights to a jury trial as to the adjudication of damages on the two claims (regarding missing artwork and the unauthorized making of *giclee* prints) on which summary judgment had been granted for the Foundation. Dkt. 200. The parties agreed that the adjudication of damages would "encompass any applicable affirmative defenses raised by the Galleries in their respective Answers, to the extent such defenses were not previously ruled on by the Court in its summary judgment decision." *Id.*

After pre-hearing briefing, the Court, on May 3, 11, and 31, 2018, received testimony on damages, and thereafter received post-hearing briefs. Dkts. 226, 227. On July 25, 2018, the

4

Court issued a decision tabulating damages. *See Hirschfeld II*, 328 F. Supp. 3d at 235–36. The Court awarded the Foundation a total of $330,981.67 in damages for 19 works in the custody of the Galleries that had gone missing[1] and for the Galleries' unauthorized making of *giclees*. Because other claims remained pending, the Court held off entering a partial judgment on these claims. *Id.* at 250–51.

### D. Ensuing Events

On July 26, 2018, the Court suspended further litigation activity, hopeful that the tabulation of damages on the above two claims would facilitate a settlement. Dkt. 235. Settlement did not, however, ensue. On October 12, 2018, the Court received a status update from the parties, Dkt. 241, and, on December 17, 2018, held a case management conference to determine the most expeditious way to resolve the remaining claims. The Court there approved a briefing schedule for cross-motions for summary judgment. Dkt. 250.

### E. The Second Round of Motions for Summary Judgment

Pursuant to that schedule, on December 28, 2018, the Foundation filed a motion for summary judgment on its claims regarding the Galleries' alleged conversion of an additional 12 Hirschfeld works, and its claims for declaratory and injunctive relief to bar the Galleries from misrepresenting their relationship to Hirschfeld and the rights they hold post-termination. Dkt. 251. In support, the Foundation filed a memorandum of law, Dkt. 252 ("Pl. Mem."), a Rule 56.1 Statement, Dkt. 256 ("Pl. 56.1"), and three declarations—from David Leopold, Dkt. 253 ("Leopold Decl."), Harry Katz, Dkt. 254 ("Katz Decl."), and Eleanor M. Lackman, Esq., Dkt. 255 ("Lackman Decl."), with attached exhibits.

---

[1] The number of Missing Works was reduced to 19 after one of the works was found at the Galleries during the Foundation's December 14, 2017 visit and returned to the Foundation. *See Hirchfeld II*, 328 F. Supp. 3d at 236 n.3.

On January 12, 2019, the Galleries filed an opposition to the Foundation's motion for summary judgment and a cross motion for summary judgment, seeking the return of several works and findings of liability on the part of the Foundation on the Gallery's counterclaims for defamation, libel, breach of contract, and breach of the covenant of good faith and fair dealing. Dkt. 258. In support, the Galleries filed a memorandum of law, Dkt. 262 ("Def. Mem."), a Rule 56.1 Counter Statement ("Def. Counter 56.1") and Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"), Dkt. 259, and three declarations—from Ronald Friedlander, Dkt. 260 ("Friedlander Decl."), Siddartha Rao, Esq., Dkt. 261 ("Rao Decl."), and Margo Feiden, Dkt. 263 ("Feiden Decl."), with attached exhibits.

On January 29, 2019, the Foundation filed a combination reply and opposition to the Galleries' cross motion, Dkt. 265 ("Pl. Reply"), a Rule 56.1 Counter Statement, Dkt. 268 ("Pl. Counter 56.1"), and further declarations from Eleanor M. Lackman, Esq., Dkt. 266 ("Lackman Reply Decl."), and David Leopold, Dkt. 267 ("Leopold Reply Decl.").

On February 6, 2019, the Galleries filed a reply, Dkt. 271 ("Def. Reply"), and further supporting declarations from Siddartha Rao, Esq., Dkt. 270 ("Rao Reply Decl."), and Margo Feiden, Dkt. 272 ("Feiden Reply Decl.").

The Court granted leave to the Foundation to file a sur-reply to address allegedly new issues raised by the Galleries' reply. The Foundation filed such sur-reply on February 21, 2019, Dkt. 278 ("Pl. Sur-Reply"), along with a declaration from David Leopold ("Leopold Sur-Reply Decl."). The Court agreed, Dkt. 280, to take under advisement a letter, Dkt. 276, from the Galleries disputing the Foundation's characterizations of issues raised in the Galleries' reply.

## III.     Applicable Law

### A.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[2]

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

---

[2] Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not grant judgment as a matter of law for one side or the other, but must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 435 (S.D.N.Y. 2016) (internal quotations omitted).

## IV.    Discussion

### A.    12 Unreturned Works

The Foundation seeks summary judgment for the Galleries' conversion of 12 Hirschfeld works—beyond those addressed in *Hirschfeld I*—that the Foundation claims were consigned to the Galleries under the Agreement but which the Galleries have failed to return. Pl. Mem. at 6. For conversion of these works, the Foundation seeks compensatory damages of $192,000. *Id.*

The Court has previously reviewed the governing contractual provisions. Under the Agreement, "all [Hirschfeld] works in the Galleries' possession other than those works owned by the Galleries are 'on consignment.'" *Hirschfeld I*, 296 F. Supp. 3d at 642 (citing Agreement ¶ 6(e)). The Court previously found the Galleries liable for their failure to account for the 20 Missing Works consigned to them under the Agreement, and held the Agreement terminated partially on this basis. *See id.* at 643. Following that termination, the Galleries were obliged to return all remaining consigned works to the Foundation, *see* Dkt. 191 at 2–3 (Nov. 29, 2017 joint letter); on December 5, 2017, the Court ordered the Galleries to return all remaining consigned works to the Foundation by December 17, 2017, Dkt. 194.

As of February 13, 2018, the parties disputed whether 15 drawings—separate and apart from the 20 Missing Works—were consigned to the Galleries. The Foundation contends that the

8

Galleries neither returned these works to the Foundation nor reported the sale of such works to the Foundation (for which sale the Foundation would be entitled to monetary compensation under the Agreement). *See* Dkt. 198 at 2–3 (Feb. 13, 2018 joint letter). The Foundation's present motion involves 12 of those drawings.[3] These, each prefaced by inventory number, are:

- #105 "Follow the Girls,"
- #AHLY 105 "Winterset, the Lively Years,"
- #AHLY 133 "Of Mice and Men,"
- #AHLY 294 "Joseph Wiseman,"
- #1986 "Don Bloomfield,"
- #2188 "The Many Faces of Bob Hope,"
- #2269 "David Dukes in M. Butterfly,"
- #2359 "Born Yesterday,"
- #2470 "Tallulah Bankhead,"
- #3114 "Kelly McGillis,"
- #3918 "Pauline Kael," and
- #3932 "Mr. President."

Pl. Mem. at 3–4.

The Galleries deny presently possessing any of these works.[4] The Galleries admit that four of these works were earlier consigned to them and that they sold these works. They admit that a fifth work was consigned to them and given away, but with, the Galleries claim, Hirschfeld's permission. Def. Mem. at 4. Of the remaining seven, the Galleries contend that three were returned in 2003 to Louise Hirschfeld (Hirschfeld's widow) and that four were never

---

[3] In the February 13, 2018 letter, the parties did not identify which 15 works remained disputed. The record does not make clear why the Foundation is not pursuing summary judgment as to the three works that it did not put at issue in the current round of summary judgment briefing.

[4] In the event the Galleries did continue to possess these works, such—independent of any breach of the Agreement—would violate the Court's Order of December 21, 2017, which ordered the Galleries to return to the Foundation all disputed works (listed by number) in the Galleries' possession. *See* Dkt. 197, at 2 (Foundation is to "maintain possession of these works and to maintain them with appropriate care pending resolution of the factual disputes over ownership.")

consigned under the Agreement. *Id.* After reviewing the standard for conversion under New York law, the Court examines the factual record as to the works in each of these categories.

### 1. Standard for Conversion

The Foundation seeks summary judgment on their conversion claim as to these 12 works. *See* Pl. Mem. at 6.[5] Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49 (2006) (citing *State of New York v. Seventh Regiment Fund*, 98 N.Y.2d 249 (2002)). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* (citations omitted).

### 2. Works Consigned and Sold

#### a. Four Works Whose Sale Is Uncontested

The Galleries do not contest that the following four works were consigned to them: No. 105 "Follow the Girls," No. 1986 "Don Bloomfield," No. 2269 "David Dukes in M. Butterfly," and No. 2359 "Born Yesterday." Def. Mem. at 4. The Galleries further admit that that they sold these works and that they did not pay the Foundation. The Galleries represent that the failure to pay the Foundation the money from these sales to which it was entitled, under the Agreement, was an inadvertent mistake. *Id.* at 4–5; *see also* Feiden Decl. ¶¶ 22–23, 28.

Regardless of the state of mind with which the Galleries acted in connection with these sales, the Galleries' admissions are sufficient to warrant entry of summary judgment on liability

---

[5] The parties earlier agreed, after the Court found the Galleries liable for breach of contract in connection with the failure to maintain custody of the 20 Missing Works, *see Hirschfeld I*, 296 F. Supp. 3d at 642, that "the Galleries' failure to account for the[se] Missing Works, as found by the Court, is an act of conversion under New York law." *Hirschfeld II*, 328 F. Supp. 3d at 236.

to the Foundation as to these four works. But the cause of action for which liability is properly entered is breach of contract: The Galleries have conceded that they sold the works at a time when the Agreement was in force, and that they neither informed the Foundation of these sales nor remitted payment to the Foundation, as contractually required. And under New York law, where a contractual remedy is available, a plaintiff may not pursue recovery in tort for conversion unless she alleges that the defendant "'engaged in tortious conduct separate and apart from [any alleged] failure to fulfill its contractual obligations.'" *Brown v. Kristal Auto Mall Corp.*, 53 N.Y.S.3d 180, 181 (2d Dep't 2017) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (alteration in original)); *see also Markov v. Spectrum Grp. Intern. Inc.*, 25 N.Y.S.3d 133, 135 (1st Dep't 2016) (affirming dismissal of claim for conversion where "the conversion claim was predicated on mere breach of contract, which is insufficient" (citation omitted)); *Barker v. Amorini*, 995 N.Y.S.2d 89, 91–92 (2d Dep't 2014) ("[T]he mere right to payment cannot be the basis for a cause of action alleging conversion since the essence of a conversion cause of action is the unauthorized dominion over the thing in question" (quotation marks and citations omitted)). Accordingly, the Court grants the Foundation summary judgment on liability as to breach of contract for the unreported sales of these four works.

As the tabulation of damages, in *Hirschfeld II*, the Court appraised the value of each of the Missing Works as of December 14, 2017, the date when the Galleries failed to return these to the Foundation, as the fact of conversion became apparent on that date when these works were not returned. 328 F. Supp. 3d at 237. In contrast, here, the Galleries have attached sales receipts for each of the four works at issue, the authenticity of which receipts is undisputed. Each work

was sold before the termination of the Agreement. Damages therefore are properly based on the

Foundation's contractual rights under the governing Agreement.[6]

In so holding, the Court rejects the Foundation's argument that because the Galleries

initially did not disclose these sales, and only belatedly admitted and came forward with proof of

them, that the Court should utilize a conversion valuation and award the Foundation damages

measured (as with the Missing Works) by their appraisal value on December 14, 2017 for

purposes of damages. *See* Pl. Mem. at 6; Pl. Reply at 28–29. Whatever the reasons are for the

Galleries' initial failure to admit earlier that it had sold these four works and to remit to the

Foundation its share of the sales prices, it is now factually undisputed that these sales occurred.

Further, notwithstanding the Galleries' belated admission of these sales, the Galleries produced

some evidence of the sales in discovery.[7] And the Foundation, for its part, concluded as of July

2016 that three of these works had been sold, as reflected in allegations contained in the July 26,

2016 Amended Complaint. AC ¶¶ 272–81 (listing "Follow the Girls," "David Dukes in M.

Butterfly," and "Born Yesterday" as having been sold). Although the Court is sensitive to the

Foundation's frustration with the Galleries' errant past statements, the Court's responsibility is to

---

[6] As to the one work, "Don Bloomfield," the facts attendant to the Galleries' breach straddle the date of termination: July 7, 2016. *See Hirschfeld I*, 296 F. Supp. 3d at 646 (noting that the Agreement terminates upon notice by Foundation to Galleries of a material breach that remains uncured for 30 days and that the Foundation had given such notice on June 7, 2016). The sales receipt for "Don Bloomfield" was completed on May 21, 2015, but the buyer appears to have completed payment of the balance due the Galleries on September 23, 2016. *See* Feiden Decl. Ex. 18 at 1. The Court holds that the Agreement still governs this sale, insofar as the sale was subject to a binding contract between the seller (the Galleries) and buyer entered into it before the termination of the Agreement.

[7] Three of the four (all but "Don Bloomfield") were designated "SOLD" on a June 21, 2016 list produced by the Galleries following the Court's entry of a preliminary injunction. *See* Lackman Decl. Ex. 2 at 2–9 ("June 21, 2016 List"). The Galleries had earlier (on December 31, 2015) provided a monthly statement to the Foundation that listed "Don Bloomfield" in a pending sales list. *See* Rao Decl. Ex. 3.

12

fix damages based on the established facts, not as punishment for defendants' previous inability or unwillingness to account for their handling of the consigned works.

For this reason, the Foundation's request that the Court, in ascertaining damages for these four sold works, use its expert Harry Katz's valuations of each's fair market value, Pl. Mem. at 6, is a non-starter. The Agreement sets the measure of the contractual recovery to which the Foundation is entitled. It entitles the Galleries to retain 50% percent of the gross sales price of consigned works, with the Foundation entitled to the rest. Agreement ¶ 4(a)(i). The Agreement does not provide for any monetary relief for the Foundation where it believes the Galleries sold a consigned work for below the work's fair market value. Katz's valuations, which range from double to six times the sales price of these three works, therefore are beside the point as to the four sold drawings. *See* Def. Mem. at 6 (citing Katz Decl. Ex. 1).[8]

According to the sales receipts, "David Dukes in M. Butterfly" sold for $6,500 on March 9, 2002; "Follow the Girls" sold for $5,199.99 in October 2010; "Born Yesterday" sold for $7,500 on August 9, 2015; and "Don Bloomfield" sold for $3,000 on September 23, 2016. As contract damages, the Galleries therefore owe the Foundation $11,100 for these four works.

> b. *"The Many Faces of Bob Hope"*

The Galleries do not dispute that No. 2188 "The Many Faces of Bob Hope" was consigned to them. The whereabouts of this work are, however, elusive. In the June 21, 2016 list that the Galleries provided to the Foundation in response to the Court's order, the Galleries represented that this drawing had been "SOLD." June 21, 2016 List at 6. The Galleries, however, have not come forward with evidence of a sale or of the sale price. Instead, in a

---

[8] In any event, there is no basis to assume that the Galleries, in selling these four works, sold materially below market value. One, in fact, "Follow the Girls," was sold at public auction. *See* Feiden Decl. Ex. 17.

declaration submitted in connection with the instant summary judgment motion, Feiden now claims to recall that, rather than selling this work, she gave it away, apparently for free, to media representatives in 1994, as a means of promoting Hirschfeld's work. In the single sentence she devotes to this work, Feiden attests that she donated this drawing with Hirschfeld's approval as a mean of publicity and promotion. *See* Feiden Decl. ¶ 27 ("In 1994, the Galleries gave the drawing 2188: *The Many Faces of Bob Hope* to a media representative with Al Hirschfeld's approval in exchange for publicity work that benefited Hirschfeld, including the wildly successful publicity for the Hirschfeld postage stamps."). Feiden's claim of authorization by Hirschfeld for this donation is pivotal. Otherwise, her unilateral donation of a consigned work would be a clear act of conversion. The Galleries have not come forward with any corroboration of Feiden's claim of a donation to an unidentified "media representative" (let alone Hirschfeld's authorization of it).

The Foundation argues the Court should not credit Feiden's new claim regarding "The Many Faces of Bob Hope." It asks that the work therefore be treated as missing, with damages assessed consistent with the methodology used in connection with the 20 Missing Works, *i.e.*, based on its fair market value as of December 14, 2017. *See* Pl. Reply at 29.

The Court agrees with the Foundation. All pertinent facts but one are undisputed: that the drawing was consigned to the Gallery, that today the drawing is missing, that there is no record of any sale of the drawing, and that the drawing's owner (the Foundation) never received any compensation for its sale. These facts entitle the Foundation to compensation for conversion, consistent with the approach the Court has taken with the other works which had been consigned to the Galleries but today are missing. The only fact with potential to change that outcome is the claim that Hirschfeld had approved Feiden's decision to give away the work as a marketing tool.

But the evidence that Hirschfield agreed to thus give away his own property comes solely from the attestation of Feiden, made some 15 years after Hirschfeld's death in 2003. Feiden's claim as to Hirschfeld's assent to this gift transaction lacks documentary or other corroboration. As such, the Galleries' evidence countering conversion is squarely precluded by New York's Dead Man Statute. Under that statute, testimony of an interested witness concerning a personal transaction between the witness and the decedent is excluded from trial. *See* N.Y. C.P.L.R. § 4519. To be sure, in general, "evidence excludable under the statute at trial may still be considered so as to defeat a summary judgment motion." *In re Estate of Lockwood*, 651 N.Y.S.2d 224, 225 (3d Dep't 1996) (citing *In re Alden's Will*, 384 N.Y.S.2d 287, 288 (4th Dep't 1976)). "Nevertheless, where, as here, the sole evidence proffered by the opposing party is the latter's oral communication with the decedent, . . . such [is] insufficient to withstand summary judgment." *Id.* (citing *Albany Savings Bank FSB v. Seventy-Nine Columbia St.*, 603 N.Y.S.2d 72, 74 (3d Dep't 1993)).

The Court therefore grants summary judgment to the Foundation as to liability for conversion with respect to "The Many Faces of Bob Hope."

The Court, however, declines to assess damages at this time. The only evidence that has been proffered as to valuation is the declaration of Harry Katz, valuing the drawing at $15,000. Katz Decl. Ex. 1 at 9. The Foundation called Katz as its valuation expert at the bench trial held to determine damages with respect to the Missing Works. The Foundation attests that Katz's valuations as to the new round of missing artwork have been informed by the Court's assessments, in *Hirschfeld II*, of his initial round of valuations. *See* 328 F. Supp. 3d at 237–42. Be that as it may, unlike in connection with the Missing Works, the Galleries have not consented to a bench trial as to damages with respect to the second round of missing Hirschfeld works.

And even if they had so consented, the Galleries would have the right, which they exercised effectively at the earlier bench trial, to cross-examine Katz as to the basis for his valuation.

Nor is summary judgment on damages appropriate. Katz's valuation cannot be taken as conclusively correct. And the Galleries have not had an opportunity to test his appraisal through a deposition or a cross-examination. The Court, therefore, while finding liability for conversion as to this drawing, reserves judgment as to damages.

### 3.    Works Consigned But Allegedly Returned

The Galleries argue that three works, although originally consigned to the Galleries, were returned to Hirschfeld's widow, Louise Hirschfeld, by the Galleries in 2003, after Hirschfeld's death. These are: No. AHLY 105 "Winterset, the Lively Years," No. AHLY 133 "Of Mice and Men," and No. AHLY 294 "Joseph Wiseman." Def. Counter 56.1 ¶ 13. The Foundation argues that the Galleries have failed to carry their burden on this necessary factual dispute—that the Galleries returned these works to Louise Hirschfeld—because the evidence proffered in support of it is unreliable. *See* Pl. Reply at 24–29.

The Court again agrees with the Foundation.   Until recently, the Galleries represented that these three consigned works remained in the Gallery's possession. On June 21, 2016, after the onset of this litigation, the Galleries produced a list of works in response to the Court's June 10, 2016 preliminary injunction. On the June 21, 2016 list, all three works are marked as "G," signifying "at the Gallery." June 21, 2016 List at 2. On July 5, 2016, the Galleries supplemented the list, in response to a June 29, 2016 Court order. Lackman Decl. Ex. 2 at 10–25 ("July 5, 2016 List"). The July 5, 2016 list did not alter the Galleries' earlier representation that these works were on its premises. On December 14, 2017, the Foundation retrieved various consigned works from the Galleries, pursuant to a Court order, but the Galleries did not then

return any of the three works or correct their earlier claim to continue to possess them. Leopold Decl. ¶ 7.

The Galleries do not dispute that they marked the three works as "at the Gallery" on the June 21, 2016 list. *See* Feiden Decl. Ex. 15 (replicating copy of the June 21, 2016 list). Nor do the Galleries contend that—until this recent round of summary judgment briefing in which the Foundation sought damages for these missing works—they had corrected that representation. The Galleries instead represent that the June 21, 2016 list was "prepared in a time crunch in order to meet court-ordered deadlines," Feiden Decl. ¶ 14, and was erroneous. The Galleries further state that Feiden "repeatedly attempted to clarify this, both in deposition, and in submissions." *Id.* ¶ 18. They do not, however, point to any specific evidence (e.g., deposition testimony) of any attempt by Feiden to retract her claim that she possessed the three Hirschfeld works.

As to the representation that the three works were long ago returned to Louise Hirschfeld, the Galleries rely solely on a list submitted by Ronald Friedlander, Def. Counter 56.1 ¶ 13, who worked at the Gallery between 1989 and 2012, Friedlander Decl. ¶ 1. Friedlander identifies a list attached to his declaration, *id.* Ex. 2 ("Consignment List"), which he contends was a list used by Louise Hirschfeld during two visits to the Gallery, Friedlander Decl. ¶¶ 5–7. The Agreement, executed in 2000 while Al Hirschfeld was still alive, provided that the Gallery would retain 500 works on consignment, and that, upon Al Hirschfeld's death, this number would drop to 250 works, chosen by Feiden. *See* Agreement ¶ 2(a)(i). Friedlander attests that Louise Hirschfeld visited the Galleries after the conclusion of the litigation in 2001 that gave rise to the Agreement, Friedlander Decl. ¶ 5, and again after Al Hirschfeld's death in 2003, *id.* ¶ 10.

The Consignment List contains a variety of notations—check marks, circles, dots, and circled letters—which, Friedlander attests, were made by Louise Hirschfeld. At the top of the list, there is a circle next to the words "MARGO RETAINS." Consignment List at 1. Each of the three works at issue both has its item number circled *and* has a check mark next to it. *See id.* at 58–59.[9] "Winterset, the Lively Years" and "Of Mice and Men" also have a circle next to the title with an "M" inside it. *See id.* at 58. "Joseph Wiseman" has "SOLD" handwritten next to its item number. *See id.* at 59. Friedlander decodes these notations as follows: Louise Hirschfeld circled the item numbers of drawings, presumably of the 500 contemplated by the Agreement, which the Gallery would retain on consignment. Friedlander Decl. ¶ 9. Louise Hirschfeld initially placed a check mark or dot next to drawings that she took during her first visit. *Id.* ¶ 8. After Hirschfeld's death, Louise Hirschfeld returned to the Gallery and marked several previously-circled item numbers with a check mark or her initials, indicating that she was retrieving the drawings. *Id.* ¶ 11. Therefore, Friedlander posits, those item numbers "that have a check mark or initials next to a circle[] indicate[] that Mrs. Hirschfeld retrieved those drawings in her second pick up of drawings and not in her first pick up of drawings." *Id.* ¶ 12. And, he further posits, the presence of a check mark next to a circle alongside the listing of each of the three drawings indicates that they were returned to Louise Hirschfeld on her second visit, after Hirschfeld's death.

The Galleries' reliance on this list as a basis to retract their earlier explicit representation that they retained the three works is deficient for multiple reasons.

---

[9] The Court notes that "Joseph Wiseman" does not have a title listed next to it, but its item number, AHLY 294, is listed without a title and contains those notations. *See* Consignment List at 59.

First, the Galleries have long had the Consignment List. The Foundation produced it in discovery and Feiden adverted to it when deposed on February 14, 2017. *See* Lackman Reply Decl. ¶ 2 & Ex. 1. Yet the Galleries at no point corrected, or attempted to correct, their representation to the Foundation, made in response to a Court order directing them to list the Hirschfeld works in their possession, that they then and there possessed these three works. At the March 3, 2018 evidentiary hearing on damages, the Court excluded Friedlander's declaration and the attached list for much the same reason—that defendants were belatedly presenting it. Hrg. Tr. at 7.

Second, Friedlander's decoding of Louise Hirschfeld's notes, when measured against the Galleries' express representation in June 2016 that the three works were present at the Galleries, is insufficient to give rise to a dispute of material fact so as to preclude summary judgment as to liability on these works. The Galleries' representation then was explicit. Indeed, on the list of Hirschfeld works annotated in June 2016, other items on that list were marked "HF" or "returned to Hirschfeld Foundation." *See generally* June 21, 2016 List. These three works were not among them. And the Galleries had the opportunity to check their work and revise the June 21, 2016 List. On the July 5, 2016 List, the Galleries corrected the June 21, 2016 List with respect to one work, stating that the June 21, 2016 List had erroneously marked it as "G," and "[i]t should have been noted as returned to Louise Hirschfeld in 2000." July 5, 2016 List at 25. Tellingly, the Galleries did not make any such correction as to the three works in question.

Third, the Galleries' basis for construing the Consignment List to mean that the three works were returned to Louise Hirschfeld is conjectural. In her declaration, Feiden, the owner and operator of the Gallery, did not attest to any independent memory of returning these three works to Louise Hirschfeld. Instead, she states, hazily, at some indeterminate point after

19

preparing the June 21, 2016 List, "we later realized" that "a handful of drawings . . . had been

returned to [the Foundation]." Feiden Decl. ¶ 17. As to the Consignment List, Feiden testified

that she did not prepare that list. *See* Lackman Reply Decl. Ex. 1.

Finally, Friedlander is not competent to authoritatively decode Louise Hirschfeld's hand

annotations. He attests generally that he "observed [Louise Hirschfeld] notate a list of drawings

available for consignment." Friedlander Decl. ¶ 7. But while he purports to assign meaning to

the various symbols used, he does not explain his basis for this meaning. He does not state, for

example, that he participated in or observed her note-taking process or checked her list, shortly

after it was made, against the Gallery's inventory of Hirschfeld drawings. And his interpretation

of Louise Hirschfeld's notations is conclusory. Friedlander claims that those works that have "a

check mark or initials next to a circle" indicate Louise Hirschfeld's retrieval of those drawings.

*Id.* ¶ 12. In fact, more than 150 of the listed drawings contain the initials "LH" followed by an

arrow pointing at the circled inventory number preceding the title of the drawing. Friedlander's

postulate is that these works were returned to Louise Hirschfeld. But the markings alongside the

three works at issue here are actually distinct from that paradigm. For these three works, there

are no initials, but only a check mark next to a circle. On the 60-page list, that notation appears

alongside only the three works at issue here and one other, No. 1899, "Dolores Gray in 42nd

Street." *See* Consignment List at 32, 58–59.[10] Friedlander does not recite a basis in personal

knowledge for treating this limited and differently-marked set of drawings as having been

handled akin to, as opposed to differently from, the 150-plus that are differently marked. And

there are other notations alongside these drawings as to which Friedlander does not opine. Both

---

[10] A handful more have a check next to a scribbled-out circle, *see, e.g.*, Consignment List at 19,
26, or an indecipherable written notation in addition to the circle and check, *see id.* at 27.

"Winterset, the Lively Years" and "Of Mice and Men," for example, have an "M" inside a circle notated to the right of their title. And, written alongside the inventory number corresponding to "Joseph Wiseman" is the handwritten notation "SOLD." This notation appears flatly incompatible with Friedlander's theory that the other handwritten notations connote the return of the consigned drawing to Louise Hirschfeld.

Had the defense conducted a pretrial deposition of Louise Hirschfeld, she might have been able to shed light on the meaning of the distinct markings alongside these three works. But the defense did not do so. In the end, Friedlander's speculation as to the meaning of 15-year-old handwritten notations made by another person is too conjectural to be received.

In the end, what carries the day is the Galleries' written and explicit admission in June 2016 in response to a Court order that the Gallery possessed these three works, coupled with the inability of Feiden or any other percipient witness to represent that these works were ever actually returned to the Foundation or its principals.

The Court accordingly grants summary judgment to the Foundation as to liability for conversion on these three works. For the same reasons as addressed above in connection with "The Many Faces of Bob Hope," however, it is premature at this stage to resolve the question of damages—the valuation as to these three missing works.

### 4.    Works Allegedly Never Consigned

The parties next dispute the claim of conversion as to four works: No. 2470 "Tallulah Bankhead," No. 3114 "Kelly McGillis," No. 3918 "Pauline Kael," and No. 3932 "Mr. President." Def. Mem. at 8. The Foundation represents that these works were consigned to the Galleries. It notes that the Galleries have represented throughout the course of this litigation that those works were consigned to it but never sold or returned. The Galleries claim in fact that they own these works outright. On its assessment of the evidence, the Court agrees with the

Foundation that as to three of these works—"Tallulah Bankhead," "Pauline Kael," and "Mr. President"—the undisputed facts indicate that these works were consigned under the Agreement and never returned. As to the fourth work, "Kelly McGillis," however, the evidence does not permit an entry of liability on summary judgment.

a.     *"Tallulah Bankhead," "Pauline Kael," and "Mr. President"*

The undisputed facts are as follows. Two of these works appeared on the June 21, 2016 List prepared by the Gallery. "Pauline Kael" was listed as "G," meaning, "at the Gallery," and "Mr. President" was listed as "SOLD." June 21, 2016 List at 9. The third work—"Tallulah Bankhead"—appeared on the July 5, 2016 list as "G. Framed," indicating that it was in a frame at the Gallery. July 5, 2016 List at 20. "Pauline Kael" then appears again on a court-ordered accounting from the Galleries from February 23, 2018, titled "Accounting of Transactions from September 6, 2016 Concerning Reproduction Rights or Consigned Works." Lackman Decl. Ex. 4 ("Feb. 23, 2018 Accounting"). The Accounting reports "Nov [2016]/Sale/$8,500 Pauline Kael Drawing #3918/Payment due." *Id.*

The parties dispute the inferences that can be drawn from these lists. The Galleries again seek to retreat from their earlier admissions, depicting, for example, the June 21, 2016 List as "a preliminary accounting of the location of drawings" that cannot be treated as accurate. Def. Mem. at 4. The Foundation notes that the lists responded to a Court order, addressed each of the works with specificity, and were never corrected until now.

As to each of the three works, the Court finds with the Foundation. The Galleries' inclusion of these works on the lists it serially prepared and submitted to the Court is fairly considered an admission by the Galleries that these Hirschfeld works had been consigned to it. To the extent that the Galleries argue that these lists also tacitly included works that the Galleries owned outright, that assertion is contradicted by the face of the documents, which explicitly

22

identify works owned outright. The June 21, 2016 List, for example, specifically labels certain items "MF" for "previously purchased by Margo Feiden." *See* June 21, 2016 List. The logical inference from this fact is that those *not* marked "MF"—and not otherwise denoted as owned by the Galleries—had *not* been purchased by Feiden and were in the Galleries' possession on consignment. This inference is bolstered by the fact that the Foundation's original Complaint discussed only consigned works—there were 265—and the Order to Show Cause issued by this Court that ordered the Galleries to account for these works was issued in the explicit context of consigned works.

The inference to this effect from the Galleries' July 5, 2016 List is even stronger. This list was created in response to a Court order directing the Galleries to account for 44 works missing from the June 21, 2016 list but which had been included in the Foundation's list of 265 allegedly consigned works. *See* Dkt. 31. The Galleries indicated even more clearly those works they considered owned by Feiden. They explicitly labeled some works "Not Consigned Under Settlement Agreement." *See* July 5, 2016 List. The inference follows that works on this list that were not designated as such were viewed by the Galleries as possessed on consignment, not ownership.

Finally, as to the Galleries' February 23, 2018 Accounting, its title states that it accounts for only "Reproduction Rights" or "Consigned Works." The works at issue in this category are not ones as to which any party claims reproduction rights had been granted. The fair inference is that the Galleries were identifying them as consigned.

These admissions by the Galleries—supported by the Foundation's representation that it lacks any evidence that it or Hirschfeld relinquished ownership of these works to the Galleries— enable the Foundation to carry its burden of showing that the Galleries possessed these three

Hirschfeld works by consignment from the Foundation. The Court considers next whether the Galleries have adduced contrary evidence to create a dispute of material fact. The Court finds that they have not.

The Galleries again rely, exclusively, on inferences they propose to draw from the "Consignment List" prepared by Louise Hirschfeld in or about 2003. Def. Counter 56.1 ¶ 14. But the List avails the Galleries even less as to these works. None of the three appear on the list. Friedlander does not opine as to what their absence might signify. He does not claim that—or to know whether—the Consignment List is the exclusive list of consigned works. (Notably, the list also goes only up to No. 3797, potentially signifying that works with higher identifying numbers were not meant to be addressed at all. These would include "Pauline Kael" and "Mr. President," Nos. 3918 and 3932, respectively.) Feiden, for her part, tellingly does not make any factual representations as to whether these works were owned or consigned. Instead, she merely cites to Friedlander's declaration. *See* Feiden Decl. ¶ 12. These submissions cannot create a dispute of material fact as to these works' consignment status.

The Galleries' final contention is limited to "Tallulah Bankhead." The Galleries claim that the Foundation mistakes one "Tallulah Bankhead" drawing for another that in fact had been sold long ago, on May 15, 1995. Feiden Decl. ¶ 19. The July 5, 2016 List identifies the work at issue as "2470/G. Framed/Tallulah B. with Tallulah Bankhead/No image available." July 5, 2016 List at 20. In her declaration, Feiden includes a statement sent to Hirschfeld from May 15, 1995 that lists "Tallulah Bankhead #2471*" under "FOR SALE OF ORIGINAL ARTWORK," with a sales price of $3,500. Feiden Decl. Ex. 16. The star after the item number indicates that the sale was "[e]xecuted before September 16, 1994." *Id.* The sale contains a handwritten

notation next to it, presumably added in connection with this litigation, that reads "[t]he Foundation has the wrong # 2470." *Id.*

To contest the Galleries' claim that the July 5, 2016 List errantly describes an already-sold document, however, the Foundation attaches a document that demonstrates the opposite. The document was produced by the Galleries, on the Galleries' letterhead, and titles itself a list of works "[a]s of September 11, 1989." Lackman Decl. Ex. 3 at 46. The list includes a line that reads "2470/Portrait of Tallulah Bankhead/to be deter." *Id.* The next line reads "2471/Tallulah in Dressing Room/to be deter." with a handwritten line and "3500" after the title, and a handwritten "paid" to the right of "to be deter." *Id.* This document strongly indicates that there were two drawings of Tallulah Bankhead with sequential item numbers, one of which (No. 2471) was indeed sold for $3,500, and the other of which (No. 2470), consistent with the Galleries' representation to the Court, was framed, unsold, and on the Galleries' premises as of July 5, 2016. In the face of the Galleries' admission to possess, on that date, a Tallulah Bankhead by Hirschfeld on consignment, the Galleries thus have not come forward with evidence giving rise to a dispute of material fact as to liability.

The Court accordingly grants summary judgment to the Foundation as to liability for conversion on these three works.

> b.     *"Kelly McGillis"*

The Foundation did not identify "Kelly McGillis" as a consigned work on either the June 21, 2016 List or the July 5, 2016 List. Nor does it appear on the February 23, 2018 Accounting. The Foundation rests its claim for summary judgment instead on (1) Leopold's declaration that it has been on the "pending sales" list since 2010 and (2) its appearance on another list produced by the Galleries. *See* Pl. 56.1 ¶ 5. Leopold's declaration that this document has appeared on a "pending sales" list is unsatisfactorily explained. Although the Foundation appears to view this

record as an admission by the Gallery of its retention pending sale of the work, a more lucid explication is needed to fortify that inference. As for the other list, it is also titled "Consignment Works List" but is different from the one relied upon by the Galleries. Lackman Decl. Ex. 3 at 2. The Foundation does not provide helpful context for this list, however, and it is unclear what use was made of it by the Galleries in its dealings with the Foundation. This list does not appear to be a comprehensive list of works consigned to the Galleries. And the manner by which it was created, and the factual basis for its list of works as consigned, is elusive. That "3114/Kelly Mcgillis In Hedda Gabler (7/10/94)" appears on this list, *id.* at 29, is not, without more, meaningful evidence of the fact of consignment. In sum, while the Court cannot rule out that the evidence, adequately explained, could establish consignment, the present record is too hazy to permit entry of summary judgment for the Foundation as to this work.

Further counseling against such relief are materials adduced by the Galleries. They attach a monthly statement sent to Louise Hirschfeld dated December 31, 2015, which lists "Kelly McGillis as Heda Gabler #3114 (Mrs. Hirschfeld-Cullman has)" under "PENDING ORIGINAL ARTWORK." Rao Decl. Ex. 3 at 2. The meaning of this notation is unclear. Absent explication by a percipient witness, the notation could be construed multiple ways, some favoring each side.[11]

Accordingly, the Court denies the Foundation's motion for summary judgment as to liability for conversion of the work "Kelly McGillis."

---

[11] On the Consignment List prepared by Louise Hirschfeld, this work's identification number— unlike those of the three works addressed above—is preceded by the notation "LH→." While the Consignment List would require explication by a percipient witness to be helpful to either side, that notation has the potential, if it were demonstrably true that similarly denoted works were returned to the Foundation, to buttress the Galleries' defense as to this work.

### B.      Use of the Hirschfeld Name

The Foundation seeks a declaratory judgment that, following the termination of the Agreement, the Galleries' only remaining rights to Hirschfeld's name are in connection with selling off the inventory of Hirschfeld works the Galleries own. The Foundation argues that the Galleries' rights in connection with such sales are the same as those of "any other person who might wish to advertise one of her Hirschfeld drawings for sale." Pl. Mem. at 7. Relatedly, the Foundation seeks permanent injunctive relief under the Lanham Act to enjoin the Galleries from using the URL "alhirschfeld.com" and the e-mail address "alhirschfeld@aol.com." *Id.* at 9–11. The Galleries oppose both forms of relief. They contend that the Agreement granted them broad post-termination rights with respect to the use of Hirschfeld's name and likeness.

The Foundation's claim for declaratory relief turns on the proper construction of the Agreement. It is undisputed that, during the Agreement's Term,[12] the Galleries[13] were entitled to "use Hirschfeld's name, likeness (including self-portraits), biographical material and to reproduce Works in connection with Feiden's promotion, advertising and marketing in further of Feiden's rights under the Settlement Agreement." Agreement ¶ 6(h)(i). As to the period after the Term, *i.e.*, after the Agreement's termination, the Agreement provides that the Galleries have the "right after the Term to use Hirschfeld's name, likeness (including self-portraits), and biographical material, and the right to reproduce those Works and/or Derivative Works in which

---

[12] The Agreement provides that its "Term" lasts initially for five years and, unless it has been validly terminated, that the Agreement then automatically renews for successive one-year periods. Agreement ¶¶ 10(a)–(b).

[13] The Agreement refers to Feiden and the Galleries collectively as "Feiden." Agreement at 1. Except where directly quoting the Agreement, the Court here uses the term "Galleries" to capture Feiden and the Gallery collectively.

Feiden has rights after the termination of the Settlement Agreement, in connection with Feiden's promotion, advertising and marketing of the sale of such Works and/or Derivative Works." *Id.*

The Foundation argues that, although the clauses governing the pre- and post-termination periods use similar language regarding the Galleries' use of Hirschfeld's name, likeness, and biographic material in connection with promotion, advertising, and marketing, the post-termination clause is significantly limited by the qualifying clause that these rights exist only as to "those Works and/or Derivative Works in which Feiden has [post-termination] rights." During the Agreement's Term, the Galleries' contractual rights were broad. It had, *inter alia*, the "exclusive right to operate a gallery in New York and New Jersey, authority to act as [the Foundation's] exclusive licensing agent, a right of first refusal on merchandise, the right to make a certain number of prints as specified in the Agreement, and even the right not to deal with certain representatives of [the Foundation]." Pl. Mem. at 7 (citing Agreement ¶¶ 2, 3, 8, 14). Those rights, however, terminated with the Agreement. Agreement ¶ 11(e) ("[A]t . . . termination . . . all rights granted to Feiden under this Settlement Agreement shall revert to Hirschfeld . . . ."). As to the post-termination period, the Agreement gives the Galleries the right to complete the sale process in connection with consigned works that, at the time of termination, were "under contract for sale." Agreement ¶ 11(e). The Agreement also gives the Galleries the right to purchase, for their own account, a limited number of works that had been consigned to them. *Id.* ¶ 9. The Agreement does not, however, otherwise confer post-termination rights upon the Galleries with respect to Hirschfeld works and derivative works.

The Foundation therefore argues that the Galleries' rights to use the Hirschfeld name, likeness, and biographical material in promotion, sales, and marketing must be understood in light of the Galleries' limited rights today in connection with Hirschfeld works and derivative

works.  *See* Pl. Reply at 32–33.  The Galleries, for their part, contend that their rights to the use of the Hirschfeld name have not changed substantially under the Agreement.

The Court holds, with the Foundation, that under the Agreement, the Galleries do not today retain any rights with respect to the use of Hirschfeld's name, likeness, or biographical material in connection with marketing, sale, or promotion other than in connection with Hirschfeld works that the Galleries own.  In the immediate aftermath of the termination, the Galleries retained rights under the Agreement for consigned works under a contract for sale on the date of termination.  But no party has claimed that there is any cause to use Hirschfeld's name, likeness, or biographical material to market works already subject to a contract for sale (and the number of such works, more than a year after termination was upheld by the Court, assuredly is *de minimis*).  As such, the Galleries' only right under the Agreement concerns Hirschfeld works that they own.  As to marketing, sales, and promotion, the Galleries therefore are limited, under the Agreement, to the use of the Hirschfeld name, likeness, and biographical material in connection with the sales of such works (and derivative works).  The Court will enter a declaratory judgment to that effect.

A separate issue is presented by the Foundation's argument that the Galleries must be enjoined under the Lanham Act from continued use of the website "alhirschfeld.com" or the email address "alhirschfeld@aol.com."  The Foundation is correct that the Agreement does not afford the Galleries any charter to use such a website and email address.  On the contrary, insofar as the Agreement has been validly terminated, the Gallery and Feiden are no longer authorized, let alone exclusive, representatives of Hirschfeld or the Foundation.  Therefore, any right to use the website and the address cannot be founded on the Agreement.

29

However, whether the Galleries' use of the URL "alhirschfeld.com" or the email address "alhirschfeld@aol.com" violates the Lanham Act presents a different question from whether the Agreement authorizes such use. And the Foundation's present claim that the Galleries' use of those addresses is unlawful differs from the Lanham Act claim pled in the Amended Complaint. The Amended Complaint did not allege that the Foundation possessed a protected trademark or copyright interest in Hirschfeld's name, as opposed to his works, so as to bar a third party from using these names. *See* AC ¶¶ 293–336. Instead, it alleged that several specific uses by the Galleries of the Hirschfeld name, especially with respect to *giclees*, suggested a false affiliation in violation of 15 U.S.C. § 1125(a)(1)(A). *See id.* ¶¶ 329–336. Consistent with that theory, it pled that the Galleries' website was then improperly holding itself out as "Al Hirschfeld's Official Website." *Id.* ¶ 330. The Foundation, however, no longer claims that the website makes that representation, which would clearly be false today. Instead, the Foundation objects to the Galleries' use, without more, of the Hirschfeld URL and the associated e-mail address, arguing that these constitute false designation of origin.

Although the Foundation's claim to this effect appears substantial, the Court declines to resolve these claims. The use of these addresses, standing alone, is not the precise conduct which the Amended Complaint pled as wrongful and as to which discovery, presumably, was focused. The Court therefore leaves unresolved the question whether use by the Galleries of the URL and/or email address is "likely to cause confusion . . . mistake, [or] dece[ption] as to the affiliation, connection, or association of" the Galleries with Hirschfeld or the Foundation, 15 U.S.C. § 1125(a)(1)(A), and declines to order injunctive relief on the Foundation's Lanham Act claims. The Court is hopeful that the parties can amicably resolve such questions and thereby obviate the need for future litigation with respect to such practices.

## C.     The Galleries' Breach of Contract Claims

The Galleries next seek summary judgment on the Gallery's counterclaim for breach of

contract, which they now style as alleging (1) breach of the Agreement's geographic exclusivity

provision and (2) failure to return artist's proofs. "[T]he Galleries bring their breach claims in

the nature of a setoff against damages already assessed in the prior hearings in this case." Def.

Mem. at 13. The Foundation argues that the Galleries failed to pursue summary judgment on

this version of its breach-of-contract claim earlier and may not do so now, and asks the Court to

exclude the Galleries' supporting evidence, which was not produced in discovery. Pl. Reply at

15. The Court previously denied the Galleries' motion for summary judgment on its breach of

contract counterclaim, and denies the Galleries' bid now to reconceive the basis of that claim.[14]

The Court accordingly grants the Foundation's motion.

The Gallery's Answer included four counterclaims: for breach of contract, breach of the

covenant of good faith and fair dealing, defamation or trade libel, and defamation *per se*. *See*

Answer ¶¶ 411–67. In the previous round of summary judgment motions, the Foundation sought

summary judgment on the Galleries' breach of contract claims also styled by Feiden as

affirmative defenses. *See Hirschfeld I*, 296 F. Supp. 3d at 644. The Galleries cross-moved for

summary judgment on the counterclaim analogues to these affirmative defenses. *See id.* The

Galleries' affirmative defenses/counterclaims were that "the Foundation ha[d] failed to perform

under the Agreement by: (1) improperly consigning media commissioned works in violation of

the Agreement's exclusivity provision; and (2) failing to append the required credit lines to

---

[14] In the hearing at which it set a schedule to rebrief summary judgment motions that the Court
had not resolved in its initial summary judgment ruling, the Court anticipated this result. It
advised defense counsel that the Galleries "had an opportunity to raise whatever breaches [were]
germane here . . . . [The Galleries] raised several. I didn't find that they carried the day. This
looks like a do-over now in which you're trying to identify other breaches that disqualify [the
Foundation] from relief." Dec. 17, 2018 Hrg. Tr. at 19.

licensed images." *Id.* Rejecting as unsubstantiated the defense's allegations, the Court held that "even if, in theory, offsetting breaches by the Foundation could undermine the Foundation's entitlement to terminate the Agreement, no such breaches by the Foundation have been established here." *Id.* The Court thus granted summary judgment to the Foundation on the breach of contract counterclaims. *See id.* at 646.

The Galleries may not now conjure new theories of breach and use these as a basis for pursuing summary judgment on their dismissed counterclaims, so as to offset the damages already assessed against them. The Galleries do not contend that these claims rely on newly-discovered evidence: to the contrary, the Galleries' breach-of-exclusivity claim is based on publicly available documents from 2011 and 2014, *see* Def. Reply at 5–7, and on an accounting that Feiden previously produced in discovery, *id.* at 8. These theories and the proof ostensibly supporting them were clearly available to the Galleries during the first round of summary judgment briefing.

The Court therefore reiterates that it has already resolved the Gallery's breach of contract counterclaim against the Galleries. The Galleries' new theories of breach are not properly before the Court and the Court therefore denies the Galleries' motion for summary judgment on them.

### D. Covenant of Good Faith and Fair Dealing

The Galleries seek summary judgment on the Gallery's counterclaim for breach of the implied covenant of good faith and fair dealing. Def. Mem. at 15. The Gallery timely brought and pursued this claim, but the Court did not resolve it on the first round of summary judgment motions.

The Galleries' theory is that, although not explicit in the Agreement, the covenant of good faith and fair dealing prevented Hirschfeld (later, the Foundation) from disadvantaging the Galleries either by (1) selling Hirschfeld works in competition with the Galleries or (2) keeping

the most desirable drawings for itself. Def. Mem. at 15; Def. Reply at 9–10. The Galleries claim that the Foundation breached this implicit prohibition by opening an online store that competed with the Galleries in 2015, before the Agreement had been terminated. Def. 56.1 ¶ 6. Further, the Galleries claim, even if the Foundation's online store did not open until after termination, the Foundation's earlier "undisclosed intention to compete directly with the Gallery" breached the implied covenant. Def. Reply at 9.

The Foundation counters that, to the extent the Galleries fault the Foundation for not enabling the Galleries to sell the most desirable drawings, such an implied prohibition cannot be squared with the Agreement's discretionary clauses. It claims that these clauses, which give the Galleries discretion to select for consignment drawings from the group of works that the Foundation "in [its] sole and absolute discretion" has chosen to offer for sale, are inconsistent with the Galleries' theory of breach of good faith and fair dealing. *See* Pl. Reply at 22 (citing Agreement ¶ 2(a)(i)). The Foundation further argues that, to the extent the Galleries' claim of improper competition overlaps with its breach of contract claim for breach of geographic exclusivity, this breach can be pursued only under contract, because an implied covenant claim "'must be premised on a different set of facts from those underlying a claim for breach of contract.'" Pl. Reply at 23 (quoting *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F. Supp. 2d 654, 664 (S.D.N.Y. 2008)). Notably, the Foundation does not, however, appear to dispute that the Agreement, while in effect, impliedly barred it from selling Hirschfeld in direct competition with the Galleries.

This counterclaim, if meritorious, could supply a potential offset to the breach of contract damages the Court has already assessed against the Galleries. The Court holds, however, that numerous material disputes of fact prevent resolution of this counterclaim in the Galleries' favor

on summary judgment. The Foundation, in fact, disputes virtually every fact underlying this counterclaim. The Foundation adduces evidence that it did not open its online store until June 2016, after serving notice of termination of the Agreement, and that it began offering drawings for sale only in December 2016. *See* Pl. Counter 56.1 ¶¶ 6, 16. Further, to the extent that the Gallery's counterclaim includes pre-termination sales in New York and New Jersey, the Foundation disputes that prints covered by the Agreement were sold on the instances cited by the Galleries. *Id.* ¶¶ 3–5. The Court additionally notes that, to the extent the Galleries theorize that the Foundation cherrypicked the most desirable drawings for its ostensibly competing sales, the Galleries have not cited evidence in support of that theory.

The Court therefore denies the Galleries' motion for summary judgment on its counterclaim for breach of the covenant of good faith and fair dealing. This claim remains open.[15]

---

[15] In what the Court understands as a separate bid to offset the existing contract damages award, the Galleries, in their moving papers on summary judgment, include three sentences seeking "offset" for two drawings that they claim belong to the Gallery but which the Foundation has kept. These are: No. 2594, "The Seven Faces of Dr. Who," and No. 40, "Critic and Artist Escape the Theater." Def. Mem. at 13; Feiden Decl. ¶¶ 45–54. The Galleries do not connect this bid for relief to any particular counterclaim. It is thus not clear on what legal basis an offset would be available. The Galleries claim in their reply that the Court embraced the concept of reducing the contract damages awarded to the Foundation to the extent of offsetting breaches, Def. Reply at 2, but the Court has never authorized pursuit of such offsets based on claims not pled.

In any event, even assuming *arguendo* that there was a foundation in the Galleries' counterclaims for this bid, entry of summary judgment for the Galleries as to these two works would be precluded by a dispute of material fact as to the Galleries' ownership. As to "The Seven Faces of Dr. Who," the only documentary evidence offered in support of such ownership is its presence on a pending sales list. *See* Rao Decl. Ex. 3. Feiden claims that its presence on this list "mean[s] not paid in full" and so "the Gallery is entitled to retain any consigned drawing that went into sales contract prior to termination," Decl. ¶¶ 52–54, and cites paragraph 11(e) of the Agreement as support for this assertion. But while paragraph 11(e)(1) does allow Feiden to retain consigned works in her possession that are "under contract for sale," paragraph 11(e)(ii) requires that she also provide "a final statement of account . . . together with a statement

34

### E. Defamation

The Galleries finally seek summary judgment on the Gallery's counterclaims for defamation and libel. There are three bases for these claims: that (1) the Foundation published a press release announcing termination of the Agreement and allegedly disparaging the Galleries; (2) Leopold reposted the press release on his Facebook page with the comment "Free at last, free at last, thank God almighty we're free at last"; and (3) Leopold told Gallery clients that the Gallery did not have an appropriate license for use of Hirschfeld drawings and threatened them for transacting with the Gallery. Def. Mem. at 16–17.

The Foundation counters that the statements in its press release were true and, in any event, were protected as pure opinion. Pl. Reply at 4–8. It further argues that the Galleries have

---

identifying those consigned Works (and their purchasers . . . ) which, pursuant to paragraph 11(e)(i), are not required to be returned." Agreement ¶ 11. Feiden does not assert that she has ever provided such a list or provide any evidence of its existence. The Galleries also have not provided an invoice or other evidence of its sale or the price owed. The Galleries, in sum, have not come forward with any proof of *ownership* of this work, and, to the extent it was possessed by the Galleries on consignment, their assertions of a contract for sale are incomplete.

As to "Critic and Artist Escape the Theater," Feiden claims that it was the first drawing she purchased from Hirschfeld but she presents no other evidence of this alleged purchase. Feiden Decl. ¶ 46–47. She notes that the work does not appear on the Consignment List. She also notes that a book depicting the drawing gives the Gallery credit via a line beneath the image reading "Drawing courtesy of the Margo Feiden Galleries." *Id.* ¶¶ 48–51; Feiden Reply Decl. Ex. 1. The Foundation disputes the meaning and significance of this credit as evidence of ownership by the Galleries. David Leopold, the Foundation's creative director, attests that this language

> indicates [only] that MFG supplied a reproduction of the image of the drawing to be used and does not indicate possession (*i.e.*, on consignment), or ownership of the drawing. Similar wording has been used in thousands of licensed reproductions by MFG—a significant number, if not a majority, of which were drawings neither owned by MFG or even in its possession.

Leopold Sur-Reply Decl. ¶ 12; *see also* Pl. Sur-Reply at 6.

Accordingly, even assuming that claims as to the misappropriation by the Foundation of these two works had been brought so as to make an offset for them potentially available, disputes of fact regarding each would preclude an award of summary judgment for the Galleries as to them.

no evidence to support either libel *per se* or special damages. *Id.* at 9–11. As to Leopold, the Foundation contends that his statements cannot be attributed to the Foundation and, in any event, would be protected as statements of opinion and would not fall into the categories of libel *per se* or special damages. *Id.* at 11–12. As to Leopold's alleged threats, the Foundation claims that his statements had a basis in fact at the time, in that the images at issue did not include a required credit line, and represents that the Foundation issued an apology once it discovered that a valid license had been procured. *Id.* at 14–15.

For the reasons that follow, the Court denies the Galleries' motion for summary judgment on the Gallery's counterclaims for defamation and trade libel.

### 1. Defamation Standard

The Gallery brought two relevant counterclaims in its Answer: for defamation/trade libel and defamation *per se*. Answer ¶¶ 453–67. In New York, "[d]efamation has long been recognized to arise from 'the making of a false statement which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Dillon v. City of New York*, 704 N.Y.S.2d 1, 37–38 (1st Dep't 1999) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)).

The elements of a defamation claim are that the defendant (1) made "a false statement, [2] published without privilege or authorization to a third party, [3] constituting fault as judged by, at a minimum, a negligence standard, and, [4] it must either cause special harm or constitute defamation per se." *Dillon*, 704 N.Y.S.2d at 38. As such, "[t]ruth provides a complete defense to defamation claims." *Id.* at 39 (citations omitted). Additionally, New York law requires of a defamation claim that "the particular words complained of shall be set forth in the complaint," N.Y. C.P.L.R. § 3016(a), and specify "'the time, manner and persons to whom the publications

were made,'" *Williams v. Buffalo Pub. Schs.*, 758 F. App'x 59, 65 (2d Cir. 2018) (quoting *Vardi v. Mut. Life Ins. Co. of N.Y.*, 523 N.Y.S.2d 95, 98 (1st Dep't 1988)). "Special damages contemplate the loss of something having economic or pecuniary value." *Liberman v. Gelstein*, 80 N.Y.2d 429, 434–35 (1992) (quotation marks and citations omitted). The four categories of defamation *per se*, as to which the court may presume damages such that they need not be proven, "consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Id.* at 435.

It is a threshold question of law "whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (citation omitted). "The court's threshold inquiry is guided not only by the meaning of the words as they would be commonly understood, but by the words considered in the context of their publication." *Id.* (citations omitted). Such context must be "tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Dillon*, 704 N.Y.S.2d at 38.

### 2. Claims Regarding Leopold's Statements

At the outset, the Court holds, the Gallery, by failing in its Answer to identify the "particular words" underlying its counterclaims regarding Leopold's Facebook post or contact with clients, have failed to "allege defamation with the specificity required under New York law." *Williams*, 758 F. App'x at 65. The Answer quotes only from the Foundation's press release. It states "[u]pon information and belief, the Foundation has made other false and defamatory statements about the Gallery to third parties." Answer ¶ 461. Under New York law,

such general assertions are legally insufficient to plead a defamation claim. The Galleries' motion for summary judgment as to these claims is, therefore, denied.

### 3. Press Release

In its Answer, the Gallery cites one sentence from the Foundation's June 7, 2016 press release as, ostensibly, defamatory: "Margo Feiden and the Margo Feiden Galleries have ceased operating in a manner consistent with the terms and spirit of the parties' agreement." Answer ¶ 454. The Galleries are limited by their pleading to founding their claim of falsity on this particular statement.

This statement is not actionable. Although misleadingly omitted by the Gallery in its Answer, the statement made by the Foundation on June 7, 2016, was more fulsome. It explained that the Foundation had announced that day the termination the agreement, on account of Feiden and the Galleries' failure to comply with its terms. In full, the press release read:

> The Al Hirschfeld Foundation (a not-for-profit organization) announced today that it is terminating the September 29, 2000 agreement between Al Hirschfeld and Margo Feiden Galleries because Margo Feiden and the Margo Feiden Galleries have ceased operating in a manner consistent with the terms and spirit of the parties' agreement.
>
> The Al Hirschfeld Foundation was established in 2004 by the will of Al Hirschfeld, who died on January 20, 2003.

Rao Decl. Ex. 8.

This statement was not defamatory because it was true. The Foundation had indeed that day notified the Galleries of its intention to terminate the Agreement. And the Court has held—in entering summary judgment for the Foundation on its contract breach claims in *Hirschfeld I*—that Feiden and the Gallery were in material breach, justifying the Foundation's decision to terminate. Because a false statement is an essential element of a defamation claim, the Galleries' defamation counterclaims must fail.

The Galleries counter that the Foundation "purported . . . to augur findings of this Court made over a year later." Def. Reply at 11. That does not rescue the defamation claim. The Foundation issued this press release based on breaches it then perceived on the basis of which it brought suit. The Court has since affirmed that the Foundation's perception of breaches by the Galleries was accurate.

The Galleries alternatively argue that the quoted sentence "denigrated the Gallery's entire business operations as having 'ceased' to be in the spirit of the Settlement Agreement." *Id.* But the sentence itself is not "reasonably susceptible" of such an interpretation. The sentence does not address the Gallery's "entire business operations," quantify the breaches, or address any specifics. Its statement that the Galleries had ceased operating consistent with the terms and spirit of the parties' agreement was in no sense inflammatory. Quite the contrary, it pithily captured, in alternative terms, the finding of a material breach that this Court made following discovery. "[C]ourts will not strain to find a defamatory interpretation where none exists." *Cohn v. Nat'l Broadcasting Co., Inc.*, 50 N.Y.2d 885, 887 (1980) (citation omitted). None exists here.

The Galleries' motion for summary judgment on the Gallery's defamation counterclaims is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court grants the Foundation's motion for summary judgment in part and denies it in part. The Court grants the Foundation's motion for summary judgment as to liability for 11 of the 12 consigned works for which summary judgment is now sought, but denies it as to the work "Kelly McGillis." Regarding damages with respect to these 11 works, the Court grants the Foundation $11,100 in damages for four works as to which

liability is for breach of contract: "David Dukes in M. Butterfly," "Follow the Girls," "Born Yesterday," and "Don Bloomfield." The Court denies summary judgment as to damages with respect to the remaining seven works, as to which liability is for conversion. The Court grants in part the Foundation's motion for a declaratory judgment with respect to the post-termination rights that the Galleries have under the Agreement but denies the Foundation's motion for injunctive relief under the Lanham Act.

The Court denies the Galleries' cross-motion for summary judgment in its entirety.

The Clerk of Court is respectfully requested to terminate the motions pending at Dkts. 251 and 258.

The Court is hopeful that the parties, with the additional guidance supplied by this decision, can now promptly resolve all outstanding issues. The Court directs the parties to meet and confer forthwith with an eye towards reaching mutually acceptable terms. In the event notice of a settlement has not been jointly filed by May 21, 2019, the Court directs the parties to submit a joint letter on that date setting out their respective views as to next steps to resolve open issues in the case, including as to the mechanism(s) by which the parties propose to resolve open damages issues.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 8, 2019
New York, New York