UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                    :
AL HIRSCHFELD FOUNDATION,                           :
                                                    :       16 Civ. 4135 (PAE)
                              Plaintiff,            :
                                                    :       OPINION & ORDER
              -v-                                   :
                                                    :
THE MARGO FEIDEN GALLERIES, LTD., and               :
MARGO FEIDEN,                                       :
                                                    :
                              Defendants.           :
                                                    :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

Plaintiff the Al Hirschfeld Foundation (the "Foundation"), successor-in-interest to renowned cartoonist Al Hirschfeld, has, since 2016, pursued claims against Margo Feiden ("Feiden") and the Margo Feiden Galleries, Ltd. (singly, the "Gallery," and together with Feiden, the "Galleries"), for breach of a settlement agreement (the "Agreement") that had governed the relationship between the Foundation and the Galleries since 2000.

This litigation has produced two rounds of summary judgment motions and opinions. In the first, the Court held that (1) the Galleries had materially breached the Agreement by failing to account for 20 missing works and by selling, without authorization, *giclée* prints; and (2) in light of these breaches, the Foundation had validly terminated the Agreement in mid-2016. *See Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 296 F. Supp. 3d 627, 643–44, 646 (S.D.N.Y. 2017) ("*Hirschfeld I*"). The Court then held a hearing to determine the damages that stemmed from these breaches, finding that the Galleries owed the Foundation $330,981.67 in damages. *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 328 F. Supp. 3d 232, 251 (S.D.N.Y. 2018) ("*Hirschfeld II*").

In the second round of summary judgment motions, the Court considered 12 additional missing works and several counterclaims from the Galleries. *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, No. 16 Civ. 4135 (PAE), 2019 WL 2022180, at *1 (S.D.N.Y. May 8, 2019) ("*Hirschfeld III*"). Relevant here, the Court held that the Galleries were liable for conversion of the seven works. These works, preceded by their inventory number, are:

- AHLY No. 105, "Winterset, the Lively Years" ("Winterset");
- AHLY No. 133, "Of Mice and Men";[1]
- AHLY No. 294, "Joseph Wiseman in the Matter of J. Robert Oppenheimer" ("Joseph Wiseman");
- No. 2188, "The Many Faces of Bob Hope";
- No. 2470, "Tallulah Bankhead";
- No. 3918, "Pauline Kael"; and
- No. 3932, "Mr. President."[2]

On October 30, 2019, the Court held a hearing limited to the damages related to the conversion of these works. It heard live testimony from two witnesses: Harry L. Katz, an expert for the Foundation;[3] and Margo Feiden, for the Galleries. For each witness, the Court received direct testimony in the form of a sworn affirmation, *see* Dkt. 301-1, Ex. 1 ("Katz Decl."); Dkt.

---

[1] The inventory number associated with "Of Mice and Men" has not been consistent. In the Foundation's summary judgment briefing, Dkt. 252 at 3, and its letter filed prior to this hearing, Dkt. 305 ("Foundation Ltr.") at 1, the inventory number is listed as AHLY 133. The Gallery's letter states that the inventory number is AHLY 244. Dkt. 303 ("Gallery Ltr.") at 1.

[2] *See Hirschfeld III*, 2019 WL 2022180, at *8 (finding the Galleries liable for conversion of "The Many Faces of Bob Hope"); *id.* at *11 (same for "Winterset," "Of Mice and Men," and "Joseph Wiseman"); *id.* at *13 (same for "Tallulah Bankhead," "Pauline Kael," and "Mr. President").

[3] Katz had testified in the damages hearing held following the first summary judgment decision. *See Hirschfeld II*, 328 F. Supp. 3d at 238 (describing his qualifications).

301-2 ("Feiden Decl."), and each was subject to live cross and redirect examination. Although the affirmations of these witnesses spanned the full seven works, the testimony at the hearing was ultimately limited to two. That was because, as explained below, on the eve of the hearing and at the hearing itself, the Galleries disclosed that they had found (1) five of the missing works and were prepared to return them to the Foundation, and (2) documentation of the Galleries' sale, following the date of termination of the Agreement, of a sixth work. This opinion sets out the Court's remedial assessments and, where appropriate, damages calculations for these seven works.[4]

## I. Returned Works

On October 23, 2019, one week before the damages hearing, the Gallery filed a letter revealing that four of the works had been "RETRIEVED": AHLY No. 133, "Of Mice and Men"; AHLY No. 294, "Joseph Wiseman"; No. 2470, "Tallulah Bankhead"; and No. 3932, "Mr. President." Gallery Ltr. at 1.[5] The Court ordered the Galleries to bring all retrieved works to the damages hearing. Dkt. 306 at 4. At the hearing, the Galleries explained that the "Tallulah Bankhead" in the courtroom was not No. 2470, but No. 2471. *See* Hearing Tr. at 21–22. The Galleries also clarified that the "Mr. President" that they were offering to the Foundation was the original, owned by Feiden personally, and not the copy designated as No. 2923. *See id.*

---

[4] For a detailed recounting of the background and procedural history of this case, see *Hirschfeld I*, 296 F. Supp. 3d at 629–35, and *Hirschfeld III*, 2019 WL 2022180, at *1–4.

[5] Given the late revelation that four works had been found and that "Pauline Kael" had been sold, *see infra* pp. 6–10, the Foundation asked the Court to adjourn the damages hearing and instead to enter partial judgment and issue sanctions, against the Galleries. *See* Foundation Ltr. at 1. The Court denied the first two requests, *see* Dkt. 306 at 4, but, at the hearing, set a briefing schedule for the Galleries' motion for sanctions, Dkt. 310. The Court will resolve that motion in a separate decision.

3

at 26–27. The locations of the No. 2470, "Tallulah Bankhead" and the No. 3932, "Mr. President" appear to remain unknown. The Galleries also brought No. 105, "Winterset," which was found after the October 23, 2019 letter. *See id.* at 23.

At the hearing, the Galleries offered these five works—AHLY No. 133, "Of Mice and Men"; AHLY No. 294, "Joseph Wiseman"; the new No. 2471, "Tallulah Bankhead"; Feiden's "Mr. President"; and No. 105, "Winterset"—as compensation for the five corresponding missing works. The Foundation accepted each, and all parties agreed that the Foundation was "fully remediated" as a result. Hearing Tr. at 27. The Court, finding that the provision of these works properly compensates the Foundation for the conversion of the five corresponding works, has no occasion to consider additional, monetary damages as to these works.

## II. "The Many Faces of Bob Hope"

The Court next turns to No. 2188, "The Many Faces of Bob Hope."

### A. Proper Measure of Damages

As the Court has explained, damages for missing Hirschfeld works consigned to the Galleries may be measured in one of two ways. Where sales were made pursuant to the Agreement, contract damages apply, pursuant to which the Foundation is to receive 50% of the profits from the sale of a work, and the Galleries maintain the other 50%. *See Hirschfeld II*, 328 F. Supp. 3d at 236–37. Where a work was unlawfully retained by the Galleries following the termination of the Agreement, or disposed of or mislaid by the Galleries so as to prevent its return to the Foundation, conversion damages apply, pursuant to which the Foundation is to receive the fair market value of the work. *See id.* For "The Many Faces of Bob Hope," the Court holds that conversion damages are appropriate.

Before the hearing, the Gallery, in its letter, stated that "The Many Faces of Bob Hope" was "LIKELY TO BE RETRIEVED." Gallery Ltr. at 1. It was not, however, retrieved by the

4

time of the hearing. At the hearing, the Galleries, through Feiden, represented that the Galleries had given away "The Many Faces of Bob Hope," *gratis*, to a press agent in exchange for his work publicizing Hirschfeld, which Feiden claimed was with Hirschfeld's consent. *See* Hearing Tr. at 28, 128–29; Feiden Decl. ¶ 55. This disposition of this drawing, according to Feiden, took place in approximately 1994. Hearing Tr. at 153. In its summary judgment decision, the Court considered this very defense: that Hirschfeld had consented to the Galleries' transfer of the drawing to the press agent. *Hirschfeld III*, 2019 WL 2022180, at *7–8. The Court held that corroboration was lacking for this claim by Feiden and, thus, that the Galleries were liable for conversion. *Id.* Feiden's claim at the hearing to the same effect remains uncorroborated.

The Court's finding that conversion damages are in order for "The Many Faces of Bob Hope" therefore is undisturbed. The Court, as a result, considers the fair market value of this work at the time and place of conversion. *Hirschfeld II*, 328 F. Supp. 3d at 237.

### B. Valuation

The Foundation and the Galleries presented divergent estimates for the fair market value of "The Many Faces of Bob Hope." Both sides agree that the drawing is an ink-on-board drawing, approximately 10 by 14 inches in size, which Hirschfeld created around the 1940s. *See* Katz Decl. ¶ 6; Hearing Tr. at 148–50. There is, however, no existing copy or other replica of this drawing, complicating the process of valuing it.

The Foundation's witness, Katz, valued "The Many Faces of Bob Hope" at $15,000. Katz Decl. ¶ 6. Although he had not seen the drawing, Katz based this valuation on an assumption that the drawing was in good condition. Hearing Tr. at 70. In his testimony, he noted that "condition is everything." *Id.* at 71. In arriving at his $15,000 valuation, Katz cited comparable drawings of celebrities that ranged from $8,250 ("The Many Faces of Danny Kaye") to $50,000 ("Bob Hope in a variety of roles"). Katz Decl. ¶ 6. All the comparable drawings

5

were larger than the drawing at issue. Hearing Tr. at 78. Katz discounted the instant Bob Hope drawing as compared to the $50,000 "Bob Hope in a variety of roles" work because the drawing in question is smaller and because he had not seen it. Hearing Tr. at 77.

Feiden, on the other hand, valued "The Many Faces of Bob Hope" at $3,500. Feiden Decl. ¶ 55. She was the only witness who had seen the drawing. She described the composition as various renditions of Hope's face, looking in different directions. Hearing Tr. at 150. Feiden based her valuation on the size and condition of the drawing. *See id.* at 154–55. As to the size, she noted that it was "the smallest drawing that [she had] ever sold" and smaller than Hirschfeld's normal drawing size. *Id.* at 154. As to condition, Feiden noted that the drawing was unfinished, "not polished," Feiden Decl. ¶ 55, and "in terrible condition," Hearing Tr. at 155. She described the drawing as "yellowed" and "damaged due to oxidation." Feiden Decl. ¶ 55. She also noted that the drawing was on thin cardboard that was "prone to cracking," because it was created before Hirschfeld transitioned to using more durable archival board. *See* Feiden Decl. ¶¶ 19–22, 55. When Feiden saw the cardboard used for "The Many Faces of Bob Hope," she observed that "all the corners were falling off" and "[t]he drawing was in great distress." Hearing Tr. at 134–35. She stated that in approximately 1994, around the time the drawing was transferred to the press agent, the drawing "was already falling apart," and she framed it "in order to keep the pieces from just going out on the floor." *Id.* at 154.

The Court holds that the proper valuation for "The Many Faces of Bob Hope" is $5,000. This valuation falls well on the lower end of the valuations the Court has assigned to missing Hirschfeld works. A lower valuation is warranted because of the condition and size of the work. In so holding, the Court credits Feiden's description of the drawing. Having seen the drawing several times, Feiden alone has personal knowledge of it. The Court found her description of its

physical characteristics and condition detailed and generally believable. This account undermines a premise underlying Katz's valuation—that the drawing was in good condition. This warrants a substantial discount from Katz's valuation, which presupposed that the work was more closely akin, including in condition, to the comparable works he cited. A higher valuation than Feiden's $3,500 is needed, however, to reflect the work's subject: the popular comedian Bob Hope. As reflected in the Court's previous decision valuing missing Hirschfeld works, works that depicted "A-list" figures like Hope tended to fetch higher prices than others. *See Hirschfeld II*, 328 F. Supp. 3d at 240. When Hope's celebrity is considered alongside the small size of the drawing, its unfinished nature, and its poor condition, the Court finds that the Galleries are liable for **$5,000** in damages for the conversion of "The Many Faces of Bob Hope."

## III. "Pauline Kael"

The Court turns to the final work missing work, No. 3918, "Pauline Kael."

### A. Proper Measure of Damages

In its pre-hearing letter, the Gallery represented that it had recently determined that it had, in fact, sold "Pauline Kael," in November 2016. Gallery Ltr. at 1.[6] The Galleries argued that this sale had not been prohibited by the Court's initial preliminary injunction, entered on June 10, 2016. *See* Hearing Tr. at 14–15. The preliminary injunction prohibited the "selling . . . of any of Hirschfeld's works in Defendants' possession, . . . except insofar as such activity is permitted in the Settlement Agreement." Dkt. 18 at 2. On March 8, 2017, after the Galleries sold at least one work without approval of the Foundation, the Court revised the preliminary injunction to require prior written approval by the Foundation before the Galleries could make *any* sales of consigned works. Dkt. 132 at 2–3. The Galleries argue that because "Pauline Kael"

---

[6] Issues about when this sale was first disclosed to the Foundation will be taken up in the Court's decision resolving the Foundation's motion for sanctions.

had been sold before this revision of the preliminary injunction, it should be liable to the Foundation only for contract damages—meaning that the Foundation is entitled to 50% of the sale profits—and not conversion damages. *See* Hearing Tr. at 14–15.

The Court is unpersuaded. Although the "Pauline Kael" sale occurred before the preliminary injunction was revised to prohibit such sales, the sale took place after the Agreement had been terminated. The Foundation issued its notice of termination of the Agreement on June 6, 2016. *See* Dkt. 156-3 at 1. According to the Agreement, the Galleries then had 30 days to cure their material breaches of the Agreement, or the Agreement would terminate in 90 days. *See id.* at 1–2; *see also* Dkt. 42-1 ("Agreement") ¶ 11(a), (b)(1). Because the Galleries did not cure such breaches, the termination took effect on September 6, 2016. *See Hirschfeld I*, 296 F. Supp. 3d at 633. Although the validity of the termination had not been briefed before or resolved by this Court as of November 2016, when the Gallery sold "Pauline Kael," the Court, in its first summary judgment decision, later determined that the Foundation had properly terminated the Agreement based on multiple material breaches by the Galleries, including the widespread conversion of (and inability to account for) consigned Hirschfeld works, and the unauthorized sale of *giclée* prints. *See id.* at 646.

The evidence at the damages hearing conclusively determined that the sale of "Pauline Kael" occurred after September 6, 2016. This evidence consisted of documentation which the Galleries claimed recently to have found regarding this sale. The documentation included an email exchange between Feiden and the buyer, in which—in emails dated October 31, November 1, and November 4, 2016—they discussed a potential sale of "Pauline Kael." *See* Court Ex. A at

4–6.[7]  This email exchange was accompanied by a FedEx shipping confirmation notification that "Pauline Kael" was scheduled to ship on November 8, 2016, with delivery on November 9, 2016. *Id.* at 1. The confirmation was followed by a November 10, 2016 email from the buyer, stating that the drawing was "exquisite" and "[a]stonishing." *Id.* at 4. These records conclusively proved that the sale occurred after the Agreement had been validly terminated, meaning that the Galleries did not have authority to make the sale. Therefore, the Court's prior holding that the Galleries were liable for conversion of this work stands, *Hirschfeld III*, 2019 WL 2022180, at *11–13, making conversion damages appropriate. Simply put, a sale in November 2016 was not and could not have been made pursuant to the Agreement.

At the hearing, the Galleries suggested that the sale may have been pending before the Agreement's September 6, 2016 effective termination date. *See* Hearing Tr. at 17; *see also* Agreement ¶ 11(e) ("Following any such written notice, and up to the Termination Effective Date, Feiden may continue to exercise Feiden's rights hereunder."). But the only documentary evidence to which the Galleries pointed was Feiden's statement in her November 1, 2016 email to the buyer: "As you may remember, the price is $8,500." Court Ex. A at 5; *see also* Hearing Tr. at 33–34. In testimony, Feiden stated, to the same effect, that her talks with the buyer concerning the sale of the Pauline Kael and another Hirschfeld drawing had begun in summer 2016. *See* Hearing Tr. at 136.

The evidence on which the Galleries rely does not establish that the sale predated the termination of the Agreement. The earliest documentation relating in any way to the sale of "Pauline Kael" is dated October 16, 2016—after the termination of the Agreement. *See* Court

---

[7] The Gallery submitted Court Exhibit A into evidence at the damages hearing. Hearing Tr. at 31. The Court, by separate order, is docketing Exhibit A.

9

Ex. A at 7 ("I keep remembering how much you admired Hirschfeld's Drawing of Pauline Kael."). And to the extent this record reflects upon earlier events, it reveals no more than the fact of a pre-sale communication between Feiden and the eventual buyer, in which Feiden sought to interest the buyer in the work. This email does not indicate, in any way, that a sale was pending. Quite the contrary, it is the ensuing (post-October 16, 2016) communications that reflect a meeting of the minds, including on the material term of price, between the Galleries and the buyer. *See* Court Ex. A at 4–6. To the extent that Feiden's testimony can be read to claim an agreement on terms before October 16, 2016, the Court rejects this claim as not credible and as refuted by the parties' written communications.[8]

### B. Valuation

Again, the parties present materially different estimates of the fair market value of the drawing. The Court addresses each in turn.

Katz, on behalf of the Foundation, valued "Pauline Kael" at $22,000. Katz Decl. ¶ 1. He initially described the drawing as "Ink, Watercolor and Gouache on board, 21 x 27 inches," and created in 2001. *Id.* He later appeared to revise this description, in his testimony, by describing it as "a pen and ink drawing with color" and explaining, when confronted with a question regarding its creation for the smaller *New Yorker* cover, that he "probably" learned of the size "through the Foundation, but it may have been [his] mistake." Hearing Tr. at 98, 100. Katz based his valuation on two main factors: the quality of the drawing and the drawing's color. *See*

---

[8] Feiden's testimony on this point was further undermined by her difficulty explaining how, shortly before the damages hearing, she had come to the realization that "Pauline Kael" had in fact been sold, as opposed to lost. Feiden's answers on this point were unconvincing and imprecise and her demeanor when testifying as to it was exasperated. *See, e.g.*, Hearing Tr. at 195–96 (stating that she "suddenly thought," two or three days before the hearing, to search her email for a particular term related to the "Pauline Kael" sale and noting that the successful search was "such an improbable thing. And boom it came up").

Hearing Tr. at 62; *see also id.* at 69 (adopting Court's characterization of these as "plus factors"). As to quality, Katz noted that Hirschfeld and Kael had been friends, giving "a luminosity and a quality" to the drawing that is "very sensitive" and "speaks to their friendship." *Id.* at 64. And he described the work as more "of a portrait rather than a caricature." *Id.* at 62. As to color, Katz stated that color, which is "unusual" in Hirschfeld's work, adds value. *See id.* at 61, 64. He noted that "quality works that are created with color as opposed to simply line art will generally realize more money." *Id.* at 61.

Katz also cited a few comparable sales as data points supporting his valuation. Three of his comparable sales, ranging from $24,000 to $28,000, were drawings of popular celebrities: Katharine Hepburn and Spencer Tracey (in "Woman of the Year"), Phil Silvers, and Paul Newman. *See* Katz Decl. ¶ 1; Hearing Tr. at 63–68. Katz acknowledged that these celebrities were bigger names than Kael, a New York film critic, but stated that that this drawing "is less about celebrity, more simply about quality." Hearing Tr. at 67. The last comparable sale Katz cited was a $20,000 "New York Times Arts and Leisure contest drawing," which he could not "remember the specifics" of, although he did note that the color and quality of "Pauline Kael" made it a more valuable drawing. *Id.* at 69–70.

Feiden, on the other hand, valued "Pauline Kael" at $8,500, reflecting the price that she sold the work following the termination of the Agreement. *See* Hearing Tr. at 142. This testimony was a change from her earlier declaration, in which she stated that "Pauline Kael" had been sold on an unspecified date for "$12,000.00, which [she] would also estimate as the fair market value of the drawing." Feiden Decl. ¶ 50. Feiden acknowledged in her testimony that the sale price, in fact, had been $8,500. *See* Hearing Tr. at 136. Feiden based her $8,500 valuation at the hearing on the sale price of $8,500, which, she acknowledged, had been the price at which

11

she had offered the drawing on her website. *See id.* ("THE COURT: So when you came up with the fair market value of this work as of November 2016 you are relying not on comparables or other factors but on the fact that that's, in fact, what you succeeded in selling it for? THE WITNESS: Correct."). She stated that she believed that there is not "any greater indication of fair market value than what a drawing is so publicly advertised for, for years." *Id.* Given an opportunity to identify comparable Hirschfeld works that had sold, Feiden was not able to do so. *See id.* at 144–48.

Considering both parties' valuations, and the evidence previously put before the Court as to the valuation of Hirschfeld works, the Court holds that the proper valuation for "Pauline Kael" is $15,000. A discount from Katz's valuation is warranted because most of Katz's comparable sales involved subjects of materially greater celebrity, including Katharine Hepburn and Paul Newman. On the other hand, Feiden's valuation is too low. It is based only on the sales price for which she advertised and sold the work. It fails to consider other factors, such as the drawing's quality and color. It also fails to consider comparable sales. Feiden herself acknowledged that "Pauline Kael" was "luminous and unique" and "as brilliant a work as Hirschfeld ever created." Hearing Tr. at 139–40, 144; *see also* Court Ex. A at 5. A higher valuation is warranted, too, because this drawing involves a subject of a degree of celebrity who was friends with Hirschfeld, and the drawing presents a rare instance of Hirschfeld working with color. The Court, therefore, finds that the Galleries are liable for **$15,000** in damages for the conversion of "Pauline Kael." This valuation is in broad accord with the valuations that the Court has previously found for Hirschfeld works, as reflected in the Court's earlier valuation decision.

**CONCLUSION**

For the reasons reviewed above, based on the evidence presented at the damages hearing and in the parties' submissions for the hearing, the Court will award damages as follows with respect to works in which summary judgment has been entered in favor of the Foundation:

- For "The Many Faces of Bob Hope": **$5,000**;
- For "Pauline Kael": **$15,000**; and
- For "Of Mice and Men," "Joseph Wiseman," "Tallulah Bankhead," "Mr. President," and "Winterset,": **$0**, because the Galleries have offered either the drawings or substitute drawings, which the Foundation has accepted as compensation.

In total, therefore, the Court awards **$20,000** in damages to the Foundation.

The Court does not direct the Clerk of the Court to enter a formal judgment at this time. The Court, in recognition that partial judgments are disfavored, will enter a judgment after all claims in this case have been resolved.

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: November 22, 2019
　　　　New York, New York